**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| Digital Retail Apps, Inc., | |
| Plaintiff, | Civil Action No.: 6:19-cv-167 |
| v. | |
| HEB Grocery Company, LP, | **Jury Trial Demanded** |
| Defendant, | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Digital Retail Apps, Inc. ("DRA"), by its undersigned attorneys, alleges claims of utility patent infringement and Texas unfair competition against Defendant HEB Grocery Company, LP ("HEB"), with knowledge of its own acts and on information and belief as to other matters, as follows:

**PARTIES**

1. DRA is a private company having offices in Toronto and formerly also in San Francisco, California. Its current principal place of business is at Wildeboer Dellelce Place, 365 Bay Street, Suite 800, Toronto, Ontario, M5H 2V1, Canada.

2. HEB is a Texas limited partnership having its principal place of business at 646 South Main Avenue, San Antonio, Texas 78204. According to the Texas Secretary of State website, no individual is identified as HEB's registered agent. Accordingly, service of process upon HEB may be effectuated upon any duly authorized officer or agent authorized to accept service at its corporate address of 646 South Flores Street, San Antonio, Texas 78204.

1

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States of America, 35 U.S.C. §§ 1 et seq.  This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental jurisdiction over the Texas law-based claim pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over HEB because: (1) it is a Texas limited partnership; (2) HEB has retail operations in this District, including the "Lakeline" H-E-B Plus! store at 14028 North US 183, Austin, Texas 78717; and (3) it has advertised, promoted, offered for use, used, made, or imported, and continues to advertise, promote, offer for use, use, make, or import infringing products at its facilities in this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1400(b), at least because HEB is incorporated in this state, has a regular and established place of business in this District, and has committed acts of patent infringement in this District.  HEB's acts of infringement in this District include but are not limited to use of the HEB Go app and supporting kiosks and back-end system(s) and server(s) ("Accused System") at HEB store locations, including but not limited to the Lakeline HEB Plus! store at 14028 North US 183, Austin, Texas 78717.

## FACTUAL ALLEGATIONS UNDERLYING ALL CLAIMS

### A.  Wendy MacKinnon

6.      Ms. Wendy MacKinnon, formerly known as Wendy MacKinnon-Keith, is an internationally known expert in industry disruption, consumer behavior, channel partnerships and strategy.  Ms. MacKinnon spent the first part of her career as a retail and consumer technology strategy consultant to Fortune 100 companies such as IBM, Ameritech, Nokia and Safeway.  In working for such companies, Ms. MacKinnon would identify early signs of industry change and

then help the organization navigate the risks and market opportunities presented by the identified burgeoning changes.

7.      By 2011, Ms. MacKinnon recognized the next disruptive event in retail sales was likely to be implementation of technologies that help to eliminate checkout lines at brick-and-mortar retail establishments.  Ms. MacKinnon then founded DRA, a retail mobile solutions company, which she hoped could create and market needed disruptive technologies.

### B.  DRA's Product And Market Development Activities

8.      DRA created an application called "SelfPay®," designed to move customers out of checkout lines and to a more contextual purchasing decision process.  Customers for DRA's product were global and national chain retailers looking to offer their customers a truly mobile shopping and payment option, direct from the aisle of their physical store.

9.      The product saves shoppers time by allowing them to skip the checkout line by using their own mobile device, for example their own smart phone, to scan in-store items, fill a shopping cart, and pay for the items in-app using a variety of supported payment methods, such as credit or debit cards, Apple Pay, PayPal, and others.  One benefit of DRA's SelfPay® product is that it brings the convenience and ease of online shopping into the spontaneous and often impulse-based in-store environment.

10.     DRA's SelfPay® product integrates with retailers' payments and point of sale (POS) systems by interfacing between the shopper's mobile device and the retailer's back end computer systems and processes.  DRA's SelfPay® product thus improves and benefits brick-and-mortar commerce.  DRA also built a partner pool that includes industry leaders in payments, POS, and retail solutions and raised more than a million dollars in funding to fuel growth of the SelfPay® software products.

11.     To sell the application product, DRA partnered with global payment companies including VISA, Synchrony Financial, and WorldPay, who showcased the SelfPay® technology at various corporate facilities.  (A copy of Ms. MacKinnon's *Curriculum Vitae* is attached as Ex. 1 and is incorporated in full herein.)

12.     DRA evangelized the technology in various articles and media events.  (A copy of a listing of selected articles and media is set forth as Ex. 2, which is incorporated in full herein.) That evangelization was somewhat facilitated by the fact that SelfPay® for retail customers and SelfPay® Staff for retailers (collectively, SelfPay®)[1] won several industry awards[2] and the products were compatible with both the iOS and Android mobile platforms for wireless devices and integrate with major credit cards and mobile wallets.

### C.  The Patents

13.     Ms. MacKinnon invented the technology embodied in the SelfPay® application and DRA filed and prosecuted to issuance a number of patents covering various aspects of the technology.  For instance, on February 25, 2014, U.S. Patent Application No. 14/189,623 was filed.  It is a continuation of and claimed priority to U.S. Patent Application No. 13/801,132 filed on March 13, 2013, which claimed priority to U.S. Provisional Patent Application No. 61/615,140 filed March 23, 2012, U.S. Provisional Patent Application No. 61/732,268 filed November 30, 2012, and U.S. Provisional Patent Application No. 61/751,653 filed January 11,

---

[1] SelfPay® is a registered trademark of Wendy MacKinnon as an individual.
[2] SelfPay® software has won Retail CIO Outlook's Top 10 Retail Mobility Solutions Providers for August 2016; Pymnts.com's Innovation Project 2016's Best POS Innovation – Finalist in March 2016 and Innovation Project; Most Innovative Company – Finalist March 2016; Rice Alliance for Technology and Entrepreneurship; Most Promising IT and web company November 2015; Women in Payments Award for Innovation September 2015; Retail Council of Canada RCC ReBoot Challenge, Finalist June 2015; CNP 2015; CNP Expo, Judges Choice Best Mobile Solution, May 2015; Innotribe's Innotribe Startup Challenge, Finalist June 2014; ACT Canada Cardware, Canadian Payments Innovation, Bronze June 2013.

2013. After examination, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 9,262,781 ("the '781 Patent"), entitled "System and Method for Facilitating Secure Self Payment Transactions of Retail Goods" on February 16, 2016. Ms. MacKinnon assigned the '781 Patent to DRA, and that Assignment can be found at Reel/Frame No. 032411/0358 of the USPTO Assignment Database.

14.     On January 5, 2016, U.S. Patent Application No. 14/988,118 was filed. It is a continuation of and claimed priority to U.S. Patent Application No. 14/189,623 filed on February 25, 2014, which is a continuation of U.S. Patent Application No. 13/801,132 filed on March 13, 2013 (now U.S. Patent No. 8,720,771), which claimed the benefit of U.S. Provisional Patent Application No. 61/615,140 filed March 23, 2012, U.S. Provisional Patent Application No. 61/732,268 filed November 30, 2012, and U.S. Provisional Patent Application No. 61/751,653 filed January 11, 2013. After examination, the USPTO issued U.S. Patent No. 9,934,506 ("the '506 Patent") entitled "System and Method for Facilitating Secure Self Payment Transactions of Retail Goods" on April 3, 2018. Ms. MacKinnon assigned the '506 Patent to DRA, and that Assignment can be found at Reel/Frame No. 045343/0936 of the USPTO Assignment Database.

15.     DRA has identified on its website that its software products are covered by the '781 Patent since at least April 2016 and the '506 Patent since at least July 2018. (Copies of both Patents are attached as Exs. 3 and 4, respectively, and are incorporated herein by this reference.) These Patents are valid, enforceable and duly assigned to DRA, who has the sole right to sue for infringement thereof.

16.     The technology embodied in these Patents was licensed under a proof of concept and royalty bearing agreement to one Canadian entity in 2013, as well as a partner contract with Visa USA Inc. in 2016 to provide software that would enable Visa to showcase the SelfPay

system to their own clients but those agreements have since terminated.  DRA has since then not been able to successfully license its technology, upon information and belief, due to industry participants, such as HEB, deciding to usurp the technology for themselves without taking available licenses to it from DRA.

17.     The '781 and '506 Patents claim specific technologic improvements over prior in-store payment systems and are directed to devices adapted to be used for in-store shopping and complimentary devices for auditing purchases on the way out of the store.  The elements and combination of elements of these Patents' claims were not well-understood, routine, or conventional to a skilled artisan in the field of in-store purchase application technology prior to Ms. MacKinnon's inventions.

18.     The '781 and '506 Patents further describe systems that improve the shopping experience for a retailer's customer and profits for itself by relying on the reality that people are now as likely to have their smartphone as their wallet during a shopping experience.  The '781 and '506 Patents thus describe systems that improve the self-payment and check-out experience for in-store purchases being made by customers.  Indeed, and in contrast to shopping on a website, customers using systems claimed in the '781 and '506 Patents may touch, inspect, and compare side-by-side merchandise before deciding to purchase, yet like shopping on a website, it is speedy, private, and requires little prying human interaction.

19.     The '781 and '506 Patents also disclose and claim systems and methods that improve the shopping experience over the use of self-checkout kiosks that bottleneck the flow of customers at check-out counters during purchasing, while at the same time improve shopping security for a store, because the patented systems avoid paper receipts, which can be falsified, duplicated, etc.  Also, importantly, though, the '781 and the '506 Patents do not preempt all

processes for and verification of payment of goods and services for use with mobile devices, even at brick-and-mortar stores. Indeed, the absence of preemption is evidenced by the sheer number of patents and patent applications cited on the face of the '781 and the '506 Patents, including U.S. Published Patent Application No. 2012/0284130 to PayPal, and also see https://patents.google.com/patent/US8720771#citedBy (showing 65 citations to U.S. Patent No. 8,720,771, from which the '781 Patent is a continuation), with all of these references being incorporated herein by this reference.

20.     The claims of the '781 and the '506 Patents are not directed to a method of organizing human activity, nor are they directed to a fundamental economic practice long prevalent in our system of commerce. Rather, the patented systems and methods overcome technical problems—how to allow a customer to speed through a retail shopping experience at his or her own pace, while reducing complexity and unnecessary and unwanted human interactions, all while improving security of the retailer against loss. Further, the claims of the '781 and '506 Patents are narrowly drawn, for example by requiring "unique tokens" for purchase verification, rather than combining known elements of prior art systems in a generic manner.

21.     In short, the technology claimed in the '781 and '506 Patents addresses a technical challenge, fulfilling the needs of customers who prefer the visual and tactile experience of in-person shopping, but also seek the speed and ease of self-checkout, while simultaneously satisfying a retailer's need for security against loss. Thus, the '781 and '506 Patents describe systems and methods that improve an in-store experience that is unfettered by queues at the registers, and thereby improve upon early kiosk-payment and paper-receipt-verification systems, with technological improvements to the relevant art.

### D. **HEB's Infringing And Unfair Conduct**

22.     On or about October 6, 2014, DRA representatives, including Ms. MacKinnon and Ms. Susan MacKay, demonstrated DRA's SelfPay® and SelfPay® "Verify" (later renamed SelfPay® "Staff") apps at a NextPoint Conference in San Diego, California.  (A copy of the conference brochure is attached as Ex. 5, and is incorporated herein by this reference.)  The Conference exhibitors, such as DRA, pay a healthy fee to participate in the Conference, while the participants, such as HEB and others, are allowed to attend for free.  In essence, the exhibitors pay for the participants, with the quid-pro-quo being that the participants will consider purchasing products from the exhibitors, not simply learn of their products and recreate them for themselves without compensating the exhibitors.

23.     Jaren Shaw, then and still Vice President of Customer Service for HEB in San Antonio, Texas (*see* https://www.linkedin.com/in/jaren-shaw-060a446/, incorporated herein by this reference), observed and discussed the DRA demonstration with Ms. MacKay, including discussing DRA's innovative approach to in-store shopping and payment pioneered by its SelfPay® apps.  Ms. MacKinnon also discussed the SelfPay® apps with William (Bill) Triplett, then Senior Vice President of Strategic Design for HEB (*see* https://www.linkedin.com/in/william-triplett-b589a618/, incorporated hereby by this reference) at the 2014 Conference.

24.     On or about October 15, 2014, in response to a follow-up email from Ms. MacKay that copied Ms. MacKinnon and referenced a potential partnership between DRA and HEB, Jaren Shaw responded that "Bill and I are getting together to discuss next steps and will get back to you shortly!"  (*See* Ex. 6, incorporated herein by this reference.)  Not much happened on the HEB front after this communication until late 2015.

25.     On or about November 11, 2015, Danny Gilbert, then a Mobile iOS Developer for HEB involved with development of the HEB Go app (*see* https://www.linkedin.com/in/danny-gilbert/, incorporated herein by this reference), reached out to DRA via a contact form on the DRA website and entered the following message: "Hey there, I was looking over this product and would love to learn more about how this is being implemented today, as well as how in depth this service can be integrated with existing Point-of-Sale systems?"  On the contact form, Mr. Gilbert provided a phone number having a 210 (San Antonio) area code and indicated "HEB Grocery" as his "Company."

26.     Mr. Gilbert was requesting a "trial box," which was offered on the DRA website in November 2015 and enabled a user to test out SelfPay® (both SelfPay® for retail customers and SelfPay® Staff for retailers) on its own.  DRA sent Mr. Gilbert the requested trial box, which consisted of a beacon (a device that indicated a shopper was present at a specific physical store location), a box of TIC TAC® candies (TIC TAC is a registered trademark of Ferrero S.p.A.), a HERSHEY'S® candy bar (HERSHEY'S is a registered trademark of Hershey Chocolate & Confectionery Corporation), an instruction sheet and a bar-code sheet.  Photographs showing these typical box contents are reproduced below.



 

27.     The trial kit was received and used by Mr. Gilbert or someone acting under his direction.  As is relevant here, to use the kit, source code for SelfPay® for retail customers and SelfPay® Staff for retailers needed to be downloaded onto two separate mobile devices.   These programs could be downloaded only after execution of a SelfPay® and SelfPay® Staff Terms of Use Agreements.  (Copies of these agreements are attached as Exs. 7 and 8, and are incorporated herein by this reference.)  These agreements prohibit the party gaining access to the programs, such as Mr. Gilbert, from using any learned information, essentially, for any purpose other than evaluating the programs for and in connection with acquiring product or rights in technology from DRA.

28.     On November 11, 2015, someone calling themselves Daniel Gilbert created an account to access the DRA software using the name "Daniel Gilbert" and the email address spydercapriani@gmail.com.  Upon information and belief, Mr. Gilbert or someone working under his direction then executed the SelfPay® and SelfPay® Staff terms of Use Agreements and then completed the needed software downloads.

29.     Also on November 11, 2015, Craig Marquis, IT Application Portfolio Manager for HEB, ordered a SelfPay® Trial Kit by using the DRA website link. The online order was received by a partner company of DRA, Two Canoes, which is based in Chicago, Illinois.  (An email string evidencing these facts is attached as Ex. 9, and it is incorporated herein by this reference.)  The trial kit was received by Mr. Marquis, and upon information and belief, he too executed the SelfPay® and SelfPay® Staff Terms of Use Agreements.

30.     A day later, on November 12, 2015, Ms. MacKay had a telephone conversation with an HEB representative, believed to be Daniel Gilbert.  The conversation led Ms. MacKay to believe that there was a chance HEB would run a pilot program with DRA as a proof of concept for the SelfPay® application and then, incredibly, and in violation of the SelfPay® and SelfPay® Staff Terms of Use Agreements, build a competing product itself.  In response to her concern, Ms. MacKay notified the HEB representative of the patented nature of SelfPay® and spent "a lot of time" discussing how prior patent workaround attempts were not effective, and therefore licensing technology from DRA was a better option.  Ms. MacKay evidenced this communication in an email to Ms. MacKinnon.  (*See* Ex. 10, incorporated herein by this reference.)  As we shall see, HEB did not heed Ms. MacKay's advice.

31.     On November 19, 2015, Daniel Gilbert made two product "purchases" on the DRA trial system using the same spydercapriani@gmail.com email address.  Upon information

and belief, Mr. Gilbert, Mr. Marquis or someone acting under their control and on HEB's behalf, used without authorization and in violation of the SelfPay® and SelfPay® Staff Terms of Use Agreements information of DRA, including proprietary information, to develop and/or in the development of the Accused System.

32.    DRA created, through its own extensive expenditure of time, labor, effort, skill, and money, the SelfPay® and SelfPay® Staff apps and created a market for such products ("Business Values").  HEB used dishonest means to learn as much as it could about the SelfPay® technology, much of which is not disclosed in the Patents, from DRA and then used that information to gain a special advantage in the market and in its business by not having been burdened by the expenses incurred by DRA to develop the technology, gaining a significant savings in research and development time and effort, and being relieved of the uncertainty and risk of being the first to put forth the effort and expenditure for a cutting-edge product and developing a market therefor.  HEB did all this by violating valid and subsisting contractual obligations owed to DRA.

## COUNT I - INFRINGEMENT OF THE '781 PATENT

33.    DRA repeats and re-alleges the allegations of the above paragraphs as if fully set forth herein.

34.    The '781 Patent includes 29 claims.  HEB directly infringes one or more of these claims without authority of DRA by making and or using products and systems, including without limitation, the Accused System, for verifying the purchase of goods and services by its consumers using a mobile device capable of communicating with one or more servers controlled by HEB.  More specifically and without limitation, HEB has been and is directly infringing,

either literally or under the doctrine of equivalents, at least Claims 1 and 12 of the '781 Patent by making, offering and using the Accused System in the United States:

| | |
|---|---|
| 1. A computer-implemented method for verifying the purchase of goods and services between a consumer and a retailer, said consumer having a mobile device capable of communicating with a server, and said retailer having an electronic device capable of communicating with the server and with the mobile device, the method comprising the following steps: | HEB provides a computer-implemented method for verifying the purchase of goods between one or more of its grocery stores and one or more customers at least through its "HEB Go" app and related server(s) and kiosks.  Moreover, HEB actively encourages its customers to install the HEB Go app on their Apple or Android smartphone.  *E.g.*, Luis de Leon, *H-E-B Launches App to Help Customers Skip the Line*, KVUE ABC at https://www.kvue.com/article/news /local/h-e-b-launches-app-to-help-customers-skip-the-line/269-614317048 (last accessed Feb. 5, 2019), and that app allows a customer to at least:<br><br>"1. Scan: Use your mobile device to scan your items as you place them in your cart or bag. The app allows you to place items into your cart as you shop or you can add and remove products before finalizing your purchase.<br><br>2. Pay: Once you are ready to pay, select the pay icon on your mobile device to finalize the order. If you have any age restricted items or coupons you must go to the H-E-B Go kiosk where one of our friendly Partners can help to finalize your transaction.<br><br>3. Go: Upon exiting the store, show your digital receipt from your mobile device to the H-E-B Go Partner. Using the H-E-B Go App is another way to shop with ease and convenience!"<br><br>The system also has other relevant functionality, and the app running on an iPhone is shown below:<br><br><br><br>Apple, *H-E-B Go on the App Store*, at https://itunes.apple.com/us/app/h-e-b-go/id1207941943?mt=8 (last accessed Feb. 5, 2019). |

| | The HEB Go app communicates with a kiosk installed at an HEB grocery store and, on information and belief, the kiosk is capable of communicating with HEB's back-end server and a customer's mobile device. |
| --- | --- |
| |    <br>(In communication with smartphone)    (In communication with server) |
| receiving a first set of data from the mobile device, said first set of data comprising identifying information for one or more goods or services to be purchased; | On information and belief, one or more HEB servers receive data from a customer's mobile device, the data being indicative of various items the customer may wish to purchase at the HEB grocery store.  For example, a HEB customer, while in the HEB grocery store and using the HEB Go app scans bar codes associated with items of interest: |



(Empty Cart)                    (Scanning a bar code)              (Item added to cart—in **red**)

Information regarding desired items is then, upon information and belief, communicated by the customer's device to the HEB kiosk(s) via the HEB server(s):



(App instructs customer to communicate with kiosk)

(Kiosk instructs customer to communicate)

(Kiosk receives information)

| receiving a second set of data from the mobile device, said second set of data identifying payment means for the consumer's purchase of said one or more goods or services; | On information and belief, one or more HEB servers receive data from a customer's mobile device, the data identifying a method of payment for the customer's purchase.  For example, a HEB customer using the HEB Go app adds a payment method (e.g., a credit card—in **blue** below) to the HEB Go app: |



Upon information and belief, the payment information is transmitted from the customer's device to the HEB server(s), and then to the HEB kiosk(s).



(App instructs customer to communicate with kiosk)    (Kiosk instructs customer to communicate)    (Kiosk receives information)

| transmitting a request for payment authorization to a payment processing system, said request for payment identifying said payment means; | On information and belief, one or more of HEB's servers transmits a request for payment authorization to a payment processing system for the payment method provided by the HEB Go app: |
|---|---|

| | |
|---|---|
| |   |
| receiving from the payment processing system a response to the request for payment authorization indicating whether or not the request for payment authorization was approved; | On information and belief, one or more of HEB's servers receives a response to the request for payment authorization from a payment processing system, the response indicating whether or not the request was approved:<br><br>  <br>(After a successful transaction) |
| creating in response to an approved request for payment authorization a data record in a database representing the consumer's completed purchase of said one or more goods or services; | On information and belief, one or more of HEB's servers creates—in response to an approved request—a data record in a database representing the consumer's completed purchase of desired goods. |



| generating in response to the completed purchase of said one or more goods or services via the identified payment means a unique token, said unique token associated with said data record; | On information and belief, one or more of HEB's servers generates and maintains in a data record - in response to a completed purchase—a unique token (i.e. a bar code annotated in **purple** below) and included on the electronic "receipt" sent to the customer's HEB Go app upon successful completion of a shopping transaction. |
|---|---|



| transmitting said unique token to the mobile device for use by the consumer to verify to the retailer the purchase of said one or more goods or services by wirelessly transmitting said unique token to a retailer electronic device; | On information and belief, one or more of HEB's servers transmits the bar code to the customer's HEB Go app and it can be accessed by the app for future use. |
| --- | --- |



| receiving from the retailer electronic device a request to verify the unique token wirelessly transmitted from the mobile device in order to confirm the consumer's purchase of said goods or services; | On information and belief, one or more HEB servers receive a request from a customer service representative, as part of a product returns process, to verify a bar code that has been wirelessly transmitted from the customer's HEB Go app to the HEB server(s). |
|---|---|



| transmitting to the retailer electronic device information indicating whether the unique token is valid; and | On information and belief, one or more HEB servers transmits to the customer service representative, as part of the returns process, information indicating whether the bar code is valid, as shown above. |
| --- | --- |
|  |  |

| | |
|---|---|
| wherein the steps of receiving the first set of data, receiving the second set of data, transmitting a request for payment authorization, creating the data record, generating said unique token, transmitting said unique token, receiving a request to verify the unique token, and transmitting information indicating whether the unique token is valid are performed by the server. | As detailed above and on information and belief, each of the steps of receiving the first set of data, receiving the second set of data, transmitting a request for payment authorization, creating a data record, generating unique tokens, transmitting the unique tokens, receiving a request to verify the unique tokens, and transmitting information indicating whether the unique tokens are valid are performed by one or more of HEB's servers. |
| 12. The method of claim 1 wherein the mobile device is equipped with location service functionality and further comprising the steps of: | A smartphone having the HEB Go app installed thereon is equipped with location service functionality:<br><br> |
| receiving from the mobile device an indication that the mobile device is located near a retailer location; and | On information and belief, one or more of HEB's servers receives from a customer's mobile device on which the HEB Go app is active an indication that the mobile device is located near a retailer location and the HEB Go app will not function in the prescribed manner unless the customer/user is located near a HEB grocery store. |



| | |
|---|---|
| transmitting to the mobile device a notification that the device is located in or near a retailer location. | On information and belief, one or more of HEB's servers transmits to the customer's mobile device a notification (annotated in **orange** below) that the mobile device is located near a retailer location. |



35.     HEB has had actual knowledge of the '781 Patent at least as early as the service of

this Complaint.  HEB has since at least then indirectly infringed the '781 Patent within the United

States by inducement under 35 U.S.C. § 271(b).  By failing to cease making and using the

Accused System at least as of the date of HEB's knowledge of the '781 Patent, HEB has

knowingly and intentionally induced users of the Accused System to directly infringe one or

more claims of the '781 Patent, inter alia, by: (1) providing instructions or information, for

example on its publicly available website, to explain how to use the Accused System in an

infringing manner, including the use of the Accused System in manners described above, which

are expressly incorporated herein; and (2) touting these infringing uses of the Accused System.

One example is HEB's App Store listing for the HEB Go, which details how to use the Accused

System, can be found at https://itunes.apple.com/us/app/h-e-b-go/id1207941943, which is

incorporated herein by this reference.

36.     HEB's acts of infringement have occurred within this District and elsewhere

throughout the United States.

37.     Based upon the facts and circumstances alleged herein, HEB's infringement of the

'781 Patent was and is being committed willfully.

38.     DRA has been damaged and will suffer additional damages and irreparable harm

unless HEB is enjoined from further infringement.

## COUNT II - INFRINGEMENT OF THE '506 PATENT

39.     DRA repeats and re-alleges the allegations of the above paragraphs as if fully set

forth herein.

40.     The '506 Patent includes 24 claims.  HEB directly infringes one or more claims of

the '506 Patent without authority by making and using products and systems, including without

28

limitation, the Accused System.  More specifically and without limitation, HEB has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claim 1 of the '506 Patent by making, offering and using the Accused System in the United States:

| | |
|---|---|
| 1. A computer-implemented method for spot-checking and verifying a consumer's in-store purchase of goods and services from a retailer prior to the consumer exiting the store, said retailer having an electronic device capable of communicating with a server and with a consumer's mobile device, the method comprising the following steps: | HEB provides a computer-implemented method for spot-checking and verifying a customer's in-store purchase of goods prior to the consumer exiting the store through the use of at least the "HEB Go" kiosk, which is capable of communicating with a customer's mobile device having installed thereon the HEB Go app and one or more HEB servers.  HEB actively encourages its customers to install the HEB Go on their Apple or Android smartphone.  *E.g.*, Luis de Leon, *H-E-B Launches App to Help Customers Skip the Line*, KVUE ABC at https://www.kvue.com/article/news/local/h-e-b-launches-app-to-help-customers-skip-the-line/269-614317048 (last accessed Feb. 5, 2019), and the HEB Go app allows a customer to:<br><br>"1. Scan: Use your mobile device to scan your items as you place them in your cart or bag. The app allows you to place items into your cart as you shop or you can add and remove products before finalizing your purchase.<br><br>2. Pay: Once you are ready to pay, select the pay icon on your mobile device to finalize the order. If you have any age restricted items or coupons you must go to the H-E-B Go kiosk where one of our friendly Partners can help to finalize your transaction.<br><br>3. Go: Upon exiting the store, show your digital receipt from your mobile device to the H-E-B Go Partner. Using the H-E-B Go App is another way to shop with ease and convenience!"<br><br>The system also has other relevant functionality, and the app, running on an iPhone, is shown below:<br><br><br><br>Apple, *H-E-B Go on the App Store*, at https://itunes.apple.com/us/app/h-e-b-go/id1207941943?mt=8 (last accessed Feb. 5, 2019). |

| | The HEB Go app communicates with a kiosk installed at an HEB grocery store.  As detailed below and on information and belief, the kiosk is capable of communicating with HEB's server and a customer's mobile device. <br><br>  (In communication with smartphone)  (In communication with server) |
|---|---|
| the retailer electronic device receiving from the consumer's mobile device prior to the consumer exiting the store a unique token that uniquely corresponds to the consumer's in-store purchase of goods and services; | The HEB Go kiosk receives, from a customer's device having installed thereon the HEB Go app, a unique order number or "token" (annotated in **red** below): |



| the retailer electronic device transmitting to the server a request to verify the consumer's in-store purchase of goods and services, said request including the unique token; | On information and belief, the HEB Go kiosk transmits to one or more HEB servers a request to verify the consumer's in-store purchase, through use of the token, annotated in red below: |
| --- | --- |



| | |
|---|---|
| the retailer device receiving from the server a response indicating whether the unique token is valid; | On information and belief, the HEB Go kiosk receives from one or more HEB servers a response indicating whether the unique order number, i.e. token, is valid, as shown above. |
| the retailer device displaying an indication of whether the unique token received from the mobile device is valid; | The HEB Go kiosk changes its display once the consumer scans the QR code of the HEB Go kiosk and the HEB Go kiosk confirms whether the order is valid. |




upon receiving an indication from the server indicating that the token is valid, the retailer device prompting a user of the retailer device for a response indicating whether the customer's in-store purchase of goods and services have been inspected and approved;

On information and belief, the HEB Go kiosk receives an indication from one or more HEB servers that the unique order number is valid, annotated in blue below:



| | |
|---|---|
| and the retailer device transmitting to the server information indicating that the customer's in-store purchase of goods and services has been inspected and approved by the user of the retailer device. | On information and belief, the HEB Go kiosk transmits to one or more HEB servers payment processing information after inspection and approval is confirmed on the kiosk. |



41.     HEB has had actual knowledge of the '506 Patent since at least as early as the service of this Complaint.  At least as early as then, HEB indirectly infringed the '506 Patent within the United States by inducement under 35 U.S.C. § 271(b).  By failing to cease making and using the Accused System at least as of the date of HEB's knowledge, HEB has knowingly and intentionally induced users of the Accused System to directly infringe one or more claims of the '506 Patent, inter alia, by: (1) providing instructions or information, for example on its publicly available website, to explain how to use the Accused System in an infringing manner, including the use of the Accused System in manners described above, which are expressly incorporated herein; and (2) touting these infringing uses of the Accused System.  One example of this inducement is HEB's App Store listing for the HEB Go app, which details how to use the Accused System.

42.     HEB's acts of infringement have occurred within this District and elsewhere throughout the United States.

43.     Based upon the facts and circumstances alleged herein, HEB's infringement of the '506 Patent was and is being committed willfully.

44.     DRA has been damaged and will suffer additional damages and irreparable harm unless HEB is enjoined from further infringement.

## COUNT III - BREACH OF CONTRACT

45.     DRA repeats and re-alleges the allegations of the above paragraphs as if fully set forth herein.

46.     The SelfPay® and SelfPay® Staff Terms of Use Agreements are valid and subsisting agreements ("Agreements").

47.     Mr. Gilbert and/or Mr. Marquis executed the Agreements by and for the benefit of HEB, meaning HEB is bound to the terms of the Agreements.

48.     HEB materially breached the Agreements, specifically including the limited

license and conduct obligations, by allowing the SelfPay® and SelfPay® Staff programs to be

accessed and/or utilized in connection with development of the Accused system.

49.     DRA has suffered commercial damage as a result of HEB's material and

continuing breach of its obligations under the Agreements.

50.     DRA is also being irreparably harmed by HEB's material breaches, for which

there is no remedy at law.

### COUNT IV - UNFAIR COMPETITION DUE TO MISAPPROPRIATION

51.     DRA repeats and re-alleges the allegations of the above paragraphs as if fully set

forth herein.

52.     Unfair competition under Texas law is the umbrella for all statutory and

nonstatutory causes of action arising out of business conduct which is contrary to honest practice

in industrial or commercial matters.  The tort requires that the plaintiff show an illegal act by the

defendant that interfered with the plaintiff's ability to conduct its business.  Although the illegal

act need not necessarily violate criminal law, it must at least be an independent tort.  Such a tort

can be misappropriation, where plaintiff must show (1) plaintiff's creation of a product through

extensive time, labor, skill and money; (2) defendant's use of that product in competition with

plaintiff, thereby gaining a special advantage in that competition, that is a "free ride" because the

defendant is burdened with little or none of the expense incurred by plaintiff; and (3) commercial

damage to plaintiff.

53.     HEB gained access to DRA's Business Values and used them, in violation of

contractual obligations owed DRA, to decide to and to create the Accused System, thus

improperly gaining a special advantage over DRA and HEB has been and is in competition with

DRA.  In other words, HEB has been and continues to free ride on DRA and its investments.

54.     As a result of HEB's misappropriation, DRA has suffered commercial damage in the nature of at least lost fees that would have flowed from providing HEB with its commercial products, etc.

55.     DRA is also being irreparably harmed by HEB's complained of conduct, as stated herein.

### **PRAYER FOR RELIEF**

WHEREFORE, DRA respectfully requests that the Court enter judgment as follows:

A.     Declaring that HEB has willfully infringed the '781 and '506 Patents;

B.     Awarding damages in an amount to be proven at trial, but in no event less than a reasonable royalty, for HEB's infringement, and all damages for breaches and misappropriation, including pre-judgment and post-judgment interest at the maximum rate permitted by law;

C.     Ordering a permanent injunction enjoining HEB, its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them from continuing to infringe the Patents-in-Suit and/or to offer or use the Accused System;

D.     Ordering an award of reasonable attorneys' fees against HEB to DRA as provided by 35 U.S.C. § 285 or other relevant law or provision;

E.     Awarding expenses, costs, and disbursements in this action against HEB, including prejudgment interest;

F.     An award of HEB's profits, DRA's actual damages, enhanced damages, exemplary damages, costs, prejudgment and post judgment interest, and reasonable attorney fees for HEB's unfair competition, misappropriation and breaches under Texas State law and/or the Province of Ontario and Canadian federal law; and

G.     Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, DRA hereby demands a trial by jury in this action of all claims so triable.

Dated:  February 20, 2019                   Respectfully submitted,

By: */s/ Jeffrey G. Toler*

Jeffrey G. Toler
Texas Bar No. 24011201
jtoler@tlgiplaw.com
Benjamin R. Johnson
Texas Bar No. 24065495
bjohnson@tlgiplaw.com
Aakash Parekh
Texas Bar No. 24059133
aparekh@tlgiplaw.com
TOLER LAW GROUP, PC
8500 Bluffstone Cove
Suite A201
Austin, TX 78759
(512) 327-5515

Todd P. Blakely (pending *pro hac* admission)
        tblakely@sheridanross.com
Robert R. Brunelli (pending *pro hac* admission)
        rbrunelli@sheridanross.com
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, CO 80202
Telephone:     303-863-9700
Facsimile       303-863-0223
litigation@sheriddanross.com

*Attorneys for Plaintiff Digital Retail Apps, Inc.*