IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| DIGITAL RETAIL APPS, INC.,<br><br>        Plaintiff,<br>v.<br><br>H-E-B, LP,<br><br>        Defendant. | Civil Action No.: 6:19-cv-00167-ADA<br><br>JUDGE ALBRIGHT<br><br>**Jury Trial Demanded** |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

Plaintiff Digital Retail Apps, Inc. ("DRA"), pursuant to the Court's Order Governing Proceedings – Patent Case (Dkt. No. 35), hereby provides its Opening Claim Construction Brief. Defendant H-E-B, LP ("H-E-B") initially identified over thirty-five (35) terms for construction, and flatly rejected DRA's request that H-E-B identify a reasonable number of terms instead. Nonetheless, after forcing DRA to consider its full list of terms, H-E-B presented substantive claim construction positions for only twelve (12) terms, with no advance notice to DRA that H-E-B had decided to narrow its list. Following a meet and confer process, a discrete number of issues remain. As set forth below, DRA's position is that the claims should be given their plain and ordinary meaning. H-E-B advances claim construction positions that either impose improper restrictions on claim terms, or are based on legally untenable indefiniteness arguments. DRA respectfully requests that the Court apply the plain and ordinary meaning of the disputed claim terms.

1

I.     TECHNICAL BACKGROUND

DRA asserts that H-E-B infringes U.S. Patent Nos. 9,262,781 ("the '781 Patent") (attached hereto as Exhibit 1) and 9,934,506 ("the '506 Patent") (attached hereto as Exhibit 2).  The '506 Patent is a continuation of the '781 Patent and they share a specification.

The two patents relate to in-store self-service transactions.  In particular, a retailer enables a consumer to use a mobile device to purchase goods or services in the retailer's store.  In the asserted claims of the '781 Patent, a server receives data from a consumer's mobile device relating to the consumer's purchase of goods or services from the retailer.  The server then communicates with a payment processing system to confirm that the transaction is approved.  On approval of the transaction, a unique token associated with the purchase is generated and transmitted to the mobile device and a retailer device.  The "token" can take various forms, including a code displayed on the user's device, such as a QR code.  *See, e.g.*, '506 Patent at 7:51-57.  The retailer device, which may be a mobile device for use in the store, or a kiosk or other stationary hardware, communicates with the server to verify the token and confirm that the transaction is valid.  *See id.* at 7:51-8:2.

The asserted claims of the '506 Patent focus on certain functions of the retailer device.  In particular, the retailer device receives a token from the consumer's mobile device and communicates with a server to verify the token and confirm that the transaction is valid.  The asserted claims further recite prompting a user of a retailer device to confirm that the consumer's purchase has been inspected and approved.

II.    ARGUMENT

DRA's position is that the disputed claim terms should be given their plain and ordinary meaning.  As discussed below, H-E-B's proposed constructions seek to inject artificial limitations into the claims.  The Court should reject H-E-B's improper attempts to impose unwarranted

limitations on the claims. H-E-B also makes indefiniteness arguments based on misinterpretations of the claims and specifications and those arguments too should be rejected.

### A. "Spot-Checking" and "Verifying"

The terms "spot-checking" and "verifying" are related and will be addressed together. The term "verifying" appears in the preambles of each asserted independent claim of the '781 Patent and in the preamble of Claim 1 of the '506 Patent. The term "spot-checking" appears only in the preamble of Claim 1 of the '506 Patent.[1] In context, the terms appear as follows:

- "A computer-implemented method for *verifying* the purchase of goods and services between a consumer and a retailer" ('781 Patent, Cl. 1 (emphasis added)).

- "A system for *verifying* the purchase of goods and services between a consumer and a retailer" (*id.*, Cl. 15 (emphasis added)).

- "A computer-implemented method for *spot-checking* and *verifying* a consumer's in-store purchase of goods and services from a retailer prior to the consumer exiting the store." ('506 Patent, Cl. 1 (emphasis added)).

Contrary to H-E-B's position, neither preamble term is limiting.

#### 1. "Spot-Checking" and "Verifying" Are Non-Limiting Preamble Terms

Claim 1 of the '506 Patent "defines a structurally complete invention in the claim body" and the terms "spot-checking" and "verifying" are used "only to state a purpose or intended use for the invention." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (internal quotations omitted). Claim 1 of the '506 Patent recites specific method steps to be performed by a retailer electronic device in connection with a transaction. Likewise, Claim 1 of

---

[1] H-E-B did not identify "spot-check" or "verify" as terms for construction and thus those terms in Claim 13 of the '506 Patent are not now before the Court.

the '781 Patent recites a specific set of receiving and transmission steps performed by a server for the purpose of "verifying."  Claim 15 of the '781 Patent similarly recites a server configured to perform specific receiving and transmitting operations.  The claimed inventions are thus described completely in the bodies of the independent claims, and the identification of "spot-checking" and "verifying" as *purposes* of the claimed inventions is not limiting.  *Arctic Cat*, 919 F.3d at 1328 (holding that preamble terms used "only to state a purpose or intended use for the invention" are not limiting); *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 771 (Fed. Cir. 2018) ("We agree with the Board that the claim terms 'game environment' and 'information delivery service' are non-limiting because they merely describe intended uses for what is otherwise a structurally complete invention."); *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236-37 (Fed. Cir. 2017) ("[I]t is apparent that the term 'mounted on a vehicle for movement along the railroad track' is meant to describe the principal intended use of the invention but not to import a structural limitation or to exclude from the reach of the claims an assembly that does not include a vehicle mount.").  Here, the intended use of the claimed inventions are verifying and/or spot-checking – those terms do not limit the otherwise structurally complete claims.  The Court should therefore decline to construe these terms at all.

        **2.**    **"Spot-Checking" Is Not Limited to a Visual Inspection of the Consumer, Receipt and Items**

To the extent the term "spot-checking" is limiting of the claimed inventions, it is not limited to a visual inspection of a consumer, receipt and purchased items as H-E-B proposes.  First, Claim 1 of the '506 Patent is directed to "*a computer-implemented method* for spot-checking" (emphasis added).  H-E-B cannot show that the claimed method is limited to a "visual" inspection if it is to be implemented on a computer.

4

Further, the specification makes clear that the "visual inspection" H-E-B refers to in its proposed construction is a known process "complement[ed]" by the claimed invention, rather than an embodiment of the invention itself:

> The verification component of the secure self-payment systems and methods described herein are used as part of retailer loss prevention initiatives. *In particular, the verification process of the secure self-payment systems and methods described herein is designed to complement a retailer's existing spot check procedures.* A spot check procedure is one in which the retailer physically or visually inspects the consumer or his or her purchase items and receipt after the transaction is conducted to ensure that the consumer is not engaging in theft of goods or services.

'506 Patent at 8:3-13. The language on which H-E-B relies in its effort to limit the meaning of "spot-checking" is thus explicitly distinguished and improved upon by the claimed invention.

The specification goes on to explain *how* the claimed invention complements existing spot-checking procedures. As one example, "the retailer verification application can automatically verify a consumer's transaction based on the code displayed on the consumer's mobile device." *Id.* at 8:17-20. The specification goes on to state that "[i]n addition, in certain embodiments the retailer verification application provides visual cues to the retail associate if the secure self-payment system cannot retrieve a legitimate data record corresponding to the displayed QR coded receipt as shown on the consumer's mobile device." *Id.* at 8:21-26. The '506 Patent thus explicitly discloses inspecting a "code displayed on the consumer's mobile device" as part of the improved "spot-checking" procedure claimed by the patent, and does not limit "spot-checking" to a visual inspection of a consumer, receipt *and* purchased items. H-E-B's proposed construction therefore excludes a disclosed embodiment and is strongly presumed to be incorrect. *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment.") (internal quotations omitted). If the Court determines that "spot-checking" requires construction, it should alter H-E-B's

5

proposed construction such that it includes inspection only of the token and one of the receipt or purchased items. Specifically, the Court should construe "spot-checking," if at all, as "inspecting either (1) a receipt, (2) purchased items, and/or (3) the token to verify the consumer's purchase."

### 3. "Spot-Checking/Verifying" Do Not Require a Completed Transaction

For both "spot-checking" and "verifying," H-E-B's proposed constructions assume the existence of a completed transaction. H-E-B asserts that "spot-checking" must be performed "after the purchase transaction is conducted" and that "verifying" means "confirming there is a valid purchase transaction." To the extent either term is limiting, the terms do not require the existence of a complete "purchase transaction" as implied by H-E-B's proposed constructions.

The shared specification provides for verification (which, according to H-E-B's proposed construction, includes "confirmation") of a transaction *before* it is completed. *See, e.g.*, '506 Patent at 15:6-21 ("At step 210 the consumer is given the opportunity to confirm the transaction before it is completed."), 18:37-40 ("The app may give the consumer an option to confirm the item for purchase and to either store it in an in-app virtual shopping cart with other previously entered items or to purchase the item alone."), Fig. 2 (showing the step "Transaction Data Sent to Servers for Verification" preceding "Receive Unique QR Code to Finalize Purchase"), Figs. 4A and 4B (showing the step "Consumer enters payment method or verification values" preceding "Transaction concludes"). The Patents thus explicitly contemplate using various "verification" and "confirmation" procedures to confirm a purchase *before* the transaction is complete. H-E-B's effort to premise the "spot-checking" and "verifying" terms on the pre-existence of a "purchase transaction" is thus unduly restrictive and inconsistent with the specification. The claims encompass confirmation steps *before* a purchase is consummated.

In sum, the Court should decline to construe "spot-checking" and "verifying" as they are non-limiting preamble terms. To the extent either requires construction, the Court should (a)

6

modify H-E-B's proposed construction of "spot-checking" to "inspecting either (1) a receipt, (2) purchased items, and/or (3) the token to verify the consumer's purchase," and (b) reject H-E-B's contention that "verifying" requires "a valid purchase transaction."

### B. "User of the Retailer Device"

The term "user of the retailer device" appears in Claims 1 and 13 of the '506 Patent. The claims require "the retailer device prompting a *user of the retailer device* for a response indicating whether the customer's in-store purchase of goods and services have been inspected and approved" and "the retailer device transmitting to the server information indicating that the customer's in-store purchase of goods and services has been inspected and approved by the *user of the retailer device*." '506 Patent, Cl. 1 (emphasis added); *see also id.*, Cl. 13 (same). Thus, the claims textually require that a user of a retailer device receive a prompt to indicate that a purchase has been inspected and approved.

H-E-B's proposed construction of "user of the retailer device" explicitly excludes the consumer as the "user." This is an inappropriate limitation on the meaning of the claim term, which requires no construction. In particular, the '506 Patent is explicitly directed toward a procedure for self-checkout. *See, e.g.*, '506 Patent at Abstract ("Disclosed herein are various embodiments for systems and methods for self-payment and verification of the purchase of retail goods and services."), 7:25-29 ("[T]he self-payment systems and methods described herein give the consumer control over where and when payment is performed in-store as well as control over the handling of his or her payment at every step of the purchase process."). The "retailer device" facilitates self-checkout and thus can be used by either the consumer *or* retail personnel to confirm the consumer's purchase. Requiring involvement by retailer personnel in a self-checkout process would be inconsistent with the embodiments disclosed in the specification is presumed incorrect. *Nobel Biocare Servs.*, 903 F.3d at 1381.

The Court should reject H-E-B's invitation to narrow the claimed invention through adoption of its proposed construction and instead apply the plain and ordinary meaning of the term "user of the retailer device," which encompasses any individual, entity or device that "uses" the retailer device. Should the Court determine that this term requires construction, the Court should modify H-E-B's proposed construction to "retail personnel, consumer, or other individual, entity or device using the retailer device."

### C. "In-Store Purchase"

The term "in-store purchase" appears in the asserted claims of the '506 Patent only. H-E-B's proposed construction is "transaction where the consumer provides payment in exchange for goods or services while the consumer is physically in the store; not a return." DRA agrees that an "in-store purchase" is "not a return," but proposes that the term otherwise be given its plain and ordinary meaning. H-E-B has not shown, and cannot show, that any specialized construction is necessary beyond excluding returns.

Despite DRA's agreement on the "returns" issue, H-E-B's counsel has cryptically stated that DRA's position on "in-store purchase" "doesn't resolve the issue as far as H-E-B is concerned, so the parties will just have to go ahead and brief the dispute about returns." Ex. 3, 10/30/2019 email from Mr. Reid to Mr. Holohan. Given this statement by counsel, DRA anticipates that H-E-B may belatedly seek to argue that the claims of the *'781 Patent* do not encompass returns. As H-E-B has not identified any terms from the '781 Patent implicating returns or advanced any claim construction positions that would exclude returns from the '781 Patent, any such effort would be untimely, prejudicial, and plainly improper. Thus, the Court should reject any such arguments H-E-B may raise out of hand. *See, e.g.*, *Seven Networks, LLC v. Google LLC*, No. 2:17-CV-00442-JRG, 2018 WL 4501952, at *3 (E.D. Tex. July 11, 2018) (striking belatedly raised claim construction positions).

Because the parties agree that an "in-store purchase" is not a return and H-E-B cannot show that the remainder of its proposed construction is necessary, the Court should apply the plain and ordinary meaning of "in-store purchase," with the understanding that the plain and ordinary meaning does not include returns.

### D. "First Communication Module"

The term "first communication module" appears in independent Claim 13 of the '506 Patent. The parties' dispute over this term centers on whether the term is a means-plus-function term. DRA asserts that the term should be given its plain and ordinary meaning, whereas H-E-B asserts that the term is a means-plus-function term with no corresponding structure. H-E-B is incorrect.

The lack of means-plus-function language creates a presumption that the term is not a means-plus-function term. *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018). In order to overcome this presumption, H-E-B will need to demonstrate that "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (internal quotations omitted). But the term "communication module" is a definite structure in the context of the '506 Patent, because the specification makes clear that the term "module" refers to software and thus "communication module" recites software related to communication. *See, e.g.*, '506 Patent at 8:45-50, 14:31-37, 41:7-18, 52:42-59, 53:32-41, 56:49-54. The modified term "communication module" is thus not a means-plus-function term. *See Free Stream Media Corp. v. Alphonso Inc.*, No. 2:15-CV-1725-RWS, 2017 WL 1165578, at *24 (E.D. Tex. Mar. 29, 2017) (holding that "a modifier added to a nonce term (e.g., module, element, device) can prevent the term from being construed as a means-plus-function element because the modifier 'further narrows the scope of those structures covered by the claim and makes the term more definite.'") (quoting *Personalized Media Commc'ns, LLC v.*

9

*Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998)); *see also St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *13 (E.D. Tex. Sept. 19, 2016) (holding that the term "transaction processing module" was not a means-plus-function term). There is thus no basis to treat this term as a means-plus-function term, and the plain and ordinary meaning should apply instead.

Further, if the Court determines that this term is a means-plus-function term, H-E-B is incorrect that there is no corresponding structure disclosed in the specification. The specification makes clear that the functions identified by H-E-B are performed by "the service provider's web API." As the specification explains,

> Through the use of the retailer verification app or compatible hardware or software running the service provider's web API such as a POS system, the retailer captures the QR code that is displayed on the consumer's device. Once the retailer's device captures the QR code, it sends a request to the service provider web API to determine whether the QR code is valid.

'506 Patent at 26:43-49 (emphasis added). Thus, the step of "transmitting a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token" function is performed via the service provider's web API.

The specification then explains that "[i]f the link embedded in the QR code points to a service provider database entry representing a valid purchase, *the web API* interprets the QR code as referring to a valid purchase receipt (i.e., having a 'match') and may further return the associated purchase information retrieved from the data record in the service provider database." *Id.* at 26:49-55 (emphasis added). In other words, functions of "receiving a response from the server indicating whether the unique token is valid" and "receiving from the server purchase information associated with the unique token" are performed via the service provider's web API in the context of analyzing the QR code. *See also id.* at 25:60-61 (referring to a "module" within a "web API"). Thus, H-E-B cannot show that there is no corresponding structure, and the term is not indefinite to the extent it

10

is found to be a means-plus-function term. *See, e.g.*, *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (holding that to satisfy the disclosure requirement, "the patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function").

The Court should apply the plain and ordinary meaning of the term "first communication module." Should the Court determine that the term is a means-plus-function term, it should reject H-E-B's indefiniteness argument because a structure that performs the function corresponding to H-E-B's proposed functions is disclosed in the specification.

E. **"Wirelessly Transmitting Said Unique Token"**

The term "wirelessly transmitting said unique token to a retailer electronic device" appears in the asserted independent claims of the '781 Patent. H-E-B's proposed construction of this term seeks to add the express exclusion "not a retailer electronic device scanning or reading the unique token from the consumer's mobile device." But there is no basis for this restriction of claim scope, which would exclude a disclosed embodiment of the '781 Patent.

The full context of the claim term is as follows: "transmitting said unique token to the mobile device for use by the consumer to verify to the retailer the purchase of said one or more goods or services by wirelessly transmitting said unique token to a retailer electronic device." '781 Patent, Cl. 1. Thus, as specifically claimed, the mobile device receives a generated token which is transmitted to the retailer electronic device to verify the consumer's purchase. The specification explains that, in a preferred embodiment, this process takes the form of the mobile device receiving a QR code that is then scanned by the retailer device:

> According to the systems and methods described herein, upon payment of goods or services, the service provider provides the consumer with a token or code that can be provided to the retailer to verify the purchase of such goods or services. In the preferred embodiment, the verification portion of the payment process uses a QR-coded digital receipt to be displayed on the consumer's mobile device. *This QR-*

> *coded digital receipt is scanned for verification by the retailer through the use of a companion verification application residing on the retailer's electronic device.*

'781 Patent at 7:36-45 (emphasis added). H-E-B's proposed construction would exclude this preferred embodiment, which is strongly presumed to be incorrect. *Nobel Biocare Servs.*, 903 F.3d at 1381. The Court should simply apply the plain and ordinary meaning of this term, which encompasses "a retailer electronic device scanning or reading the unique token from the consumer's mobile device" as described in the specification. In particular, the Court should reject H-E-B's contention that this term is "not a retailer electronic device scanning or reading the unique token from the consumer's mobile device."

### F. Alleged "Printed Matter" Terms

H-E-B appears to take the position that the terms "list of goods and services," "list of goods and services purchased," "time and place of the purchase," and "identity of the consumer who made the purchase," which all appear in certain claims of the '506 Patent, are indefinite under the principle that "[c]laim limitations directed to printed matter are not entitled to patentable weight unless the printed matter is functionally related to the substrate on which the printed matter is applied." *Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1031 (Fed. Cir. 2018). H-E-B's position is untenable and nonsensical. Each of these limitations is a species of "purchase information" in Claims 1 and 8, which is information communicated by the server to the retailer device. Thus, the information recited in this claims is *communicated* from one component of the claimed system to another in order to facilitate the operation of the system, not information that is printed on a substrate. H-E-B's indefiniteness arguments as to these terms should be rejected out of hand. For example, in *In re Lowry*, 32 F.3d 1579, 1583 (Fed. Cir. 1994), the Federal Circuit held that where the claimed "data structures, which according to Lowry greatly facilitate data management by data processing systems, are processed by a machine," the "printed

matter cases have no factual relevance here." The same is true here. The communication of data between the components of the claimed system facilitates the operation of the system and method. H-E-B's "printed matter" arguments have no applicability.

Further, H-E-B has provided no alternative constructions for these terms. Thus, the Court should apply the plain and ordinary meanings of these terms.

### G. "Currently Unavailable for Purchase"

H-E-B's proposed construction of "currently unavailable for purchase," which appears in dependent Claims 5 and 19 in the '781 Patent, is unduly narrow, limiting the term to "currently out of stock or at high risk of running out of stock." The specification of the '781 Patent makes clear that the term is not so limited, and that the term also encompasses items that are not available to be purchased using the claimed system or method. For example, the specification states that the self-service "app may contain functionality that prompts the consumer to enter identifying information manually, *or permits a consumer to select the item from a list of available goods or services*." '781 Patent at 14:16-19 (emphasis added). This described implementation of the system would encompass an app that provides a list of available goods or services *for purchase through the app*, while other goods and services may be available at the retailer for purchase by other means. Thus, there is no basis to restrict the meaning of this term as H-E-B proposes. The Court should apply the plain and ordinary meaning of this term, which includes situations in which the goods and services are currently unavailable for purchase using the claimed system or method.

### H. "Transmitting to the Electronic Device the Goods or Services Purchased by the Consumer " and "Displaying on the Electronic Device the Goods or Services Purchased"

H-E-B's position as to these terms is pedantic to the point of absurdity. H-E-B appears to assert that these terms require that the actual goods and services – i.e., the physical objects or the physical acts to be purchased – be transmitted or displayed. The structure of the claim in which

13

these terms appear – Claim 8 of the '781 Patent – makes clear that what is being transmitted and displayed is ***information identifying*** the goods and services purchased, not the actual good or services.  Claim 8 recites in its entirety:

> The method of claim 1 further comprising the steps of:
>
> retrieving from a database a data record associated with said unique token;
>
> obtaining from said data record the identity of the goods or services purchased by the consumer;
>
> transmitting to the electronic device the goods or services purchased by the consumer; and
>
> displaying on the electronic device the goods or services purchased.

'781 Patent, Cl. 8 (emphasis added).  The natural reading of this claim is that the *identity* of the goods or services purchased is then transmitted and displayed.  H-E-B's absurd reading of this claim should be rejected in favor of the plain and ordinary meaning.  *See Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1357 (Fed. Cir. 2014) (reversing a district court's claim construction because it led to an "absurd result").

To the extent the Court determines that these terms require construction, the Court should clarify the terms and construe them as "transmitting to the electronic device information identifying the goods and/or services purchased by the consumer" and "displaying on the electronic device information identifying the goods and/or services purchased," respectively.

### III.     CONCLUSION

DRA respectfully requests that the Court adopt DRA's claim construction positions and reject H-E-B's unsupported efforts to inject improper limitations into the claim language or render the claims invalid based on specious indefiniteness arguments.

Dated:  November 1, 2019                    Respectfully submitted,

By: */s/ Robert R. Brunelli*
    Jeffrey G. Toler
    Texas Bar No. 24011201
    jtoler@tlgiplaw.com
    TOLER LAW GROUP, PC
    8500 Bluffstone Cove
    Suite A201
    Austin, TX 78759
    (512) 327-5515

    Todd P. Blakely (Admitted *pro hac vice*)
    tblakely@sheridanross.com
    Robert R. Brunelli (Admitted *pro hac vice*)
    rbrunelli@sheridanross.com
    Matthew C. Holohan (Admitted *pro hac vice*)
    mholohan@sheridanross.com
    Tara K. Hawkes (Admitted *pro hac vice*)
    thawkes@sheridanross.com
    SHERIDAN ROSS P.C.
    1560 Broadway, Suite 1200
    Denver, CO 80202
    Telephone:  303-863-9700
    Facsimile   303-863-0223
    litigation@sheridanross.com

*Attorneys for Plaintiff Digital Retail Apps, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on November 1, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Robert R. Brunelli*
Robert R. Brunelli
