**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| DIGITAL RETAIL APPS, INC.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>H-E-B, LP,<br><br>　　　　　Defendant. | Civil Action No. 6:19-cv-00167-ADA<br><br>HON. ALAN D. ALBRIGHT<br><br>**Jury Trial Demanded** |

## DEFENDANT H-E-B, LP'S OPENING CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    PATENTS IN SUIT ....................................................................................... 2

III.   BACKGROUND OF TECHNOLOGY ........................................................ 3

IV.    LEVEL OF ORDINARY SKILL IN THE ART ......................................... 4

V.     LEGAL STANDARDS ................................................................................. 4

    A.     Claim Construction Generally .......................................................... 4

    B.     Means-Plus-Function Claiming ......................................................... 5

    C.     Indefiniteness ..................................................................................... 7

VI.    DISPUTED TERMS FROM THE ASSERTED PATENTS ........................ 8

    A.     In-Store Purchase and Disavowal of Returns .................................... 8

    B.     User of the Retailer Device ............................................................... 12

    C.     First Communication Module ........................................................... 15

    D.     Spot-checking .................................................................................... 21

    E.     Verifying ............................................................................................ 23

    F.     Wirelessly Transmitting Said Unique Token to a Retailer Electronic
        Device ................................................................................................ 25

    G.     Indefinite Terms Under the Printed Matter Doctrine ........................ 26

    H.     Currently Unavailable for Purchase .................................................. 28

    I.     Nonsensical Terms ............................................................................. 29

VII.   Conclusion .................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page**

## Cases

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*
521 F.3d 1328 (Fed. Cir. 2008) ........................................................................ 7

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*
412 F.3d 1291 (Fed. Cir. 2005) ........................................................................ 6

*ePlus, Inc. v. Lawson Software, Inc.*
700 F.3d 509 (Fed. Cir. 2012) .......................................................................... 7

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996) ........................................................................................... 2

*Masco Corp. v. United States*
303 F.3d 1316 (Fed. Cir. 2002) ........................................................................ 5

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*
248 F.3d 1303 (Fed. Cir. 2001) ............................................................. 6, 18, 20

*Micro Chem., Inc. v. Great Plains Chem. Co.*
194 F.3d 1250 (Fed. Cir. 1999) ........................................................................ 6

*Nautilus Inc. v. Biosig Instruments, Inc.*
572 U.S. 898 (2014) ........................................................................................... 7

*Noah Sys., Inc. v. Intuit Inc.*
675 F.3d 1302 (Fed. Cir. 2012) ........................................................................ 7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
521 F.3d 1351 (Fed. Cir. 2008) .................................................................... 2, 5

*Ormco Corp. v. Align Tech., Inc*.
498 F.3d 1307 (Fed. Cir. 2007) ........................................................................ 8

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) .................................................................... 4, 5

*Rexnord Corp. v. Laitrop Corp.*
274 F.3d 1336 (Fed. Cir. 2001) ........................................................................ 4

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 4

*Williamson v. Citrix Online, LLC*
792 F.3d 1339 (Fed. Cir. 2015) ............................................................... passim

*WMS Gaming Inc. v. Int'l Game Tech.*
   184 F.3d 1339 (Fed. Cir. 1999) ................................................................................. 6

## Statutes

35 U.S.C. § 112 ............................................................................................................... 7

35 U.S.C. § 112(f) ........................................................................................................... 5

35 U.S.C. § 285 ............................................................................................................... 2

## Other Authorities

Merriam-Webster's Collegiate Dictionary (11th ed. 2008) ........................................... 12

## I.    INTRODUCTION

From the very start of this case, DRA has sought to wield ambiguity as a weapon against Defendant H-E-B.  DRA's original complaint contained misappropriation and breach of contract claims that were deliberately vague, seeking a strategic advantage by denying H-E-B knowledge of what it stood accused of taking and doing.  As the Court will see below, DRA's approach to claim interpretation pursues the same strategy and therefore suffers from many of the same flaws.  DRA has relied on vague terms and disclaimed scope to feign infringement by H-E-B because the patents-in-suit[1] fundamentally relate to checking and auditing customers as they exit the store—a practice H-E-B does not employ.

Although it is asserting twenty-seven claims across two patents—text that encompasses nearly 1,500 words[2]—DRA has insisted that *not a single word* requires construction.  Rather, when H-E-B identified 36 terms for discussion purposes, DRA complained that was too burdensome, then contended every single one should merely receive its "plain and ordinary meaning" without specifying what that meaning is.  Since then, DRA has clarified it fully plans to argue to the jury later—through expert testimony and evidence—that claim terms *do* have special meaning, so DRA's apparent intent is to avoid specifying such meanings *now*.

DRA's approach defies settled, black-letter law on claim interpretation.  Indeed, DRA's strategy stands the fundamental idea of *Markman* on its head: "[t]he purpose of claim

---

[1] United States Patent No. 9,262,781 (the "'781 Patent") is attached as Ex. 1 (DRA0001303), and its file history is attached as Ex. 2 (DRA0002336).  United States Patent No. 9,934,506 (the "'506 Patent") is attached as Ex. 3 (DRA0002389), and the its file history is attached as Ex. 4 (DRA0001929).  For clarity, these documents are referred to and cited by their names, and not their exhibit numbers.

[2] According to DRA's infringement contentions, it is asserting Claims 1, 2, 5, 8-16, 19, 25, and 27-29 of the '781 Patent and Claims 1-5, 13, and 18-21 of the '506 Patent (collectively, the "Asserted Claims").  Cutting and pasting the language of these claims into Microsoft Word reveals a word count of 1,494 words.

construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996)).

The reason DRA wants to depart from settled precedent and deprive H-E-B—and the Court, experts, and jury—of the benefits of express constructions is to preserve ambiguity. If the claims have no fixed meaning, DRA's positions can remain amorphous, moving targets that change throughout the case. Indeed, given how DRA is attempting to overlook express disclaimers in the file histories and rewrite its claim language, it appears DRA knows[3] that many of its claims suffer from fatal flaws but is hoping to keep them alive as long as possible.

Ultimately, while the Court need not construe every word in the claims, there are a series of disputed terms where the parties need the Court to resolve discrepancies and ensure everyone knows what falls within the claim scope and outside it. Because H-E-B's proposals more accurately reflect the proper meanings of those words and phrases in light of the claims at issue, H-E-B respectfully requests that the Court adopt its proposals for the terms identified below.

## II.    PATENTS IN SUIT

The '781 and '506 Patents are from the same family, have the same figures, share a specification, and claim March 13, 2013 as the earliest priority date.

The '781 Patent and the '506 Patent are both titled "System and Method for Facilitating Secure Self Payment Transactions of Retail Goods." According to the "Field of the Invention,"

---

[3] On October 23, 2019, H-E-B sent DRA a letter pursuant to 35 U.S.C. § 285 identifying a subset of the twenty-seven asserted claims that cannot possibly be maintained. During the parties' October 25 meet and confer on claim terms, DRA indicated it will not withdraw any of the offending claims.

the patents relate generally to "the payment and verification of payment of goods and services for use with mobile devices." '506 Col. 1:20-22.[4]

### III.    BACKGROUND OF TECHNOLOGY

The patents in suit are directed to loss and theft prevention when in-store electronic sales are occurring.  Indeed, the Background section of the specification describes how in-store electronic transactions can accelerate business in the retail environment, but then caveats such benefits with the contention that "existing mobile shopping applications do not provide a complete and secure solution for in-store mobile payment and self-checkout."  Thus, the specification promises that the patent will provide "a system that allows a consumer to proceed with a transaction for goods on demand, and to do so in a secure fashion that is acceptable to both the consumer and the retailer."

While the patents describe an electronic system and method, the Court is doubtlessly already aware of the basic steps involved in the kinds of retail transactions the patents describe. After all, Costco, Best Buy, and other "big box" stores have stationed sales personnel at their exit doors for years to cross-check a customer's receipt against the contents of the customer's cart to ensure every item was paid for.  And the same stores use electronic devices to scan barcodes on receipts to verify purchases when customers want to return items.  In essence, the '781 and '506 systems are meant to combine the two systems to assist that exit door employee by providing an electronic device to cross-check the customer's electronic receipt and prove purchase.

---

[4] Because the '506 Patent is a continuation of the '781 Patent, the text of their specifications is identical other than introductory material at the start and the claims at the end.  To simplify matters for the Court, all specification citations herein will be made to the columns and line numbers found in the '506 Patent.

IV.     **LEVEL OF ORDINARY SKILL IN THE ART**

H-E-B's position is that a person of ordinary skill at the time of the alleged invention would have had a bachelor's degree in computer science or a related study and two years of experience with e-commerce and electronic transactions, or the equivalent.

V.      **LEGAL STANDARDS**

    A.      **Claim Construction Generally**

Claim terms are generally given their customary meaning as understood by a person of ordinary skill in the art ("POSITA") at the time of the invention.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  To determine that meaning within the field of art, the court should look to "those sources available to the public that show what a person of ordinary skill in the art would have understood [the] disputed claim language to mean."  *Phillips*, 415 F.3d at 1314.  Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.*

Where claim terms are disputed, intrinsic evidence must be considered first as it is "the most significant source of the legally operative meaning of disputed claim language."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "[I]f the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained by one of ordinary skill in the art from the language used, a court must look to the specification and file history to define the ambiguous term in the first instance."  *Rexnord Corp. v. Laitrop Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001) (internal marks omitted).  Thus, after the language of the claims themselves, the Court should consider the rest of the intrinsic evidence, beginning with the specification and finishing with the prosecution history.  *Id*.  Claims do "not stand alone"; rather, they "are part of a fully integrated written instrument"

and thus must be read in view of the specification. *Phillips*, 415 F.3d at 1315 (internal citations and quotation marks omitted).  To that end, "the specification is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Id*.

Where there is an actual dispute regarding the proper scope of claim terms, "the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.*  Where the ordinary meaning of a term does not resolve the dispute, "claim construction requires the court to determine what claim scope is appropriate in the context of the patents in suit." *Id.* at 1361-62.

### B.      Means-Plus-Function Claiming

A patent claim may be expressed using functional language.  *See* 35 U.S.C. § 112(f);[5] *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion).  In particular, § 112(f) provides that a structure may be claimed as a "means...for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).  While there is a rebuttable presumption § 112(f) applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms, the presumption stands or falls according to whether one of ordinary skill in the art would

---

[5] Prior to the America Invents Act ("AIA"), functional claiming fell under 35 U.S.C. § 112, ¶ 6. The AIA moved that section to § 112(f).  Section 112(f) applies here because the patents' effective filing date is March 13, 2013.  Nevertheless, prior caselaw discussions of § 112, ¶ 6 continue to apply to § 112(f) and H-E-B may use these terms interchangeably herein.

understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *Id.*

When it applies, § 112(f) limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step...is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112(f) limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general-purpose computer but rather

-6-

the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C.    Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).  Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention.  35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite.  *Id.* at 901.  Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed.  *Id.* at 911.

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351–52.  The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352.  Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation.  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

## VI.   DISPUTED TERMS FROM THE ASSERTED PATENTS

### A.   In-Store Purchase and Disavowal of Returns

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|---|---|---|---|
| "in-store purchase" | 506: 1, 13 | "transaction where the consumer provides payment in exchange for goods or services while the consumer is physically in the store; not a return" | Plain and ordinary meaning. |

The claim term that is perhaps most emblematic of DRA's disingenuous approach to claim construction is "in-store purchase."  DRA claims this phrase can be afforded its "plain and ordinary meaning," and H-E-B does not necessarily disagree.  The problem is, DRA's infringement contentions revealed it has interpreted "in-store purchase" as including returns, a construction inconsistent with both the plain and ordinary meaning of the phrase and express disavowals made during prosecution.  H-E-B raised these inconsistencies—and their implications for DRA's infringement contentions that hinge on return activity—to DRA in correspondence and at the parties' required meet and confer.  (Letter from Tom Millikan to Robert Brunelli (Oct. 23, 2019) (via e-mail) (Decl. Ex. 5).)  Days later, just before this briefing was due, DRA offered to concede the term "in-store purchase" does not include a return.  (Holohan E-mail to H-E-B (Oct. 29, 2019, 12:04 PM PDT (Decl. Ex. 6).)  However, DRA simultaneously indicated it planned to maintain its infringement contentions based on return activity under the '781 Patent because that patent avoids the phrase "in-store purchase."  *Id.*  Ultimately, because no "purchase" includes a return, and because DRA's express disavowal of return activity spans both patents, H-E-B needs the Court to resolve this dispute and expressly declare that returns lie outside the claims in this case.  *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313-17 (Fed. Cir. 2007).  Otherwise, DRA will be recapturing scope abandoned at the Patent Office, contradicting the file history, and impermissibly broadening the patents in suit.

DRA abandoned claim scope covering "returns" because it faced strong prior art showing its claimed system matched the process of scanning receipts during returns.  When the application that resulted in the '781 Patent was filed, it contained a series of claims numbered 30-36 that were all based off the following independent language:

> A computer-implemented method for **_verifying the purchase of goods and services between a consumer and a retailer_**, said consumer having a mobile device capable of communicating with a server, and said retailer having an electronic device capable of communicating with the mobile device and with the server, the method comprising the following steps: [1] **_wirelessly receiving from the mobile device a unique token_**; [2] transmitting a request to server to verify that said unique token wirelessly received from the mobile device is valid; [3] **_receiving a response from the server indicating whether said unique token wirelessly received from the mobile device is valid_**; [4] **_displaying via the electronic device whether said unique token wirelessly received from the mobile device is valid_**;….

('781 File History, Feb. 25, 2014 Transmittal of New Application, Decl. Ex. 2 at 1898-99.)  The patent examiner assigned to the application rejected all these claims over Lewis et al. (US2012/0284130), a reference that addressed performing electronic sales returns.  The examiner lined up each of the elements of claims 30-36 against the Lewis reference, specifically calling out several that involved returns.  ('781 File History, May 14, 2015 Non-Final Rejection, Decl. Ex. 2 at 1395-97.)  For example, the examiner noted the third and fourth method steps of claim 30 were analogous to the way Lewis "allow[ed] the purchase adjustment to proceed" and facilitated "changing the transaction…if it is properly found on the store server."  ('781 File History, May 14, 2015 Non-Final Rejection, Decl. Ex. 2 at 1396-97.)  Similarly, the examiner's remarks with respect to claim 32 address what happens in Lewis "when a user returns to the store to modify the transaction."  *Id.*  The rejections of claims 34-36 were based on identical reasoning.  *Id.*

The applicant's responsive remarks about Lewis are telling.  Specifically, the applicant distinguished Lewis by contending as follows:

> Applicant respectfully disagrees that Lewis discloses or suggests the specific combination of the features recited in claims 30-36.  In particular, the disclosure in Lewis at step 212 of Fig. 2 of scanning a barcode at a POS terminal in connection with a ***return*** and in-store ***adjustment*** to an [sic] ***prior*** purchase is distinguishable from the systems and methods of claims 30-36 which address verification of a unique token in connection with an ***original purchase*** for ***purposes of fraud detection and loss prevention***.

('781 File History, Aug. 13, 2015 Amendment and Response to the Non-Final Office Action, Decl. Ex. 2 at 1380-81.)  In other words, the applicant's entire basis for contending Lewis did not invalidate was that the '781 system did not deal with returns.  Rather than modify the proposed claims in a way that would maintain a read on returns, the applicant cancelled claims 30-36 in their entirety.  Issued claim 1 was drafted more narrowly than the cancelled claims.  *Compare* '781 Claim 1 ("receiving a first set of data from the mobile device, said first set of data comprising identifying information for one or more goods or services ***to be purchased***" (emphasis added)), *with* ('781 File History, Feb. 25, 2014 Transmittal of New Application, Decl. Ex. 2 at 1898 ("wirelessly receiving from the mobile device a unique token").)  By its express words and cancelling its broader claims to avoid Lewis, the applicant surrendered and disavowed coverage of return activity, meaning it cannot possibly be at issue here.  *Ormco*, 498 F.3d at 1313-17.

One would think the applicant would have learned its lesson through the prosecution of the '781 Patent, but when it filed the application that yielded the '506 Patent, it again included claims that were broad enough to encompass return activity.  Once again, the examiner rejected the proposed claims over Lewis et al. (US 2012/0284130) because Lewis taught that, "in the event of a return…the customer returns to the store and presents their barcode, which is used to

retrieve the transaction that they performed." ('506 File History, Oct. 13, 2016 Non-Final

Rejection, Decl. Ex. 4 at 2152.)  The applicant then amended the proposed '506 claims to clarify

the claimed method was limited to verifying an "in-store purchase" ***before*** the consumer left the

store.  (*See* '506 File History, Feb. 13, 2017 Amendment and Response to Non-Final Rejection,

Decl. Ex. 4 at 2121; *see also* '506 File History, Feb. 2, 2017 Applicant Initiated Interview

Summary, Decl. Ex. 4 at 2145 (applicant stating intent to make amendments to "recite that the

electronic receipt check occurs upon exit of the store by the customer.").)  In the accompanying

Remarks, the applicant further clarified that the claimed method—including the step of a retailer

device receiving a unique token associated with the purchase—was limited to verifying a

purchase "prior to the consumer exiting the store."  (*See* '506 File History, Feb. 13, 2017

Amendment and Response to Non-Final Rejection, Decl. Ex. 4 at 2121.)  The examiner lifted the

rejection over Lewis because Lewis did not teach verifying a customer's purchase at an exit.

('506 File History, April 3, 2017 Final Rejection, Decl. Ex. 4 at 2005.)

    As the Court can see, return activity has been expressly disavowed in both patents in suit.

This impacts the construction of "in-store purchase," which cannot be interpreted to include

return activity, but also the general scope of the asserted claims of the '781 Patent, which

likewise cannot be read to include returns given the applicant's broad disavowals.  *Ormco*, 498

F.3d at 1313-17.  These broad disavowals limit the scope of the asserted claims of the '781

patent independent of a particular phrase, like "in-store purchase."  *Id*.

    Given these disavowals, H-E-B does not think the Court needs to reach the issue of the

plain and ordinary meaning of "in-store purchase" (or "purchase").  But if the Court does wish to

address that issue, H-E-B submits that the plain meaning of "purchase" does not include

"return."  While lay dictionaries are not dispositive, the verb "purchase" is defined as "to obtain

by paying money or its equivalent."  (*Purchase*, <u>Merriam-Webster's Collegiate Dictionary</u> (11th ed. 2008) (Decl. Ex. 7).)  Conversely, "return" is defined as "to give back to the owner." (*Return*, <u>Merriam-Webster's Collegiate Dictionary</u> (11th ed. 2008) (Decl. Ex. 7).)  Not surprisingly, the patents' specifications themselves recognize this inherent distinction, treating purchases and returns as distinct transaction categories.  Col. 25:35-44 (noting aspects of "purchase" that may be "stored for later use for purchase verification, returns or exchanges").

For all of these reasons, the Court should adopt H-E-B's proposed construction for "in-store purchase" and expressly resolve that claims of both patents do not cover returns.

### B.    User of the Retailer Device

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|------|---------------------|----------------|--------------|
| "user of the retailer device" | 506: 1, 13 | "retail personnel, and not a consumer, using the retailer device" | N/A |

The term "user" is often employed in patents, and typically H-E-B would not suggest it requires construction.  However, even a cursory review of the claims and specifications here demonstrates that "user" in the context of the patents-in-suit does not mean just **any** person, but rather a certain class of people who have access to the retailer device, *i.e.*, retail personnel. Accordingly, that restriction ought to be expressly adopted to properly reflect the meaning of the claims and to avoid confusion regarding what could otherwise be a much broader term.

The phrase "user of the retailer device" appears only in claims from the '506 Patent. When it does appear, however, earlier references within those very claims dictate that this "user" is not just anyone, but retail personnel operating the retail device.  For example, the preamble of '506 claim 1 refers to "said retailer having an electronic device capable of communicating with a server and with a consumer's mobile device."  When claim 1 then later refers to "the retailer device prompting a user of the retailer device for a response," Col. 58:55-58, it is obvious from

the preamble's earlier description that the "user" in question is a member of the retailer personnel, rather than any other person adjacent to the transaction. Claim 13 is no different, other than it is structured as a device claim rather than a method. Claim 13's preamble sets forth "[a]n electronic device for use by a retailer." A later limitation in claim 13 references that, "upon receiving an indication from the server," the device "prompt[s] the user of the retailer device for a response." Col. 60:3-8. Indeed, claim 13's use of "the" as the article describing the "user"—as opposed to "a"—means that the term "user" must refer back to the antecedent description. The only other reference to a "user" in claim 13 is the one in the preamble. *See generally* '506 Claim 13.

The common specification is wholly consistent with H-E-B's interpretation. To begin, when explaining Figure 1, the text distinguishes between "consumer 102," *i.e.*, "the customer, shopper or other user running the self-payment application on his or her mobile device," and "retailer 104" who, significantly, "is the party who sells goods and services ***and who operates the purchase verification on the retailer's electronic device.***" *Compare* Col. 8:53-55, *with* Col. 8:58-61 (emphasis added). This distinction makes complete sense when one is thinking about loss/theft prevention, where "[t]he purpose of the retailer scanning device is to verify a consumer's purchase through a real world interaction." Col. 36:24-26. Put another way, little loss/theft prevention would occur if the customers were responsible to check themselves.

The specification maintains the distinction between consumer and retailer personnel as it continues. For example, the specification explains that "[r]etailer electronic device 610 is typically a handheld or stationary piece of hardware that is traditionally ***used by retailers*** to identify items by scanning a barcode." Col. 36:17-23 (emphasis added). In fact, whenever the retail device is referenced as being used in the specification, it is with reference to the retail

personnel performing the use.  *See, e.g.*, Col. 20:5-8 ("Once the QR code is visible and clearly displayed on the device screen, the consumer may present his or her mobile device ***to the retailer*** for capture…."); Col. 20:10-12 ("The retailer then captures the unique token, such as the QR code…either through the functionality provided by the secure self-payment retailer verification app…").  No examples exist in the specification where the customer or other, non-retailer personnel uses the retailer device.  *See Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting the district court's claim construction that openings in a railcar could be adjacent to both a "side wall" and an "end wall" as inconsistent with the specification because "[t]he patent does not contemplate the openings performing double duty in this manner.").

For some reason, DRA will not agree with H-E-B's proposal, even though the construction is drawn directly from the '506 claims themselves and the common specification themselves.  Not specifying that the "user" in this context is retail personnel could lead to confusion as to whether other people involved in the transaction—the customer, for example—could be manipulating the retail device.  Yet, DRA has not offered any rationale for either interpreting "user" differently than H-E-B has or for why no construction is necessary.  One likely explanation is that DRA is hoping to use the vagueness of this term to expand its infringement contentions by having actions required of the retailer be those undertaken by customers at H-E-B stores.  H-E-B trusts its customers—in the digital shopping scenarios H-E-B has established, no H-E-B personnel check or otherwise oversee customers moving through the registers.  Accordingly, DRA has no one to point to as the "user of the retailer device" if that phrase is properly construed.  Nevertheless, claims are interpreted in light of the patent, not the

accused infringer's conduct, and therefore H-E-B requests that the Court adopt its proposal for

"user of the retailer device."

      **C.**     **First Communication Module**

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|---|---|---|---|
| "first communication module" | 506: 13, 18 | Indefinite.<br><br>Means plus function term. <u>Functions</u>:<br>1. "transmitting a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token"<br>2. "receiving a response from the server indicating whether the unique token is valid"<br>3. "receiving from the server purchase information associated with the unique token"<br><br><u>Corresponding Structure</u>: None. | Plain and ordinary meaning.  Not means plus function.<br><br>Alternatively, <u>Functions</u>:<br>1. "transmitting a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token"<br>2. "receiving a response from the server indicating whether the unique token is valid"<br>3. "receiving from the server purchase information associated with the unique token"<br><br><u>Corresponding Structure</u>: "the service provider's web API" at Col. 26:43-45. |

      "First communication module" is another term where H-E-B simply cannot understand

DRA's position, given the way it flouts Federal Circuit precedent and openly undermines the

fundamental purpose of claim construction.  DRA's proposal to give "first communications

module" its "plain and ordinary meaning"—with nothing more than that said—is nonsensical.

The term "first communications module" has no plain and ordinary meaning; in fact, it falls

clearly within the Federal Circuit's opinion on nonce words in *Williamson*.

In *Williamson*, the term at issue was "distributed learning control module."  792 F.3d at 1348-54.  Although that term did not expressly invoke the word "means," the Federal Circuit noted that "'[m]odule' is a well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6."  *Id.* at 1350.  The court went on to explain that "'module' is simply a generic description for software or hardware that performs a specified function."  *Id.*

Here, consistent with the Federal Circuit's understanding, the patents themselves use "module" to mean portions of software that perform certain functions.  The specification notes that "[i]n the preferred embodiment, the self-payment application is one of 21 shopper activity-based software modules that comprise a suite of white label branded mobile shopping 'apps' (i.e., software programs) brand-customized for an individual retailer."  Col. 8:45-49.  The specification goes on to confirm that, even in "alternative" embodiments, "the self-payment application is the only module in the suite of apps."  Col. 8:49-50.  Moreover, various functionality is described as being performed by "modules" within the software application, including: self-payment functionality, Col. 14:31-35 ("At step 204 the consumer enters a participating physical retail store and, using the consumer's mobile device, opens the self-payment app ***containing a module directed specifically to performing self-payment functions***"); the QR generator, Col. 25:60-63 ("This QR code generator ***may be a module*** within the web API or may be hosted by a third party on a third-party server in communication with the web API via a network."); and other, optional features, Col. 52:66-Col. 53:4 ("These optional features may be implemented…through the use of third-party APIs, or ***through functionality included in some of the remaining modules*** in the service provider's suite.") and Col. 53:7-11 ("Each of the optional features described below is provided ***via one or more optional application-specific***

*modules* that may be included with the self-payment app.  ***Each of these modules contains the requisite software*** to carry out the functionality described in connection with the features.").[6]

In *Williamson*, the Federal Circuit concluded "module" was a nonce word because it did "not provide any indication of structure" but rather "set[] forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."  792 F.3d at 1350.  Moreover, "the prefix 'distributed learning control' d[id] not impart structure into the term 'module'" because although "portions of the claim d[id] describe certain inputs and outputs at a very high level," the claim did "not describe how the 'distributed learning control module' interacts with other components…in a way that might inform the structural character of the limitation-in-question or otherwise impart structure."  *Id.* at 1351.

Here, similarly, the prefix "first communications" does not provide any structure to specify the term "module" beyond something that is purely functional.  Indeed, the specification never refers to a "communications module" outside the claims or otherwise attributes "communications" to a particular structure or group of structures within the description of the invention.  Rather, "communication" and "communications" are referenced broadly throughout the specification in an apparent effort to capture every possible means of communication, from "wired and wireless networks using well-known standards and protocols" to "real world physical interactions between the consumer-facing self-payment application and the retailer-facing verification application or other compatible device."  Col. 8:36-42; *see also* Col. 10:40-44 ("An example would be through the use of NFC (near-field communication) technology"); Col. 20:20-

---

[6] The "optional features" are detailed in Columns 52 through 54, which discuss the functionality provided by a "personal shopper module," a "customer visit alert module," a "social media module," and a module that provides "tag removal, bagging and assistance features."  *See generally* Col. 52:19-54:45.

22 (using "NPC" in another embodiment).  The specification warns that "[t]he manner of communication, including the protocol and data content of the communication, may vary depending on the purpose of the communication and the respective capabilities of the sending and receiving party."  Col. 9:42-45.  The specification also includes a boilerplate catch-all provision contending that the invention "can be implemented in digital electronic circuitry, or in computer hardware, firmware, software, or in combinations of them," where "[a] computer program can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a standalone program or as a module, component, subroutine, or other unit suitable for use in a computing environment."  Col. 56:41-54.  Thus, like the "module" in *Williamson*, the "first communications module" here ought to be construed in means plus function format.

Further demonstrating the fallacy of DRA's "plain and ordinary" position, it has conceded that if "first communications module" is construed as a functional term, the three functions H-E-B has identified are correct.  Accordingly, assuming the Court agrees with *Williamson*, the first part of the two-step process is complete: the Court can adopt the three agreed-upon functions the "first communications module" is meant to perform.

That leaves the second step, *i.e.*, identifying the corresponding structure disclosed in the specification that performs those functions.  Unfortunately, for the reasons H-E-B has already identified, there is no corresponding structure.  Nowhere in the common specification does it lay out the combination of physical structures and algorithms necessary to perform the three, expansive "communication" functions this module is meant to undertake.  *See generally* '781 and '506 Patents.  Indeed, there is no language "linking" the three functions to any physical structure.  *Medtronic*, 248 F.3d at 1311 ("Structure disclosed in the specification is

'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.") (citation omitted).  Without corresponding structure, however, the term fails as indefinite and should be found invalid.

Lacking anything concrete at which to point, DRA suggests that the structure is "the service provider's web API" based on a single reference of three lines in the specification.  That suggestion is fraught with problems.  First and foremost, an API—also known as an Application Programming Interface—is, in and of itself, functional.  An API is a set of functions and procedures allowing the creation of applications.  One cannot provide "structure" by pointing to another functional element—it is the equivalent of claiming the structure for one means element is another means element.  The tradeoff for allowing functional claiming is that the applicant is limited to the structures specifically addressed in the patent—otherwise, patentees would be able to monopolize entire functions.  Here, DRA cannot claim to own all "communication," but pointing at another functional element of an unspecified API would allow it to do exactly that.

The next problem is, assuming that pointing to an API could satisfy the structure requirement as a general matter, the reference here is far too scant to suffice.  The entire text DRA points to reads as follows:

> Through the use of the retailer verification app or compatible hardware or software running the service provider's web API such as a POS system, the retailer captures the QR code that is displayed on the consumer's device.

Col. 26:43-47.  But this passage, standing alone, would require one of ordinary skill to build an entire POS (point-of-sale) system—with absolutely no guidance—to practice the "first communications module" element.  And even then, it is not completely clear that such an API would be capable of undertaking the broad range of "communications" the patent envisions.

Moreover, the specification fails to clearly link or associate the API to the three functions recited in the claim.  *Medtronic*, 248 F.3d at 1311.  The passage above merely recites that the retailer captures the QR code displayed on a consumer device through a retailer verification app, or hardware or software running the service provider's web API.  Plainly absent from this passage is any clear association between an API and the three recited functions, namely, (1) transmitting a request for the server to verify the consumer's in-store purchase of goods and services; (2) "receiving a response from the server indicating whether the unique token is valid"; and (3) "receiving from the server purchase information associated with the unique token." DRA's argument thus fails because the specification fails to make a clear link between the API and these three functions.  *See id.* at 1311-1313.

Indeed, the API ***cannot*** be the structure that performs the three functions because the specification makes clear that the API communicates with a separate device that actually performs those functions.  The sentence that follows the one DRA cites states: "Once the retailer's device captures the QR code, ***it sends a request to the service provider web API*** to determine whether the QR code is valid."  Col. 26:47-49 (emphasis added).  This passage explains that the API ***receives*** the request to verify a QR code—it does not ***transmit*** the request. Despite this clear communication flow, DRA argues the API—a server-side feature—performs functions the specification associates with a retailer device.  DRA's theory thus fails because the specification directly contradicts it.

Ultimately, the way "first communications module" is drafted, together with the lack of disclosure in the common specification, means that this term should be construed in means plus function format, but that under such an approach, the term is invalid.

### D.    Spot-checking

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|---|---|---|---|
| "spot-checking" | 506: 1, 13 | "the retailer physically or visually inspecting either a consumer and receipt, or a consumer's purchased items and receipt, after the purchase transaction is conducted to ensure the customer is not engaging in theft of goods or services" | Plain and ordinary meaning. |

The key dispute over "spot-checking" concerns the need for a physical or visual inspection by retailer personnel.  While DRA claims the term should be afforded its "plain and ordinary meaning," to try and avoid this requirement, it is necessitated by both the '506 Patent claims and specification as well as DRA's own express disclaimer of spot-checking without such inspections.  Accordingly, the Court should adopt the inspection requirement to properly limit this term and prevent DRA from recapturing scope surrendered during prosecution.

The preambles of method claim 1 and apparatus claim 13 each initially reference a "spot-check" that is further described in the limitations which follow.  '506 Claim 1 ("A computer-implemented method for spot-checking and verifying a consumer's in-store purchase of goods and services…"), Claim 13 ("An electronic device for use by a retailer to spot-check and verify a consumer's in-store purchase of goods and services…").  In each claim, a subsequent limitation requires that the spot check include "prompting a user of the retailer device for a response indicating whether the customer's in-store purchase of goods and services have been inspected and approved."  '506 Claim 1; '506 Claim 13.  During prosecution, the examiner rejected all proposed claims as obvious over Carney (US 2012/0280040), because Carney taught that "[a] warning or alert goes to an employee stationed at an exit," to which the employee must respond. ('506 File History, April 3, 2017 Final Rejection, Decl. Ex. at 2006-08.)  DRA amended to add the introductory phrase, "upon receiving an indication from the server indicating that the token is

-21-

valid," in order to "make clear that the step of prompting occurs in each spot check."  ('506 File History, June 2, 2017 Response After Final Office Action, at 1995-96.)  Moreover, DRA distinguished its invention from Carney by saying Carney taught that "[n]o interaction by store employees or personnel is required," and, "[i]n fact, Carney explicitly disparages the use of personnel for each spot-check."  *Id.* at 1961.  Accordingly, DRA has expressly disavowed scenarios where no inspection by retail personnel occur.

This narrower scope for "spot-checking" is also supported by language used throughout the '506 Patent specification.  The specification describes a spot-check as a procedure "in which the retailer physically or visually inspects the consumer or his or her purchase items and receipt after the transaction is conducted to ensure that the consumer is not engaging in theft of goods or services.  Col. 8:8-12.  H-E-B used this exact language to frame its proposed construction because it details what a reader of the '506 Patent would understand "spot-checking" to be.

The specification further supports H-E-B's construction by noting that "[a] spot check is the physical act of the retailer verifying a consumer's purchase."  Col. 45:1-4.  Even the prompting step of a spot-check is described in the specification as requiring an employee to physically verify the items purchased.  Col. 47:42-49 ("The retailer verification app displays portions of the purchase information that may assist the retailer with verification of the purchase, such as the items and the quantity purchased, along with the consumer's identification information.  The confirmation screen 1308 provides the retailer with an 'Approve' function 1312, which the retailer uses to signal to the verification app that the retailer has reviewed the purchase and verified the details thereof.").

Although H-E-B's proposed construction is rooted in the express language of the patent, DRA has rejected it, insisting instead that the plain and ordinary meaning of "spot-check" is

satisfactory.  The problem, obviously, is that such a "plain and ordinary meaning" construction
ignores DRA's express disclaimer and risks omitting the very limitation DRA introduced to spot-
check in order to obtain allowance.  Accordingly, H-E-B requests that the Court adopt its
proposal for "spot-checking" and expressly include the "physical or visual inspection" aspect
that is necessitated by the specification and file history.

      **E.**    **Verifying**

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|---|---|---|---|
| "verifying" | 781: 1, 15 506: 1, 13 | "confirming there is a valid purchase transaction" | Plain and ordinary meaning. |

The term "verifying" is used consistently throughout the patents-in-suit to mean
"confirming there is a valid purchase transaction."  While DRA proposes the term should receive
its "plain and ordinary meaning" without anything more, such an open-ended construction would
ignore the context and meaning given to the term in the specification.

Claim 1 of the '781 Patent recites "[a] computer implemented method for ***verifying*** the
purchase of goods and services between a consumer and a retailer" that includes "transmitting
said unique token to the mobile device for use by the consumer to ***verify*** to the retailer the
purchase of said one or more goods or services," "receiving from the retailer electronic device a
request to ***verify*** the unique token," and "transmitting to the retailer electronic device information
indicating whether the unique token is valid."  '781 Claim 1 (emphasis added); *see also* '781
Claim 15.  This shows verification is the act of confirming the transaction's validity.

The specification provides further support for this construction.  The disclosed system
and method even use a "verification application" that "can automatically verify a consumer's
transaction based on the code displayed on the consumer's mobile device."  Col. 8:17-21.  The
verification application is able to automatically verify transactions because "each transaction is

represented by a QR code that is used for in-store verification."  Col. 32:1-5.  Additionally, the purpose of verifying by "confirming that there is a valid purchase transaction" is to improve loss prevention efforts.  *See* Col. 16:43-47 ("The option to verify the consumer's purchase of goods or services through the capture of the code provided by the service provider web API is a critical option in retailer security of the transaction and is in place to minimize theft or shrinkage.").

DRA attempts to retain a broad scope for the terms by conflating the steps of "verifying" with "spot-checking," even though they are used distinctly across the patents-in-suit.  The '506 Patent adds "spot-checking" to the preamble, accompanied by distinct claim limitations that reflect additional steps attributable to "spot-checking."  It is clear the scope of "verifying" is unchanged by this addition, because the same three limitations are used consistently across the patents-in-suit to represent "verifying."  *Compare* '506 Claim 1 ("the retailer electronic device ***receiving*…*a unique token***," "the retailer electronic device transmitting to the server a ***request to verify*** the consumer's in-store purchase of goods and services," and "the retailer device receiving from the server *a response indicating whether the unique token is valid*" (emphasis added)) *with* '781 Claim 1 ("***transmitting said unique token*…*to verify to the retailer*** the purchase," "***receiving*** from the retailer electronic device *a request to verify* the unique token," and "transmitting to the retailer electronic device ***information indicating whether the unique token is valid***").  The claims of both patents-in-suit use verify in only one way, which is to use the unique token to "confirm that there is a valid purchase transaction."

H-E-B's proposed construction of "verifying" reflects the specific usage of the term in the claims of both patents-in-suit.  DRA proposes to use the plain and ordinary meaning of the term, without addressing the broad scope and various meanings that "verifying" has outside the context of these claims.  Therefore, H-E-B requests the Court adopt its proposal for "verifying."

**F.      Wirelessly Transmitting Said Unique Token to a Retailer Electronic Device**

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|------|---------------------|----------------|--------------|
| "wirelessly transmitting said unique token to a retailer electronic device" | 781: 1, 15 | "consumer's mobile device wirelessly transmitting said unique token to a retailer electronic device; not a retailer electronic device scanning or reading the unique token from the consumer's mobile device" | Plain and ordinary meaning. Alternatively, transmitting said unique token at least in part via a wireless medium to a retailer electronic device. |

The dispute over "wirelessly transmitting said unique token to a retailer electronic device" concerns the distinction between (1) wireless transmission, and (2) photographing or otherwise scanning a code.  DRA has proposed an unstated "plain and ordinary meaning," or alternatively to mischaracterize "wirelessly transmitting" as "transmitting…at least in part via a wireless medium," in an apparent attempt to include photographing or scanning a barcode.

The claims of the '781 Patent use "wireless transmission" only when referring to step of getting the unique token from the consumer's mobile device to the retailer device for verification.  *See* '781 Claims 1, 7, 9-10, 15, 22.  In fact, dependent claim 7 adds a further limitation regarding the "wireless transmission" requiring the devices be in sufficient proximity for "wireless communication" between the devices.  '781 Claim 7.

In contrast to the use of "wireless transmission" in the '781, the claims of the '506 demonstrate that entirely different terminology is used when referring to photographing or scanning, namely, "capturing."  '506 Claim 6 ("the retailer device ***capturing*** the code displayed on the mobile device" (emphasis added)); '506 Claim 17 ("***capturing*** via the camera a code displayed on the mobile device" (emphasis added)).  A dependent claim analogous to claim 6 is then used to distinctly claim wirelessly transmitting the token.  '506 Claim 8 ("receiving from the mobile device a unique token…is accomplished via ***bi-directional wireless communication***

-25-

*protocol*, comprising…the retailer device *wireless transmitting* to the mobile device a request

for the unique token….” (emphasis added)).

The specification also draws this distinction between wireless transmissions and scanning

a QR code.  Most pointedly, the specification recites that information can be captured from the

consumer's device through a variety of methods, “including scanning or reading a code

containing this information, as well as receiving a wireless transmission of the information.”

Col. 10:16-20.  The specification is clear that the scope of “wirelessly transmitting” is not

inclusive of scanning.  *See* Col. 23:4-17 (“wherein the token is in the form of a URL link

embedded in a QR code that is displayed to the retailer for capture *via scanning*, it would be

appreciated that this step may take *other forms* where the unique token is presented *via wireless*

*transmission*, such as through NPC communications.” (emphasis added)).

Although H-E-B has proposed a construction reflecting that distinction and the proper

scope of the term, DRA has avoided the issue in an apparent effort to broaden the scope of the

patents' clear terms.  Therefore, H-E-B requests the Court adopt its proposal for “wirelessly

transmitting said unique token to a retailer electronic device.”

**G.**     **Indefinite Terms Under the Printed Matter Doctrine**

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|---|---|---|---|
| “list of goods and services”  “list of goods and services purchased” | 506: 3, 19 | Indefinite. | List of goods and/or services purchased |
| “time and place of the purchase” | 506: 4, 20 | Indefinite. | Plain and ordinary meaning.  Alternatively, information indicating a time and a location associated with a purchase of goods and/or services. |

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|------|---------------------|----------------|--------------|
| "identity of the consumer who made the purchase" | 506: 5, 21 | Indefinite. | Plain and ordinary meaning. Alternatively, information indicating the customer who made the purchase. |

H-E-B has grouped these three terms and phrases because they all suffer from the same flaw, namely, they all fail as indefinite and invalid under the printed matter doctrine.

As the Court is aware, claims may be drafted in independent or dependent form. Dependent claims are subject to 35 U.S.C. § 112(d), which requires that "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation on the subject matter claimed." Here, claims 3-5 attempt to modify "purchase information" merely by changing the content of that information.[7] But the additional "limitations" these dependent claims attempt to impose are not limitations at all as the content of information is not entitled to any patentable weight. *Praxair Distribution, Inc. v. Mallinckrodt Hosp. Prod. IP Ltd.*, 890 F.3d 1024, 1032 (Fed. Cir. 2018). From a substantive perspective, then, the scope of each of claims 3-5 is identical to the claim from which they depend; claims 19-21 similarly overlap exactly with claim 18. Accordingly, these duplicative claims cannot stand.

DRA, for its part, has articulated absolutely no defense to the printed matter issue. H-E-B raised this flaw in a letter to DRA and then again in the parties' required meet and confer on claim construction. DRA's only response has been to insist it is continuing to pursue these claims, despite the clear law to the contrary. H-E-B will see what opposition DRA articulates for the very first time in its briefing, but H-E-B believes that maintaining these allegations is wholly

---

[7] Claims 3-5 depend from claim 1 and recite "the purchase information." Claim 1, however, does not disclose purchase information. Thus, "the purchase information" in claims 3-5 lacks an antecedent basis, thereby rendering those claims invalid for that reason as well.

improper.  Accordingly, H-E-B reserves its rights to seek remedies downstream for DRA's
continued pursuit of these improper claims.

### H.    Currently Unavailable for Purchase

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|------|---------------------|----------------|--------------|
| "currently unavailable for purchase | 781: 5, 19 | "currently out of stock or at high risk of running out of stock" | Plain and ordinary meaning. |

Once again with "currently unavailable for purchase," DRA has proposed an open-ended
"plain and ordinary meaning" construction that unnecessarily broadens the words past their
intended meaning.  H-E-B's construction, "currently out of stock or at high risk of running out of
stock," is taken directly from the specification and therefore should be noncontroversial.

The '781 claim limitations recite identifying goods or services to be purchased and
determining whether any "are currently unavailable for purchase."  '781 Claims 5, 19.  While the
unavailability could stem from a number of factors, the specification clarifies that the items must
be actually unavailable for purchase—not merely available for purchase through another means.
The specification teaches that, "[a]s items are added into the shopping cart, the secure self-
payment application sends out a request to the retailer network to confirm that the retailer carries
the item and that it is stock [sic]."  Col. 22:17-20.  The specification also describes that "[s]tore
inventory 504 includes data representing the goods and services available for sale by a retailer,"
and that "[a]n optional use of this data is to determine whether an item is in stock."  Col. 30:8-20.
This relationship makes clear that an item is unavailable for sale when the item is out of stock.
Thus, "unavailable" does not include other, special cases where the item merely cannot be
purchased through the electronic system.  In a retail environment, one can imagine numerous
reasons why certain items are controlled—age restrictions on alcohol and tobacco, oversize items
that require employee assistance—and thus may only be "available" by purchasing through a

traditional register.  But, as the specification makes clear, the '781 Patent is not addressing these scenarios, only the condition where the items are truly unavailable because they are out of stock.

H-E-B's proposed construction fits the literal meaning of the phrase, and is drawn directly from the patent itself.  Accordingly, the Court should adopt H-E-B's proposal and eschew DRA's open-ended construction that would only serve to cause confusion by failing to resolve the parties' dispute over the meaning of this phrase.  *O2 Micro*, 521 F.3d at 1360.

## I.      Nonsensical Terms

| Term | Patent(s)/ Claim(s) | H-E-B Proposal | DRA Proposal |
|------|---------------------|----------------|--------------|
| "transmitting to the electronic device the goods or services purchased by the consumer" | 781: 8 | Indefinite. | Plain and ordinary meaning. Alternatively, transmitting to the electronic device information identifying the goods and/or services purchased by the consumer. |
| "displaying on the electronic device the goods or services purchased" | 781: 8 | Indefinite. | Plain and ordinary meaning. Alternatively, displaying on the electronic device information identifying the goods and/or services purchased. |

These two phrases, grouped together because they suffer from the same issue, represent a classic case of careless draftsmanship during prosecution.  Read literally, these two limitations require H-E-B's goods and services to be transmitted to the electronic device and displayed on the electronic device, respectively.  But this is not Star Trek, and H-E-B's goods and services are not electronic in nature.  No one can—at least as of now—transmit an apple or a banana to an electronic device.  Yet that is what these claim terms facially require.

Not surprisingly, DRA offers no construction at all in hopes the ambiguity will be resolved in its favor and preserve its infringement theories.  DRA's alternative proposal expressly rewrites the claims, as "information identifying" a good or service is different from the good or service itself.  But other parts of the patents show DRA was capable of referencing

information when it wanted to: claims 3-5 of the '506 Patent, discussed elsewhere herein, demonstrate that during prosecution DRA appreciated the distinction between information about a good or service and the good or service itself.  *Compare* '506 Claim 3 ("wherein the purchase information includes the list of goods and services purchased."), *with* '781 Claim 8 ("transmitting to the electronic device the goods or services purchased by the consumer").

Because these claim terms are nonsensical, they should be found indefinite. Alternatively, the claims should be read strictly to require what they say, *i.e.*, that goods and services themselves be transmitted or displayed, rather than information about them.

## VII.   CONCLUSION

For the reasons stated herein, H-E-B respectfully requests the Court adopt its proposed constructions for the disputed terms and phrases from the '781 and '506 Patents.

Dated:  November 1, 2019                Respectfully submitted,


By:  */s/ Joseph P. Reid*
       Thomas N. Millikan, *Pro Hac Vice*
       Texas State Bar No. 24105276
       California State Bar No. 234430
       TMillikan@perkinscoie.com
       Joseph P. Reid, *Pro Hac Vice*
       California State Bar No. 211082
       JReid@perkinscoie.com
       PERKINS COIE LLP
       11452 El Camino Real, Suite 300
       San Diego, CA 92130-2080

       Skyler M. Howton
       Texas State Bar No. 24077907
       SHowton@perkinscoie.com
       PERKINS COIE LLP
       500 N. Akard Street, Suite 3300
       Dallas, TX 75201-3347

       ATTORNEYS FOR DEFENDANT
       H-E-B, LP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 1, 2019, a true and correct copy of

the foregoing **DEFENDANT H-E-B, LP'S OPENING CLAIM CONSTRUCTION BRIEF**

has been served via the Court's CM/ECF system per Local Rule CV-5(b):

Todd P. Blakely                               Jeffrey G. Toler
tblakely@sheridanross.com        jtoler@tlgiplaw.com
Robert R. Brunelli                          Benjamin R. Johnson
rbrunelli@sheridanross.com       bjohnson@tlgiplaw.com
Matthew C. Holohan                      TOLER LAW GROUP, PC
mholohan@sheridanross.com
Tara K. Hawkes
thawkes@sheridanross.com
SHERIDAN ROSS P.C.

By: */s/ Joseph P. Reid*
Joseph P. Reid