**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| DIGITAL RETAIL APPS, INC., <br><br>                Plaintiff, <br><br> v. <br><br> H-E-B, LP, <br><br>                Defendant. | Civil Action No.: 6:19-cv-00167-ADA <br><br> JUDGE ALBRIGHT <br><br> **Jury Trial Demanded** |

---

### PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

---

Plaintiff Digital Retail Apps, Inc. ("DRA"), pursuant to the Court's Order Governing Proceedings – Patent Case (Dkt. No. 35), hereby provides its Responsive Claim Construction Brief. Defendant H-E-B, LP ("H-E-B") pursues a well-worn tactic in advancing its muddled claim construction arguments, namely, seeking to improperly import artificial limitations into claim terms that are facially unambiguous, and concocting indefiniteness arguments through strained and legally baseless misinterpretations of plain language. The asserted claims are set forth in detail and employ plain language that would readily be understood by lay jurors without formal construction.

DRA is not, as H-E-B claims, seeking to wield ambiguity to its advantage. Rather, DRA is seeking to afford the asserted claims their full scope under the applicable law. Conversely, H- E- B attempts to craft unreasonable and unsupported claim interpretations in order to

manufacture noninfringement arguments.  The Court should reject H-E-B's arguments and afford the disputed claim terms their plain and ordinary meanings.[1]

## I.    ARGUMENT

H-E-B has done nothing to meet its burden to rebut "the presumption that claim terms are to be given their plain and ordinary meaning." *Cisco Sys., Inc. v. Innovative Wireless Sols., LLC*, No. 1:13-CV-00492-LY, 2015 WL 128138, at *5 (W.D. Tex. Jan. 8, 2015).  Nor has H-E-B proved by clear and convincing evidence that any asserted claim is invalid for indefiniteness.  *Advanced Electrolyte Techs. LLC v. Samsung SDI Co., Ltd*, No. A:17-CV-0030-LY, 2018 WL 2770648, at *4 (W.D. Tex. June 8, 2018).  The Court should reject each of H-E-B's arguments.

### A.    "Spot-Checking"

H-E-B seeks to artificially and improperly limit the asserted claims by requiring that "only retailer personnel" be directly involved in the use of the claimed system or performance of the claimed method.  H-E-B's arguments concerning "spot-checking" are consistent with this improper attempt to limit the claims.  First, as explained in DRA's Opening Brief, the term "spot-checking" is not textually limiting, meaning the Court should decline to construe the term altogether and disregard the totality of H-E-B's arguments.

Second, the patentee did not "expressly disavow[] scenarios where no inspection by retail personnel occur" during prosecution.  Dkt. No. 54 at 22.  While the Applicant added the limitation "upon receiving an indication from the server indicating that the token is valid" to overcome prior art during prosecution, the Applicant explained this was added to specify that the "prompting" occurs in the context of "inspect[ion] and approv[al] **by the *user of the retailer device***."  Dkt. No.

---

[1] H-E-B reveals its improper litigation tactics by including H-E-B's October 30 correspondence with its Opening Brief.  For completeness of the record, DRA's response to H-E-B's letter is included here as Exhibit 1.

54-5 at DRA0001995-96 (emphasis added).  Thus, the prosecution history supports that the "user of the retailer device" *can be any user*—it does not limit the "user" to a retailer employee who visually inspects the goods and services.

Further, while the Applicant made additional arguments concerning the Carney reference, the arguments that Carney does not require involvement by the retailer are consistent with the overall scope of the claims of the '506 Patent providing a method and system for the *retailer* to "spot-check" transactions.  In other words, the *customer's* use of the retailer device according to the claimed methods and systems provides the *retailer* with a means to confirm the validity of the transaction, regardless of whether an individual retailer employee is physically involved in the transaction.  The Applicant's arguments concerning Carney thus cannot be interpreted to require that retailer *personnel* must "spot-check" every transaction.  *See, e.g.*, *SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.").

H-E-B's reliance on the specification also misses the mark.  In particular, the language on which H-E-B relies – describing a spot-check as a procedure "in which the retailer physically or visually inspects the consumer or his or her purchase items and receipt after the transaction is conducted to ensure that the consumer is not engaging in theft of goods or services" – describes **prior art** systems that are **improved upon** **by the claimed inventions**.  Dkt. No. 53 at 5-6.  Construing a claim term to be limited to the distinguished prior art is nonsensical and improper. *See Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1373 (Fed. Cir. 2014) (declining to construe a term "so broadly that it encompasses" devices "within the prior art as defined by the specification . . . .").

H-E-B also relies on a non-limiting example from the specification in an effort to limit claim language. While the specification describes an illustrative embodiment in which the retailer can use an "Approve" function to signal the verification of the customer's transaction, the specification never states that *only* retailer personnel can use the retailer device. That is not surprising, as the '506 Patent is directed to **a *self*-checkout system** and excluding use of the claimed system by the customer would be inconsistent with the purpose of the invention and thus the patent specification. Dkt. No. 53 at 7.

H-E-B's attempt to ignore the plain meaning of "spot-check" and insistence that the term require a physical act be performed by a specific retailer person is nothing more than a bare effort to improperly import limitations from the specification into the claims in order to manufacture an argument to avoid infringement, "one of the 'cardinal sins' of patent law." *Collaborative Agreements, LLC v. Adobe Systems Inc.*, No. A-14-CV-356-LY, 2015 WL 2250391, at *9 (W.D. Tex. May 12, 2015) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). H-E-B's disclaimer and specification-based arguments should be rejected. "Spot-checking" should not be construed and simply be provided its plain and ordinary meaning.

**B.      "Verifying"**

H-E-B's arguments concerning "verifying" should be disregarded due to H-E-B's failure to explain why the term needs construction. As explained in DRA's Opening Brief, Claim 1 of the '506 Patent recites specific method steps to be performed by a retailer electronic device in connection with a transaction. Claim 1 of the '781 Patent recites a specific set of receiving and transmission steps performed by a server for the purpose of "verifying" the transaction, while independent Claim 15 recites a server configured to perform specific receiving and transmitting operations. The claimed inventions are thus described completely in the bodies of the independent

claims—with the identification of "spot-checking" and "verifying"[2] as *purposes* of the claimed inventions, not being at all limiting.  *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (holding that preamble terms used "only to state a purpose or intended use for the invention" are not limiting).

To the extent either term is found to be limiting, H-E-B's proposed construction does nothing more than import limitations from the specification into the claims.  That is improper and H-E-B's numerous citations to the specification provide only non-limiting examples, none of which are required to define the intrinsic meaning of "verifying."  Indeed, H-E-B's citations to the specification are self-defeating, revealing that "verifying" was never limited, as H-E-B suggests, to "confirming there is a valid purchase transaction."  Rather, the specification shows that the term applies broadly to various forms of verification.  In particular, H-E-B acknowledges that the specification describes "verifying a unique token," Dkt. No. 54 at 23, but fails to explain how verifying a *token* is the same as verifying a *transaction*.

H-E-B's proposed claim construction of the term "verifying" is also redundant to other portions of the claim and nonsensical.  H-E-B proposes that "verifying" must specify that "a valid purchase transaction" is being "confirm[ed]."  But the claims already explicate that "verifying" refers to "verifying a consumer's in-store purchase of goods and services" or "verifying the purchase of goods and services between a consumer and a retailer."  H-E-B's proposed claim construction would transform clear claim terms into "confirming there is a valid purchase transaction a consumer's in-store purchase of goods and services" and "confirming there is a valid purchase transaction the purchase of goods and services between a consumer and a retailer,"

_____

[2] H-E-B suggests Claim 13 of the '506 Patent includes "verifying"—it does not.

creating phrases that are completely unintelligible.  H-E-B's proposed constructions would therefore provide no assistance to the trier of fact and would only confuse the issues.  H-E-B's proposed claim construction should be rejected because H-E-B "has not shown that any construction is necessary to 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'"  *E-System Design, Inc. v. Mentor Graphics Corp.*, No. 4:17-cv-682, 2018 WL 6599130, at *6 (E.D. Tex. Dec. 17, 2018) (quoting *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010)).

Finally, DRA has not, as H-E-B argues, conflated "verifying" with "spot-checking."  Dkt. No. 54 at 24.  DRA only addressed the two terms together in its Opening Brief as they are both non-limiting preamble terms.  DRA never suggested they should have the same meaning.  In any case, the Court should decline to construe "verifying" as a non-limiting preamble term.

### C.    "User of the Retailer Device"

H-E-B's arguments concerning "user of the retailer device" are nothing more than another effort to improperly import limitations from the specification into the claims, a "cardinal sin[]" of patent law.  *Collaborative Agreements*, 2015 WL 2250391, at *9.  H-E-B acknowledges that the term "user" is a well-understood term in patent law and typically does not require construction.  Dkt. No. 54 at 12.  Nonetheless, H-E-B goes on to attempt to limit "user" to "retail personnel, and not a customer" in an undisguised and improper effort to improperly alter the claim language to avoid infringement.

First, H-E-B raises circular arguments concerning the claim language, asserting that because Claims 1 and 13 of the '506 Patent refer to a "retailer having an electronic device," the user must be retail personnel.  Dkt. No. 54 at 12-13.  But H-E-B does not explain how the quoted claim language limits the ***user*** to retail personnel.  On the contrary, the claim language itself makes

clear **that "user" is a generic term that can refer *either* to the consumer or the retailer**.  In particular, the preamble of Claim 1 reads:

> A computer-implemented method for spot-checking and verifying a ***consumer's*** in-store purchase of goods and services from a ***retailer*** prior to the consumer exiting the store, said retailer having an electronic device capable of communicating with a server and with a consumer's mobile device, the method comprising the following steps:

'506 Patent, Cl. 1 (emphasis added); *see also id.*, Cl. 13 (similar).  The patentee knew how to distinguish between the ***consumer*** and the ***retailer*** and used specific words to do so when desired. However, when the patentee referred to "a user of the retailer device," the patentee used the indefinite article "a" and the generic term "user" rather than "the consumer" or "the retailer."  The inventor thus did not limit "a user" to a specific party to the transaction.  Having used a generic term amid specific terms, the patentee logically intended for the generic term "user" to encompass *both* the consumer and the retailer.  There is no basis to limit "user" to retailer personnel.

Further, while H-E-B is correct that the specification distinguishes between "consumer" and "retailer" (Dkt. No. 54 at 13-14), this is more reason ***not*** to limit "user" to "retailer." Construing "user" as "retailer" would contravene the well-established principle that "different claim terms are presumed to have different meanings." *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1031 (Fed. Cir.), reh'g granted, opinion modified, 776 F. App'x 707 (Fed. Cir. 2019) (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008)).  Given these understandings, it is perhaps not surprising that the specification is consistent with DRA's proposed construction, emphasizing *self*-checkout.  Dkt. No. 53 at 7.  H-E-B's reliance on *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) is therefore misplaced, as the specification in that case did not contemplate the proposed broader construction at all.

H-E-B then feigns "confusion as to whether other people involved in the transaction—the customer, for example—could be manipulating the retail device." Dkt. No. 54 at 14. But DRA has been clear since serving its infringement contentions on July 8, 2019 that the ***user*** of the retailer device may be the customer. Indeed, H-E-B clearly understood DRA's infringement contentions to encompass the customer as the user of the retailer device, as H-E-B sent DRA's counsel a letter complaining about this very allegation on October 23, 2019. Dkt. No. 54-7. H-E-B's intent in seeking to artificially limit the term "user" is thus clear: H-E-B wishes to avoid infringement through an improper claim construction. *See* Dkt. No. 54 at 14-15 ("H-E-B trusts its customers— in the digital shopping scenarios H-E-B has established, no H-E-B personnel check or otherwise oversee customers moving through the registers. Accordingly, DRA has no one to point to as the 'user of the retailer device' if that phrase is properly construed.").

The Court should not countenance H-E-B's undisguised effort to avoid infringement through improper claim construction. It should instead adopt DRA's position that the meaning of "user of the retailer device" is clear and not limited to only retail personnel.

### D.      "In-Store Purchase"

The parties agree that "in-store purchase" does not include returns and H-E-B "does not necessarily disagree" that the term should otherwise be given its plain and ordinary meaning. Dkt. No. 54 at 8. The Court's consideration of this term should end there, because there is no claim construction dispute to be resolved as to "in-store purchase." *Traxcell Techs., LLC v. Huawei Techs. USA Inc.*, No. 217CV00042RWSRSP, 2019 WL 121966, at *6 (E.D. Tex. Jan. 7, 2019) ("[T]he Court's claim construction obligations do not extend to claim terms that are not disputed."); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

Unfortunately, H-E-B has chosen to violate the Court's Scheduling Order by belatedly asking the Court to construe "purchase" on its own, across the '506 and '781 Patents, despite never having advanced a claim construction position as to whether the '781 Patent encompasses returns during the claim construction proceedings.  DRA warned H-E-B before the deadline for opening claim construction briefs that its planned course of action was blatantly improper and that DRA would seek appropriate relief if H-E-B pressed forward.  Ex. 2, 10/30/2019 Email from Holohan to Reid.  H-E-B has regrettably chosen to disobey both the spirit and letter of the Court's Scheduling Order by burdening DRA and the Court with an untimely claim construction issue.  The Court should ignore the entirety of H-E-B's "in-store purchase" arguments, admonishing H- E- B to comply with the Court's Orders in the future.[3]

H-E-B makes no effort to justify its untimely effort to have the Court address returns in the context of the '781 Patent, instead falsely accusing DRA of disingenuousness and launching straight into a substantively meritless argument that the '781 Patent does not encompass returns.

Buried in H-E-B's lengthy discussion of the '781 Patent's file history is **an explicit admission** that the sole prosecution history arguments on which H-E-B relies were directed to *cancelled* claims.  Dkt. No. 54 at 10.  With this admission, H-E-B's entire argument disintegrates, because arguments directed toward cancelled claims can have no bearing on the scope of issued claims.  *See, e.g.*, *Micronity Sys. Eng'g, Inc. v. Acer, Inc.*, No. 2:10-CV-91-LED-RSP, 2013 WL 12134146, at *17 (E.D. Tex. Mar. 8, 2013) (rejecting a claim construction position premised on prosecution history arguments directed to a cancelled claim).  H-E-B even admits that the issued claims of the '781 Patent are narrower than the cancelled claims (Dkt. No. 54 at 10), bolstering the

---

[3] DRA reserves the right to seek attorneys' fees incurred in responding to H-E-B's improper arguments and violation of the Court's Scheduling Order.

conclusion that H-E-B's cancelled claims-focused arguments have no bearing on the issued claims, which were allowable *with* the subject matter allegedly disavowed as to the cancelled claims.

In fact, the Examiner acknowledged the allowability of the claims that ultimately issued *before* the Applicant said a word about returns.  This is clear from the Applicant's "Summary of the Office Action" in the submission on which H-E-B relies:

> In the Office Action, all pending claims were rejected on the grounds of a [sic] alleged non-statutory double patenting as being unpatentable over claims 1-30 of U.S. Patent No. 8,720,771.  (Office Action at 2-3.)  In addition, claims 30-33 were rejected under 35 U.S.C. § 112(b) or pre-AIA 5 U.S.C. § 112 (second paragraph) as allegedly being indefinite in view of a clerical error.  (Id. at 3-4.)  In addition, claims 30-36 were rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being unpatentable over U.S. Patent Publication No. 2012/0284130 ("Lewis").  (*Id.* at 5-6.)  **However, the Examiner confirmed the potential allowability of claims 1-29 (pending withdrawal of the non-statutory double patenting rejection), and specifically noted the patentability of claims 1-29 over Lewis provided the alleged non-statutory double patenting rejection were addressed.**  (*Id.* at 7-11.)

Dkt. No. 54-3 at DRA0001379 (emphasis added).  Only after highlighting the fact that Claims 1-29 (the claims that ultimately issued) were patentable did the Applicant make the statements concerning Claims 30-36 on which H-E-B relies.  In other words, *all issued claims had been deemed allowable* without any arguments from the Applicant distinguishing Lewis as to returns. The Examiner issued Claims 1-29 after Claims 30-36 were cancelled, and the Examiner's Notice of Allowability makes no mention of returns.  *Id.* at DRA0001321-23.  Had the Applicant never submitted Claims 30-36, the Examiner would have allowed the issued claims without mentioning Lewis and H-E-B would have absolutely nothing to point to in the prosecution history.  *Micronuity Sys. Eng'g, Inc.*, 2013 WL 12134146, at *17.

Not content to rely on irrelevant arguments from the '781 Patent's prosecution history, H- E-B strays even further from pertinent subject matter by bringing in arguments from the

prosecution history of the separate '506 Patent.  The Court should ignore these arguments as well.  First, as stated above, DRA agrees that the term "in-store purchase" in the '506 Patent does not include returns.  There is thus no need for the Court to consider whether statements in the file history of the '506 Patent limit that term.  Second, the Applicant's comments concerning "in-store purchase" in the file history of the '506 Patent are categorically irrelevant to the scope of the claims of a separate patent *that does not include that term.  See, e.g.*, *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) (refusing to apply limitations expressed in prosecution histories of related patents where relevant claim term was not included in claims of the asserted patent).  H-E-B has nothing to point to that would limit the scope of the '781 Patent to exclude returns, in either prosecution history.

H-E-B has been aware of the Court's claim construction schedule since June 27, 2019, and if H-E-B wanted the Court to construe a term in the '781 Patent that would bar returns, H-E-B could have properly raised the issue during the scheduled claim construction proceedings.  H-E-B missed its chance and, rather than live with its decision, H-E-B now flouts the Court's Scheduling Order, improperly asserting meritless claim construction arguments.  There is simply no dispute regarding "in-store purchase" and the Court should adopt the plain and ordinary meaning for the term as the parties originally agreed.

### E.    "First Communication Module"

"First communication module" is not a means-plus-function term.  "Module," standing alone, may be a "nonce term."  Dkt. No. 54 at 15-16.  But the claim term is "communication module" and inclusion of "communication" as part of the claim phrase confers sufficient structure to avoid means-plus-function construction.

First, DRA agrees that "module" refers to software.  Dkt. No. 16-17.  But H-E-B's reliance on *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-49 & n.3 (Fed. Cir. 2015) to convert

"communication module" into a means-plus-function term is misplaced.   In *Williamson*, the Federal Circuit held that "the prefix 'distributed learning control' d[id] not impart structure into the term 'module'" because although "portions of the claim d[id] describe certain inputs and outputs at a very high level," the claim did "not describe how the 'distributed learning control module' interacts with other components . . . in a way that might inform the structural character of the limitation-in-question or otherwise impart structure." *Id.* at 1351.   The same is not true here.   The claims of the '506 Patent explain specifically how the "first communication module" interacts with the server and the unique token.   In particular, the first communication module enables transmission of a request to the server that includes the unique token, enabling receipt of a response from the server indicating whether the token is valid.   *Williamson* has no applicability here.

Rather, this case is akin to *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *13 (E.D. Tex. Sept. 19, 2016), which held that the term "transaction processing module" was not a means-plus-function term.   As the court explained:

> The claim explains that the "transaction processing module" performs the "transaction processing" function in the following manner.   The "module" (1) communicates by receiving transaction information, (2) identifies a specific party to the transaction, (3) transmits a request for verification to that party, (3) recognizes the result of that request, (4) determines the authenticity of the request using that result, and (5) appropriately continues with the transaction. This step-wise description of the operation of the "module" forms an algorithm. The algorithm connotes structure.

*Id.*

Similarly, here, the "first communication module" (1) transmits a request for the server to verify the consumer's in-store purchase of goods and services; (2) receives a response from the server indicating whether the unique token is valid; and (3) receives from the server purchase information associated with the unique token.   Those steps explain the "communication" function performed by the "first communication module," thereby connoting sufficient structure to prevent

means-plus-function claiming. Consistent with these facts, it is of no relevance that the specification does not refer to "communication module" by name. While the specification discusses communication broadly, the claims recite a specific set of communications between specific components, and thus describe sufficient structure to avoid means-plus-function construction as held in *St. Isidore Research*.

If the term is found to be expressed as a means-plus-function, H-E-B is incorrect in arguing that it is indefinite. Indeed, H-E-B's assertion that the corresponding structure for the "communication module" cannot be software such as a web API disregards well-established patent law and rests on a fundamental misreading of the claims. An API, as a piece of software, is not purely functional any more than software is purely functional and an API – like software – can provide corresponding structure for a means-plus-function term. *See, e.g.*, *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017) (holding that "the reporting module installed within the CRM software application" was a corresponding structure); *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1342 (Fed. Cir. 2016) ("'In software cases, therefore, algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art.'") (quoting *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007)); *EON Corp. IP Holdings LLC v. AT & T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015) ("[T]he corresponding structure for a function performed by a software algorithm is the algorithm itself."). H-E-B is simply incorrect in asserting that software can *never* be a corresponding means-plus-function structure.

Second, again citing no authority, H-E-B asserts that the disclosure of a web API in the specification is "too scant" because the disclosure "would require one of ordinary skill to build an

entire POS (point-of-sale) system—with absolutely no guidance—to practice the 'first communications module' element." Dkt. No. 54 at 19. But this argument is unsupported. First, an API is a well-understood software element in the field of computer programming. The specification disclosure would instruct a person of ordinary skill in the art that an API could be used to implement the functions. Likewise, a POS would be well-understood by that person, as recognized by the fact that the specification presumes knowledge of POS systems by discussing various uses of POS systems in implementing the claimed inventions. *See, e.g.*, '506 Patent at Fig. 10, 7:46-50, 10:33-38, 13:45-50, 19:41-45, 20:54 – 21:3, 37:20-24, 38:36-41, 38:55-62, 44:15 – 45:38. The specification is replete with discussions of suitable POS systems that would instruct a person of ordinary skill in the art as to how to implement the API.

H-E-B is also incorrect in asserting that the API would not "be capable of undertaking the broad range of 'communications' the patent envisions." Dkt. No. 54 at 19. The API need not perform every communication function recited in the claims, but need only serve as a conduit "*via*" which communications take place. The claim language is clear in this regard:

> transmitting *via* the first communication module a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token;

> receiving *via* the first communication module a response from the server indicating whether the unique token is valid

'506 Patent, Cl. 1 (emphasis added). The claims do not suggest that the first communication module performs *all* necessary communication functions, but only that the first communication module *enables* the communications to occur.

H-E-B then wrongly asserts that "the specification fails to clearly link or associate the API to the three functions recited in the claim." Dkt. No. 54 at 20. As explained in DRA's Opening Brief, the specification makes clear that the API is the conduit for all three communication

functions recited in the claims.  Dkt. No. 53 at 10.  Again, the "first communication module" does not have to perform every communication function recited in the specification or contemplated by the claim.  Rather, the "first communication module" is a component *via* which communication takes place.  The fact that other devices are involved in the communication does not render the term invalid, as the specification makes clear that the conduit functions are provided by the API.

H-E-B's indefiniteness defense concerning "first communication module" fails—"first communication module" is not a means-plus-function term, but even if it is, there is a clearly disclosed associated structure in the specification, meaning the term is definite as a matter of law. *Alfred E. Mann Found. for Scientific Research*, 841 F.3d at 1341.

### F.      "Wirelessly Transmitting Said Unique Token"

H-E-B's "wirelessly transmitting said unique token to a retailer electronic device" arguments are improper on their face as such interpretation would improperly exclude disclosed embodiments from the scope of the claimed invention.  H-E-B states that "[t]he claims of the '781 Patent use 'wireless transmission' only when referring to [the] step of getting the unique token from the consumer's mobile device to the retailer device for verification."  Dkt. No. 54 at 25.  As explained in DRA's Opening Brief, "getting the unique token from the consumer's mobile device to the retailer device" ***explicitly includes scanning codes* in the preferred embodiment**.  Dkt. No. 53 at 11-12.  Nonetheless, H-E-B seeks to artificially exclude such scanning operations from the construction of "wirelessly transmitting," thereby excluding the preferred embodiment from the scope of the claims.  H-E-B's proposed construction is *presumed* incorrect.  *Nobel Biocare Servs.*, 903 F.3d at 1381.

"'[H]ighly persuasive evidentiary support' is required to overcome the presumption against assigning a meaning to a claim term which excludes a preferred embodiment." *Powerbahn, LLC v. Found. Fitness LLC*, No. 1:17-CV-02965-AT, 2019 WL 2323587, at *5 (N.D. Ga. Mar. 12,

2019) (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1253-1254 (Fed. Cir. 2013)).  H-E-B has made no attempt to meet this standard.  H-E-B points to the '506 Patent, a separate patent, which uses "capturing" to refer to the form of wireless communication that includes code scanning.  Dkt. No. 54 at 25.  But this terminology, in the claims of a separate patent, has no bearing on the claims of the '781 Patent at all.  Such a tangential argument certainly cannot overcome the presumption that excluding a preferred embodiment is incorrect.

Nor does H-E-B's meager reliance on the specification overcome the presumption. Tellingly, H-E-B omits the portion of the quote on which it relies explaining that scanning a QR code is "the preferred embodiment."  '781 Patent at 22:22-26 ("Although this step is described in connection with the preferred embodiment wherein the token is in the form of a URL link embedded in a QR code that is displayed to the retailer for capture via scanning . . . . ").  H-E-B's reasoning for this omission is clear: H-E-B hopes the Court will ignore the fact that H-E-B's proposed construction excludes the preferred embodiment and that H-E-B has made no effort to overcome the corresponding strong presumption that its construction is therefore incorrect.

H-E-B then cites a passage from the specification linking scanning with wireless transmission.  Specifically, H-E-B relies on the statement that "wherein the token is in the form of a URL link embedded in a QR code that is displayed to the retailer for capture via scanning, it would be appreciated that this step may take other forms where the unique token is presented via wireless transmission, such as through NFC communications."  Dkt. No. 54 at 26 (emphasis removed, quoting '708 Patent at 23:4-17).  But this statement fails to provide the "highly persuasive evidentiary support" required to overcome the presumption that its position is incorrect for excluding a preferred embodiment from the interpreted claim.  The "other forms" referenced in the specification refer to other forms of "wireless transmission," such as "NFC communications."  On

this reading, scanning and NFC communications are both "forms of wireless transmission," and thus "wirelessly transmitting" in the claims encompasses scanning as described in the preferred embodiment. "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable" disavowal or surrender of claim scope. *Hitachi Maxell, Ltd. v. Top Victory Elecs. (Taiwan) Co. Ltd.*, 143 F. Supp. 3d 485, 493 (E.D. Tex. 2015) (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013)).

H-E-B points to nothing that is clear and unmistakable in the specification that excludes "scanning" as a form of wireless transmission; its proposed construction remains presumptively incorrect and should be rejected.

### G.    Alleged "Printed Matter" Terms

H-E-B makes no attempt to satisfy its burden to prove by clear and convincing evidence that the identified "printed matter" terms render any claim indefinite. Instead, H-E-B faults DRA for not anticipating H-E-B's baseless indefiniteness theories, which were articulated for the first time *after* the deadline for proposing claim constructions, and two days before the Court's deadline for meeting and conferring on claim construction. Dkt. No. 54-7. Because H-E-B has failed to properly articulate its argument in a timely manner – either in its invalidity contentions, its claim construction positions, or its Opening Brief – the Court should disregard these indefiniteness theories out of hand. H-E-B has still failed to explain why *communicated information* is "printed matter" under any cognizable legal theory and its earlier reliance on *Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1031 (Fed. Cir. 2018) is unfounded.

### H.    "Currently Unavailable for Purchase"

H-E-B offers no justification for construing "currently unavailable for purchase" at all, and openly acknowledges that its proposed construction is nothing more than a set of hand-picked

limitations from the specification.   None of the special circumstances that H-E-B claims are exclusively encompassed by "currently unavailable for purchase" even use the term "unavailable," let alone amount to a clear and unmistakable disavowal of claim scope required to depart from the plain and ordinary meaning of the phrase.   As the Federal Circuit has stated, "We do not read limitations from the specification into claims; we do not redefine words.  Only the patentee can do that.  To constitute disclaimer, there must be a clear and unmistakable disclaimer."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).  Further,

> [t]o act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning.  It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term.

*Id.* at 1365 (internal citations omitted).  H-E-B cannot glean a clear and unmistakable intent to redefine "currently unavailable for purchase" from a handful of specification passages that do not even use the term in question.

H-E-B even acknowledges that well-understood cases of "unavailable" exist outside its narrow construction, but offers no reasoning for excluding these aspects of a well-understood term.  Dkt. No. 54 at 28.  H-E-B is once again seeking to avoid infringement by improperly importing claim limitations from the specification.  The Court should disregard H-E-B's invitation to commit such legal error.

I.      **"Transmitting to the Electronic Device the Goods or Services Purchased by the Consumer " and "Displaying on the Electronic Device the Goods or Services Purchased"**

H-E-B has inexplicably chosen to burden the Court with an unfounded argument that various terms in a single dependent claim of the '781 Patent are indefinite.  The lack of support for H-E-B's position is clear from its citation to Star Trek and teleporting bananas.  Dkt. No. 54 at 29.  In any case, H-E-B's argument is self-defeating.  H-E-B acknowledges that the issues it raises

regarding Claim 8 of the '781 Patent are "a classic case of careless draftsmanship during prosecution." Dkt. No. 54 at 29.  But "careless drafting in the prosecution of the patent . . . does not create ambiguity in the meaning of the patent's claims nor demonstrate that a person skilled in the art would be unable to discern its readily understood meaning within the context of the patent." *Vidir Mach. Inc. v. United Fixtures Co.*, 570 F. Supp. 2d 693, 707 (M.D. Pa. 2008).  It is clear from the plain meaning of the claim language what the terms in question are meant to convey and the Court should simply ignore H-E-B's unfounded arguments otherwise.

## II.     CONCLUSION

DRA respectfully requests that the Court adopt DRA's claim construction positions and reject H-E-B's unsupported efforts to inject improper limitations into the claims or argue that any claim terms are invalid as indefinite.

Dated:  November 22, 2019                    Respectfully submitted,

By: */s/Robert R. Brunelli*
    Jeffrey G. Toler
    Texas Bar No. 24011201
    jtoler@tlgiplaw.com
    TOLER LAW GROUP, PC
    8500 Bluffstone Cove
    Suite A201
    Austin, TX 78759
    (512) 327-5515

    Todd P. Blakely (Admitted *pro hac vice*)
    tblakely@sheridanross.com
    Robert R. Brunelli (Admitted *pro hac vice*)
    rbrunelli@sheridanross.com
    Matthew C. Holohan (Admitted *pro hac vice*)
    mholohan@sheridanross.com
    Tara K. Hawkes (Admitted *pro hac vice*)
    thawkes@sheridanross.com
    SHERIDAN ROSS P.C.
    1560 Broadway, Suite 1200
    Denver, CO 80202

Telephone:  303-863-9700
Facsimile   303-863-0223
litigation@sheridanross.com

*Attorneys for Plaintiff Digital Retail Apps, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on November 22, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Robert R. Brunelli*
Robert R. Brunelli