## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

DIGITAL RETAIL APPS, INC.,

               Plaintiff,

   v.

H-E-B, LP,

              Defendant.

Civil Action No. 6:19-cv-00167-ADA

HON. ALAN D. ALBRIGHT

**Jury Trial Demanded**

## DEFENDANT H-E-B, LP'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. DRA Mischaracterizes the Technology Background in an Effort to Improperly Aggrandize the Patents-in-Suit ......................................................................... 1

III. DRA Failed to Identify—or Even Address—the Necessary Level of Ordinary Skill ................................................................................................................... 3

IV. DISPUTED TERMS FROM THE ASSERTED PATENTS ............................. 4

    A.   DRA's Attempt to Recapture Return Activity Abandoned During Prosecution Should Not Be Countenanced. ......................................... 4

    B.   DRA's Construction of "User of the Retailer Device" Would Perversely Have Customers Policing the Accuracy of Their Own Receipts. ......................... 6

    C.   DRA Wholly Ignores *Williamson* and Improperly Suggests Software Can Be "Structure" for the "First Communication Module." ........................ 9

    D.   "Spot-Checking" is Limited to Visual Inspection of the Consumer or Their Purchase Items and Receipt After a Completed Transaction .............................. 13

        1.   "Spot-Checking" Is a Limiting Preamble Term ...................................... 13

        2.   The '506 Patent and Prosecution History Limits "Spot-Checking" to Visual Inspection. ................................................................. 15

        3.   The '506 Patent Limits "Spot-Checking" to Reviews of Completed Transactions. ..................................................................... 17

    E.   "Verifying" is Limited to Confirming There is a Valid Purchase Transaction. ..................................................................................... 19

        1.   "Verifying" is a Limiting Preamble Term. ............................................. 19

        2.   Both Patents Envision "Verifying" Completed Transactions. ................ 20

    F.   DRA Seeks to Expand "Wirelessly Transmitting" to Include Scanning Activities Expressly Carved Out by the Specification. ....................... 22

    G.   DRA Has No Intelligible Response to the Printed Matter Doctrine. ................. 25

    H.   DRA Seeks to Broaden "Currently Unavailable for Purchase" With No Support for Doing So. ......................................................................... 26

    I.   DRA Has No Answer for the Proper Construction of the "Transmitting…" and "Displaying…" Terms Other than Rewriting the Claims. ........................... 27

V.  CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

Page

CASES

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009)...................................................................................11

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002)..............................................................................13, 15

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
  899 F.3d 1291 (Fed. Cir. 2018)....................................................................................9

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)............................................................................13, 14

*ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*,
  566 F.3d 1028 (Fed. Cir. 2009)....................................................................................9

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)..................................................................................11

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)..................................................................................19

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014)..................................................................................28

*In re Lowry*,
  32 F.3d 1579 (Fed. Cir. 1994)....................................................................................25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)......................................................................15, 17, 29

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)......................................................................20, 21, 22

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
  403 F.3d 1364 (Fed. Cir. 2005)....................................................................................3

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012)..................................................................................11

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007)....................................................................................5

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015).................................................................14, 20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...............................................3, 16, 17, 19

*Praxair Distribution, Inc. v. Mallinckrodt Hosp. Prod. IP Ltd.*,
   890 F.3d 1024 (Fed. Cir. 2018).......................................................................26

*Ruckus Wireless, Inc. v. Innovative Wireless Sols.*,
   LLC, 824 F.3d 999 (Fed. Cir. 2016).............................................................28

*Seoul Semiconductor Co. v. Nichia Corp.*,
   596 F. Supp. 2d 1005 (E.D. Tex. 2009) ........................................................3

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015)...........................................................9, 10, 12

## STATUTES

35 U.S.C. § 101 ...............................................................................................25

35 U.S.C. § 285 .................................................................................................4

## OTHER AUTHORITIES

Local Rule CV-5(b) ........................................................................................30

MPEP § 2106.03 (9th ed. Jan. 2018) ............................................................25

MPEP § 2173.05(e) (9th ed., Jan. 2018).......................................................13

## I.      INTRODUCTION

As H-E-B predicted in its opening brief, DRA's overall approach to *Markman* and the specific constructions it has proposed are divorced from Federal Circuit precedent and emphasize ambiguity over clarity.  This brief highlights the problems with DRA's proposals and renews H-E-B's respectful request that the Court adopt H-E-B's constructions.

## II.     DRA MISCHARACTERIZES THE TECHNOLOGY BACKGROUND IN AN EFFORT TO IMPROPERLY AGGRANDIZE THE PATENTS-IN-SUIT

DRA's alleged invention is, at best, an automated receipt checker for loss and theft prevention.

In an effort to aggrandize the patents-in-suit,[1] DRA contends "the two patents relate to in-store self-service transactions," where "a retailer enables a consumer to use a mobile device to purchase goods or services in the retailer's store."  (Dkt. 53 at 1.)  These inflated statements of the alleged invention echo DRA's Complaint, which characterized the inventor as "an internationally known expert in industry disruption," who had the idea that "the next disruptive event in retail sales was likely to be implementation of technologies that help to eliminate checkout lines at brick-and-mortar retail establishments."  (Dkt. 1 at ¶¶ 6-7.)

But the Court should not be fooled.  DRA and its inventor were not the first to foresee a world where retail payments would become automated.  DRA's own patents concede it did not invent the idea of mobile payment, nor did it invent a kiosk or a device to conduct mobile payments.  Col. 2:15-35 (describing "systems that exist in the marketplace").[2]  DRA did not

---

[1] United States Patent No. 9,262,781 (the "'781 Patent") was previously attached as Ex. 1 (DRA0001303).  United States Patent No. 9,934,506 (the "'506 Patent") was previously attached as Ex. 3 (DRA0002389), and its file history was previously attached as Ex. 4 (DRA0001929).  Those patents-in-suit are continuations of United States Patent No. 8,720,771 (the "'771 Patent"), which is attached as Ex. 8 to the Declaration of Joseph Reid, filed herewith.

[2] Because the '506 Patent is a continuation of the '781 Patent, the text of their specifications is identical other than introductory material at the start and the claims at the end.  To simplify

invent the server infrastructure necessary to have point-of-sale terminals communicate with central servers to evaluate transactions, update inventory, or anything else. *Id.*

Rather, as the patents-in-suit themselves explain, because "methods involving visual inspection of a paper receipt" generated by automatic retail transactions "are vulnerable to duplication and falsification and generally slow down the customer's shopping process," they can be replaced by an automatic system that "allows a consumer to proceed with a transaction for goods on demand…in a secure fashion that is acceptable to both the consumer and the retailer." Col. 2:36-45. Put another way, "the invention relates to…paying and verifying the payment of goods and services…wherein a unique coded receipt is generated to verify the valid purchase of goods and services."[3] Col. 1:23-26. Thus, as H-E-B explained on opening, the patents-in-suit seek merely to augment the process already undertaken by the likes of Costco and Best Buy, wherein a living person at the exit reviews a customer's paper receipt to ensure items on the receipt match those in the customer's bag. That alleged "invention" is far narrower than DRA has portrayed it in its papers.

Once one appreciates the purpose of the patents-in-suit, *i.e.*, loss and theft prevention in a world where automatic transactions are already occurring, the parties' disputes over the terms in question come into sharper relief. Specifically, DRA wants to stretch its patents past this limit, in hopes of capturing automatic transactions that have nothing to do with the claimed system.

---

matters for the Court, all specification citations herein will be made to the columns and line numbers found in the '506 Patent.

[3] When issuing the '506 Patent, the examiner noted that he initially "had viewed a number of limitations involving verifications, prompts and communications as mere formalities," but "[t]hese specific steps taken together are not taught or suggested in the prior art, and the specific sequence is a meaningful part of the invention." ('506 File History, Nov. 16, 2017 Notice of Allowance, Ex. 4 at 1948.)

III.   **DRA FAILED TO IDENTIFY—OR EVEN ADDRESS—THE NECESSARY LEVEL OF ORDINARY SKILL**

One consistent problem with DRA's approach to *Markman* is that DRA asks the Court adopt the "plain and ordinary meaning" for terms without specifying what that meaning is. (Dkt. 54 at 1.)  In DRA's opening brief, it took this tactic one step further by failing to identify—or even address—the level of ordinary skill.

Patents are "intended to be read by others of skill in the pertinent art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Moreover, a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Accordingly, the Court does not merely afford claim terms their lay, everyday definition, but rather construes the terms "from the vantage point of a person of ordinary skill in the art." *Id.* "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

The Federal Circuit has found reversible error where the level of ordinary skill in the art to be applied in claim construction is not resolved by the trial court.  *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370–71 (Fed. Cir. 2005) (vacating and remanding "for a detailed analysis of the disputed claim construction" where "the district court provided no analysis of the level of ordinary skill in this art").  Moreover, the tactical advantage from a party failing to take a position on the level of ordinary skill has been recognized as prohibitive.  *Seoul Semiconductor Co. v. Nichia Corp.*, 596 F. Supp. 2d 1005, 1011 (E.D. Tex. 2009) (warning against "the tactical advantage…that result[s] from avoiding disclosure of contentions" and finding that "the complexity and expense of modern commercial litigation make the cost of dilatory tactics and 'trial by ambush' prohibitive").

Here, DRA has scrupulously avoided *any* mention of the level of ordinary skill or how that skill informs the constructions that should be adopted.  Indeed, the phrase "ordinary skill" does not appear anywhere within DRA's opening brief; the word "skill" appears only once, in a parenthetical quote from the Federal Circuit.  (Dkt. 53.)  By refusing to address this issue, DRA has ceded it and the Court should adopt H-E-B's position on the level of skill wholesale.  Moreover, DRA's silence on this critical issue demonstrates the unmoored approach it has taken to claim construction, and is yet another reason the Court should view DRA's proposals with extreme skepticism.

## IV.   DISPUTED TERMS FROM THE ASSERTED PATENTS

### A.   DRA's Attempt to Recapture Return Activity Abandoned During Prosecution Should Not Be Countenanced.

DRA's effort to recapture claim scope abandoned during prosecution has involved a shell game of ever-shifting positions.  To recap, DRA served infringement contentions identifying return activity in H-E-B stores as implicated by the asserted patents.  H-E-B complained about this tactic in a letter drafted under 35 U.S.C. § 285, while simultaneously advancing claim construction positions designed to elevate this issue to the Court for resolution.  DRA then attempted to "concede" that the '506 Patent does not reach returns while maintaining its return allegations under the '781 Patent because the '781 uses "purchase" in lieu of "in-store purchase."

DRA's opening brief repeats this procedural "gotcha" tactic with no discussion of the merits.  (Dkt. 53 at 8.)  Given that H-E-B explained the repeated disclaimer of returns in its opening brief, and did so in relation to the term "purchase," (Dkt. 54 at 8-12), it will not repeat that substantive material here.  Instead, H-E-B will briefly address DRA's incorrect suggestion that, due to DRA's tactical maneuvering, this entire issue should be disregarded "out of hand." (Dkt. 53 at 8.)

Even crediting DRA's incorrect argument that "purchase" and "in-store purchase" are distinct terms and somehow DRA was not on notice, DRA's procedural "gotcha" is wrong as a matter of law.  The *Markman* process is meant to clarify the meaning and scope of the patented invention.  Disclaimers necessarily factor into that process by limiting what a patentee can, and cannot, contend infringes the claims.  But not all disclaimers are tied to individual claim terms and phrases—some are broader than that.  In *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1312 (Fed. Cir. 2007), the Federal Circuit considered whether the district court properly construed claims to require "automatic determination of finishing tooth positions," where that interpretation was not tied to specific language in each claim.  The Federal Circuit concluded that the construction was correct in limiting most of the claims, because requiring "automatic determination of finish tooth positions most naturally aligned with the patent's description of the invention." *Id.* at 1313 (internal quotations omitted).  The court noted that "[a]lthough their claim language does not expressly recite automatic control of the finish tooth positioning, that is what they mean, and that is all that the specification describes." *Id.* at 1316.  Accordingly, the *Ormco* court limited the claims even though no specific term was implicated. *Id.* ("[T]o attribute to the claims a meaning broader than any indicated in the patents and their prosecution history would be to ignore the totality of the facts of the case and exalt slogans over real meaning.").[4]

Here, whether the Court finds the applicant's disavowal of returns is implicated in the meaning of "in-store purchase," "purchase," or no specific claim term at all, that disavowal is still effective and still narrows the scope of both the '506 and '781 Patents.  Put another way, under *Ormco*, DRA cannot recapture expressly disavowed scope merely because such

---

[4] DRA's claim that H E B needed to identify the general disclaimer prior to opening claim construction briefs does not make sense because the disclaimer is not tied to a claim term, and the local rules do not require any such exchange.

disavowals are not tied to a particular word in the claims. H-E-B needs the Court to enforce this limitation on scope and *Markman* is the proper place for such clarification to be made. Accordingly, H-E-B respectfully requests the Court find both the '506 and '781 Patents do not cover returns.

### B.     DRA's Construction of "User of the Retailer Device" Would Perversely Have Customers Policing the Accuracy of Their Own Receipts.

DRA's attempt to broaden the clear scope of "user of the retailer device" to include consumers or retail personnel directly contradicts the claims, specification, and prosecution history, all of which disclose exclusive use of that device by retailer personnel. Further, DRA's proposal to include consumers as "user[s] of the retailer device" produces the nonsensical result in which a customer would be inspecting and approving their own purchase.

As detailed in H-E-B's opening brief, '506 claims 1 and 13 require that the retailer electronic device is "for use ***by a retailer*** to spot-check and verify a consumer's in-store purchase." (Dkt. 54 at 12-13 (emphasis added)); *see also* '506, Cl. 1. Every one of the five references to the retailer electronic device in the common specification shows it being used by retail personnel. First, while explaining Fig. 1, the text defines the "retailer 104" as "the party who sells goods and services ***and who operates the purchase verification on the retailer's electronic device***." Col. 8:58-61 (emphasis added). The final step of Fig. 2 also recites "Show QR code to ***Clerk*** for Tag Removal & Bagging." '506 Fig. 2 (emphasis added). And the specification goes on to describe this step by reciting that, "[a] ***retail associate*** scans the displayed QR code ***with a retailer mobile device***." Col. 16:10-15 (emphasis added). The specification later discloses additional features that may be implemented. One recites tracking consumer interactions with store associates for employee metrics and consumer feedback purposes. Col. 52:59-53:6. This feature includes "a method of identifying retail associates

-6-

*requir[ing] all sales associates* to…have their personal associate QR code displayed on *their retailer device*." Col. 52:59-62 (emphasis added).  Finally, an additional feature is disclosed in which a consumer may forego the self-pay features but still pay with a payment method of their mobile wallet, in which "[t]he *retail associate confirms this selection* of payment method on the POS *or retailer mobile electronic device*." Col. 55:18-22 (emphasis added).

Similarly, all seven specification references to a user of the retailer verification app, which "resid[es] on the retailer's electronic device," Col. 7:58-60, contemplate the user exclusively being a store associate.  To begin, the specification distinguishes between the self-payment system, which includes "a *retailer-facing* verification application," and the "consumer-facing self-payment application."  Col. 7:17-20 (emphasis added).  The preferred embodiment is then described to include verifying the purchase with a QR-coded digital receipt, where "the retailer verification component…may be *used by a live associate* anywhere in-store."  Col. 7:60-65 (emphasis added).  In another embodiment, "the retailer verification application provides visual cues *to the retail associate* if the secure self-payment system cannot retrieve a legitimate data record."  Col. 8:22-26 (emphasis added).  The user of the verification application is again discussed later in the specification while explaining Fig. 12, in which the self-payment method "is used in combination with a verification app *used by the retailer, typically a retail sales associate*, for the purpose of successfully verifying a consumer's purchase."  Col. 46:28-31 (emphasis added).  While discussing Fig. 13, the specification then assumes that purchase verifications are made by retail associates when it suggests that "[o]n subsequent *verification attempts by other retail associates*, the verification app may show the approved screen right away."  Col. 48:31-34 (emphasis added).  The final two references to the user of the verification application on the retailer device are in the specification's discussion of the verification app's

-7-

features.  First, the specification discloses that the retail associate is the user of the app, and therefore the device in question, by asserting that "the retailer verification app is capable of performing an ***associate-assisted in-store payment***."  Col. 48:45-47 (emphasis added).  Then, it continues that "the retailer verification app [is allowed] to be ***used as an aid for the store associate*** when helping a consumer in-store."  Col. 48:58-63 (emphasis added).

Given that every single reference in the specification identifies retail personnel as the user of the retail device, DRA cannot—and has not—offered even a single example where the converse is true.  (*See generally* Dkt. 53.)  Indeed, DRA's only alleged support for "user" including consumers is not about the "retail device" at all—it actually references the "consumer device," a wholly distinct apparatus.  Specifically, DRA points to language in the abstract that recites "various embodiments for systems and methods for self-payment and verification of the purchase of retail goods and services," and the start of the detailed description which recites "the self-payment systems and methods described herein give the consumer control over where and when payment is performed."  (Dkt. 53 at 7.)  But neither of these citations is relevant to the "user of the retailer device," because the specification immediately distinguishes that "the consumer conducts the payment transaction at his or her leisure using a self-payment consumer application ***installed on the consumers' own personal mobile device***."  Col. 7:32-35 (emphasis added).  While it is no surprise a consumer uses the consumer device, the term at issue here is the retailer device, the user of which is only retailer personnel.

The fallacy underlying DRA's proposed construction is further demonstrated by the way its result would fundamentally undermine the theft and loss prevention purposes of the patents.  Under DRA's interpretation, after completing self-payment, a consumer would use the store's retail device to inspect and approve the customer's own purchase.  That means the customer

would be the one checking to see if the customer is stealing.  This is the electronic equivalent of Costco leaving a highlighter at the exit for each customer to mark off their own receipt.

DRA's proposal contradicts the plain language of the claims and specification.  *ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1034 (Fed. Cir. 2009) ("We generally do not construe claim language to be inconsistent with the clear language of the specification; usually, it is dispositive." (quotations and citations omitted)).  DRA's proposal also ignores their disclaimer of this very scope during prosecution, (Dkt. 54 at 21-22), and completely undermines the alleged purpose of the invention.  Accordingly, it should not be adopted, and H-E-B requests that the Court instead adopt its proposal for "user of the retailer device."

### C. DRA Wholly Ignores *Williamson* and Improperly Suggests Software Can Be "Structure" for the "First Communication Module."

DRA's approach to the "first communication module" term is remarkable in its wholesale effort to avoid controlling law and to advocate for its proposed construction from a false premise.

In its discussion of "first communication module," DRA wholly eschews ***any*** mention of the Federal Circuit's *Williamson* opinion or the issue of nonce words in functional claiming. (*See generally* Dkt. 53 (lacking any citation to *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), or any discussion of its holding).)  Indeed, DRA actively misstates the law by citing *Diebold* for the proposition that "module" should be treated as structural term because it avoids the word "means"; *Diebold* is itself a *Williamson* case that applies means-plus-function treatment to a non-means nonce word "unit."  *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1297-98 (Fed. Cir. 2018).  While DRA would prefer to pretend *Williamson* does not exist[5], DRA's omission of the required nonce-word analysis is particularly egregious here:

---

[5] DRA suggests the modifier "first communication" provides structural support to "module," (Dkt. 53 at 9-10), but this exact argument was rejected in *Williamson*, as H-E-B explained in its opening brief.  (Dkt. 54 at 16.)

*Williamson* not only clarified the law by recognizing the role of so-called "nonce" words to accomplish functional claiming, the very nonce word at issue in *Williamson* was "module," ***the same as it is here***.  *Compare Williamson*, 792 F.3d at 1350-51 ("Here, the word 'module'…sets forth the same black box recitation of structure…as if the term 'means' had been used."), *with* '506 Cl. 13.  DRA's complete failure to address the correct case law ought to be fatal.  Even if DRA had a good faith belief the nonce word "module" did not require means-plus-function treatment, it owed the Court the candor of acknowledging *Williamson* and an explanation of why the presumption was not rebutted here.

Moving to substance, H-E-B has already explained at length why "first communication module" term ought to receive means-plus-function treatment.  (Dkt. 54 at 16-18.)  Given that DRA has no response other than its conclusory assertion about the presumption applied to terms lacking the word "means," H-E-B will not repeat its opening brief here.  Instead, H-E-B will address the general and the specific problems plaguing DRA's argument that the web API is sufficient structure to overcome indefiniteness.

To begin, DRA's entire approach to this element hinges on software.  Every single argument DRA makes in its opening brief solely identifies "the web API"—rather than any structure(s) running the web API or specific algorithms included in the web API—as the structure for this claim.  (Dkt. 53 at 9 ("[T]he term 'communication module' is a definite structure in the context of the '506 Patent, because…the term 'module' refers to software and thus 'communication module' recites software related to communication."), 10 ("[I]f the Court determines that this term is a means-plus-function term….the functions identified by H-E-B are performed by 'the service provider's web API.'").)

This entire line of reasoning begins from a false premise, since software, standing alone, **cannot** denote structure.  The Federal Circuit has made it abundantly plain that, when it comes to software means-plus-function claims, one must identify **how** the software performs the functions by disclosing an algorithm in order to provide sufficient structural specificity.  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) ("It is well settled that [s]imply disclosing software, however, without providing some detail about the means to accomplish the function[,] is not enough." (quotations omitted)); *see also Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (distinguishing between software means plus function claims in which no algorithm is disclosed, which are indefinite, and claims in which an algorithm is disclosed); *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1313 (Fed. Cir. 2009) (finding a means plus function claim to be indefinite because the specification language simply described the function to be performed without explaining how the function was to be performed).

Here, DRA has no such algorithm or other support for its software.  H-E-B explained on opening why the specification's generic references to "the web API" did not provide sufficient clarity regarding **how** the software would operate.  (Dkt. 54 at 18-20.)  Proving H-E-B's point, DRA does not identify any algorithm or other specific instructions that address each of the required functions.  (*See generally* Dkt. 53.)

Lacking any algorithm, DRA resorts to mischaracterizing the functions in the claims themselves to fit the web API.  For example, the first enumerated function of the "first communication module" is "**transmitting** a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token."  Yet, in its brief, the only specification language to which DRA points discusses how the web API **receives** this

request.  *Compare* Col. 26:43-49 ("Once the retailer's device captures the QR code, it ***sends a*** ***request to the service provider web API*** to determine whether the QR code is valid."), *with* '506 Cl. 13 ("***transmitting*** a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token").  Transmitting and receiving are clearly two different functions, so DRA's lone citation is wholly insufficient.

As with the first function, DRA mischaracterizes the second and third functions, "receiving a response from the server indicating whether the unique token is valid" and "receiving from the server purchase information associated with the unique token."  In both instances, while DRA contends these functions are performed by the web API, the web API exists on the server at the opposite end of these functions.  For example, DRA's alleged support for the second function is "the web API ***interpret[ing]*** the QR code as referring to a valid purchase receipt," wherein the server itself determines whether the unique token is valid rather than ***receiving*** an indication that the token is valid as required.  *See* Col. 26:49-55 (emphasis added).  With respect to the third function of "receiving…the purchase information," DRA's own support discloses that "the web API…may further ***return*** the associated purchase information," to the retailer device, which is the web API ***sending*** the purchase information rather than ***receiving*** it.  *See* Col. 26:49-55 (emphasis added).

As the Court can see, DRA's proposal on "first communication module" is fatally flawed, both legally and factually, in a myriad of ways.  If the Court follows the clear Federal Circuit precedent established by *Williamson*, it should have no choice but to find this module term is a means-plus-function term that lacks sufficient supporting structure.  Accordingly, the Court should adopt H-E-B's proposal and find the claims containing this phrase indefinite.

-12-

### D. "Spot-Checking" is Limited to Visual Inspection of the Consumer or Their Purchase Items and Receipt After a Completed Transaction.

While DRA goes to elaborate lengths to confuse the construction of "spot-checking"—including conflating it with the distinct term "verifying,"[6] and claiming the gerund form of the verb is distinct from the present tense[7]—none of DRA's three arguments is well-founded.

### 1. "Spot-Checking" Is a Limiting Preamble Term.

The preambles of '506 claims 1 and 13 are limiting and therefore require construction. The Federal Circuit has instructed:

> [D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention. Likewise, when the preamble is essential to understand the limitations or terms in the claim body, the preamble limits claim scope.

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

Here, an examination of the claims at issue directly disproves DRA's assertion that "the claimed inventions are thus described completely in the bodies of the independent claims." (Dkt. 53, at 4.)  The body of '506 claim 1 begins with "***the***[8] retailer electronic device receiving

---

[6] DRA conflates "spot-checking" and "verifying" in its opening brief in an effort to bolster its "spot-checking" arguments, but the two terms are not used interchangeably in the claims, specification, or prosecution history.  (Dkt. 54 at 21-23.)

[7] DRA contends for the very first time in its opening brief that "spot-check" and "verify" in '506 Cl. 13 are not before the Court because H-E-B identified the words "spot-check***ing***" and "verify***ing***."  (Dkt. 53 at 3 n.1.)

[8] The Manual of Patent Examining Procedure dictates how the articles "a" and "the" are used in patent claims.  Specifically, the first time a noun is mentioned, the article "a" is used, while thereafter the article "the" or "said" is used to refer back to the antecedent basis.  MPEP § 2173.05(e) (9th ed., Jan. 2018) ("The lack of clarity could arise where a claim refers to "said

from *the* consumer's mobile device prior to *the* consumer exiting the store a unique token that uniquely corresponds to *the* consumer's in-store purchase of goods and services." '506 Cl. 1 (emphasis added).  The second limitation of claim 1 also provides the body's first reference to "*the* server." *Id.* (emphasis added).  These terms make no sense without the preamble of claim 1, which provides antecedent basis for each term.  *Id.* at Preamble ("A computer-implemented method for spot-checking and verifying *a consumer's in-store purchase of goods and services* from a retailer prior to the consumer exiting the store, said *retailer having an electronic device* capable of communicating with *a server* and with *a consumer's mobile device*, the method comprising the following steps:" (emphasis added)).  The preamble should therefore be found limiting, including the verb "spot-checking" which is interposed between these other words and is therefore integral to their structure and meaning.  *Id.* at Preamble; *see Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1023 (Fed. Cir. 2015) (holding preamble limiting where preamble terms "user" and "repetitive motion pacing system" provided antecedent basis for limitations in the body).  Claim 13 follows an analogous claiming convention where the body alone is not structurally complete because it references back to items whose antecedent basis is provided in the preamble.  '506 Cl. 13.

Further, the preambles of claims 1 and 13 are limiting and require construction because DRA relied on the term "spot-check" from the preamble to distinguish the claims over the prior art, as detailed in H-E-B's opening brief.  (Dkt. 54 at 21-22 ("DRA amended to add the introductory phrase, 'upon receiving an indication from the server indicating that the token is valid,' in order to 'make clear that the step of prompting occurs in each spot check.'").)  The

---

lever" or "the lever," where the claim contains no earlier recitation or limitation of a lever...."), *available at* https://mpep.uspto.gov/RDMS/MPEP/e8r9#/e8r9/d0e218320.html.

Federal Circuit has identified that "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Catalina Mktg.*, 289 F.3d at 808.

### 2. The '506 Patent and Prosecution History Limits "Spot-Checking" to Visual Inspection.

DRA's assertion that "spot-checking" is not limited to visual inspection is incorrect because the claims of the '506 patent require store personnel to "inspect" the customer's purchase, the specification defines this inspection to be visual, and the prosecution history makes clear that this step occurs in *every* spot-check. DRA also heavily relies on citations to the "verification process" not requiring visual inspection, even though the specification is clear that "verification" and "spot-checking" are distinct terms that are not interchangeable. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

The '506 patent claims a method and device for "spot-checking and verifying a consumer's in-store purchase" in the preamble, and then provides the steps for doing so in the body of the claims. *See* '506 Cls. 1, 13; (Dkt. 54, at 21-22.) Specifically, after the consumer's purchase is verified,[9] the additional spot checking limitations include "prompting a user of the retailer device for a response indicating *whether the customer's in-store purchase of goods and services have been inspected and approved*," and "transmitting to the server information indicating *that the customer's in-store purchase of goods and services has been inspected and*

---

[9] The claims and specification of the patents-in-suit are clear that "verifying" refers to the steps of receiving a unique token from the consumer to automatically "confirm there is a valid purchase transaction." (Dkt. 54 at 23-24.)

*approved* by the user of the retailer device." '506 Cls. 1, 13 (emphasis added); *see* (Dkt. 54, at 21-22.)

DRA's assertion that visual inspection cannot be required by these claims is directly contradicted by the express disclaimer during prosecution that these steps must occur in each spot check, and that retail personnel is required in performing these steps.  (Dkt. 54, at 21-22.) During prosecution, all proposed claims were rejected as obvious over Carney (US 2012/0280040), because Carney taught that "[a] warning or alert goes to an employee stationed at an exit," to which the employee must respond.  ('506 File History, April 3, 2017 Final Rejection, Ex. 4 at 2006-08.)  DRA amended to add the introductory phrase, "upon receiving an indication from the server indicating that the token is valid," in order to "make clear that the step of prompting occurs in each spot check."  ('506 File History, June 2, 2017 Response After Final Office Action, Ex. 4 at 1995-96.)  Moreover, DRA distinguished its invention from Carney by saying Carney taught that "[n]o interaction by store employees or personnel is required," and, "[i]n fact, Carney explicitly disparages the use of personnel for each spot-check."  (*Id.* at 1961.) Given that retail personnel must "inspect" the customer's purchase, and the claims require transmitting information indicating "that the customer's [purchase] has been inspected," it is unclear how DRA can credibly maintain that visual inspection is not required in each spot-check.

In its opening brief, DRA has attempted to avoid this disclaimer by conflating the terms "spot-checking" and "verifying" and using descriptions of "verifying" to modify "spot-checking."  (Dkt. 53 at 5.)  Such an interpretation is plainly incorrect as it would recapture scope expressly disclaimed during prosecution.  (Dkt. 54 at 21-22.)  Moreover, DRA's approach also ignores that the terms "spot-check" and "verify" are used differently across the patents-in-suit, and that both are used separately in the claims of the '506 patent.  *See Phillips v. AWH Corp.*,

415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").  Tellingly, the '506 patent is a continuation of the common specification that previously led to U.S. Patent No. 8,720,771 (the "'771 patent," Ex. 8) and the '781 patent, both of which use "verifying" in their claims without mentioning "spot-checking" or including additional "spot-checking" limitations.  *Compare* '771 Cl. 1 ("A computer-implemented method for processing and verifying a consumer's in-store self-purchase") *and* '781 Cl. 1 ("A computer-implemented method for verifying the purchase"), *with* '506 Cl. 1 ("A computer-implemented method for spot-checking and verifying a consumer's in-store purchase").

Neither the express disclaimer during '506 prosecution, the distinction between "spot-checking" and "verifying," nor their disparate use across the patent family can be ignored.  Such claim drafting choices are assumed to have meaning and their implications are given weight when the patents are construed.  *See Innova/Pure Water*, 381 F.3d at 1119; *Phillips*, 415 F.3d at 1314.  Accordingly, the Court should adopt H-E-B's proposal for "spot-checking," which properly recognizes the scope of that term in light of the intrinsic record.

> ### 3.    The '506 Patent Limits "Spot-Checking" to Reviews of Completed Transactions.

The claims of the '506 patent require that the "spot-check" be performed after a purchase transaction.  DRA's contention that a completed transaction is not required is nonsensical because without a transaction, there is no unique token to verify, no goods to inspect, and the claims of the patent are not operable.

Independent claims 1 and 13 of the '506 patent each claim "spot-checking…***a consumer's in-store purchase*** of goods and services."  '506 Cl. 1 (emphasis added); *see* '506 Cl. 13.  Likewise, each claim contains a limitation in which the unique token that is verified

"uniquely corresponds to the consumer's in-store purchase of goods and services." '506 Cls. 1,

13.  And, when one considers the expressly-articulated purpose of the alleged invention—loss

and theft prevention—examining the unique token after the transaction is completed is the only

process that makes sense: the time to stop theft is not when the customer is browsing the aisles,

but rather after they have paid and as they are leaving the store.

In light of these clear requirements, DRA's only hope is to resort to mischaracterization.

DRA suggests that embodiment descriptions where a customer is allowed to change or confirm

an order before finalizing payment constitute pre-transaction "spot-checking."  (Dkt. 53 at 6.)

But that argument is belied both by the fact that the specification labels such activity with a

different term ("confirmation"), Col. 15:6-7 ("the consumer is given the opportunity to confirm

the transaction before it is completed"), as well as the fact that such scenarios do not match the

express descriptions of "spot-checking" in the claims and specification.  *Compare* Col. 18:37-40

("The app may give the consumer an option to confirm the item for purchase and to…store it in

an in-app virtual shopping cart"), *with* '506 Cl. 1 ("the retailer device prompting user of the

retailer device for a response indicating whether the customer's in-store purchase of goods and

services have been inspected and approved").  As H-E-B identified in its opening brief,

subsequent claim language requires that a spot-check includes "prompting a user of the retailer

device for a response indicating whether the customer's in-store purchase of goods and services

have been inspected and approved."  (Dkt. 54 at 21.)  The noun "purchase" in that subsequent

limitation identifies that the transaction is already complete.  Similarly, the specification

expressly relates that a "spot-check" is "one in which the retailer physically or visually inspects

the consumer or his or her purchase items and receipt ***after the transaction is conducted***."

Col. 8:8-12 (emphasis added).

H-E-B has articulated the only proposal for "spot-check" that comports with the intrinsic evidence and that is consistent with the purposes of the invention.  The Court should adopt H-E-B's proposed construction and reject the construction advanced by DRA.

**E.      "Verifying" is Limited to Confirming There is a Valid Purchase Transaction.**

As noted above, although "verifying" is a separate and distinct term from "spot-check," DRA has conflated the two terms to give support to its broadened interpretation of "spot-check."  Consequently, DRA's opening brief does not provide any novel or unique arguments with respect to "verifying."  In general, then, H-E-B's responses are analogous to those above and need only be briefly reiterated.

**1.      "Verifying" is a Limiting Preamble Term.**

While "spot-checking" only appears in claims 1 and 13 of the '506 Patent, "verifying" also appears in the preambles of claims 1 and 15 of the '781 Patent.  Given that the limiting nature of the preambles of the '506 Patent are addressed above, H-E-B will only discuss the '781 Patent here.

Claims 1 and 15 of the '781 Patent each use their preambles to introduce and describe terms used later in the body of the claims.  For example, the body of Claim 1 initially recites "receiving a first set of data from ***the*** mobile device," an antecedent basis reference back to the mobile device in the preamble.  '781 Cl. 1 (emphasis added).  Similarly, the claim body goes on to reference "***the*** consumer's purchase of said one or more goods or services," "***the*** retailer," and "***the*** server," all of which are introduced in the preamble.  *Id.* (emphasis added).  Indeed, were it not for the preamble, these terms would fail for lack of antecedent basis.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable").  The preamble should therefore be

found limiting, including the verb "verifying" which is interposed between these other words and is therefore integral to their structure and meaning.  '781 Cl. 1 at Preamble; *see Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1023 (Fed. Cir. 2015).

Claim 15 follows an analogous claiming convention where the body alone is not structurally complete in view of first references to "***the*** mobile device," "***the*** consumer's purchase of ***said*** one or more goods or services," and "***the*** retailer."  '781 Cl. 15 (emphasis added).  Again, the preamble is limiting because it was used to claim these terms.  *Id.* at Preamble ("A system for ***verifying the purchase of goods and services*** between a consumer and ***a retailer***, said consumer having ***a mobile device*** capable of communicating with one or more servers" (emphasis added)).  Accordingly, that preamble should also be deemed limiting and "verifying" must be construed.

### 2.    Both Patents Envision "Verifying" Completed Transactions.

The claims of both patents-in-suit limit the term "verifying" to confirming the unique token is associated with a completed transaction.  DRA has seemingly ignored the language of the claims in asserting otherwise, instead choosing instead to cherry-pick other, out-of-context instances of the word "verify" from the specification as purported support.

The number one guide to the meaning of claim terms is the language of the claims themselves, *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves"), and all four claims at issue here use "verify" consistently.  All four limiting preambles of the independent claims recite that the system or method is for verifying a consumer's purchase of goods and services.  '781 Cls. 1, 15; '506 Cls. 1, 13.  The method steps of '781 claim 1 further require a completed purchase in the recitation "creating in response to an approved request for payment authorization a data record in a database

*representing the consumer's completed purchase* of said one or more goods or services." '781 Cl. 1 (emphasis added).  Claim 1 then uses "verify" in two following limitations to exclusively refer to verifying the unique token that is generated in response to the "completed purchase." The steps first require "transmitting said unique token to the mobile device *for use by the consumer to verify to the retailer the purchase* of said one or more goods or services," *id.* (emphasis added), and then "receiving from the retailer electronic device a request to verify the unique token wirelessly transmitted from the mobile device *in order to confirm the consumer's purchase* of said goods or services," *id.* (emphasis added).

Like '781 claim 1, claim 15 again recites "A system for *verifying the purchase* of goods and services" in its preamble.  '781 Cl. 15 (emphasis added).  The limitations of claim 15 then require a purchase transaction to apply in their recitation "generating *in response to the completed purchase* of said one or more goods or services via the identified payment means *a unique token*."  *Id.* (emphasis added).  The independent claims of the '506 patent are no different—they contain analogous preambles and claim limitations which exclusively use "verify" to refer to a completed purchase.  *Compare* '781 Cl. 1 ("transmitting said unique token to the mobile device for use by the consumer to verify to the retailer the purchase"), *with* '506 Cl. 1 ("transmitting to the server a request to verify the consumer's in-store purchase of goods and services, said request including the unique token") *and* '506 Cl. 13.  Therefore, in every instance of "verify" in the claims of the both patents, the term is used to mean "confirming that there is a valid purchase transaction."

Turning to the common specification, the root "verif" appears in the text 186 times.  *See generally* '506 Patent (searching the text yield 197 instances, 8 of which are in the claims).  In virtually every one of these instances, "verify" or "verifying" is used consistently with the claims

-21-

to mean processing the unique token of a completed transaction.  Conspicuously, then, DRA cites only a single instance of "verifying" as alleged support for its claim construction argument. (Dkt. 53 at 6.)  That lone example, drawn from '506 Figure 2, indicates data is sent to the servers for "verification" in advance of the transaction being completed.  *Id.*  But that is literally the exception that proves the rule.  To begin, it is obviously a rare instance among the nearly 200 uses of the word that DRA could find to support its proposed construction.  Even more tellingly, though, the data being processed at that point in Figure 2 are ***not*** the same data being verified in the claims.  In the claims, the token or QR code is being verified; in Figure 2, the data in question are data about the transaction, *i.e.*, the specific products, their price and number, etc. *Compare* '781 Cl. 1 ("receiving from the retailer electronic device a request to verify the unique token"), *with* Col. 15:22-30.

The Court should not be confused by DRA's misleading citation—when it comes to the act of "verifying" in the claims of both patents-in-suit, the token being verified represents a completed purchase.  Indeed, if a completed purchase were not required, there would be nothing to "verify" since the token is only issued as a result of the transaction being processed. Col. 24:62-66; '781 Cls. 1, 15; '506 Cls. 1, 13.  And, obviously, verifying a non-final transaction would do nothing to serve the patents' stated goals of loss and theft prevention—those terms only have meaning if you are comparing the materials a customer has when exiting the store to what he or she has purchased.  For these reasons, the Court should adopt H-E-B's proposed construction.

### F. DRA Seeks to Expand "Wirelessly Transmitting" to Include Scanning Activities Expressly Carved Out by the Specification.

The parties' dispute over "wirelessly transmitting" stems from DRA's insistence that the term include scanning or reading a barcode or QR code, despite the specification and claims

clearly distinguishing between "scanning" on one hand and "wirelessly transmitting" on another. Once again, DRA has attempted to support this improper broadening by mischaracterizing the common specification.

In the description of Fig. 1, the specification recites that capturing the unique code "can encompass a variety of methods, including ***scanning or reading a code*** containing this information, ***as well as receiving a wireless transmission*** of the information."  Col. 10:16-20 (emphasis added).  When later describing the steps of Fig. 3, the specification reiterates this distinction.  Col. 20:14-22.  Specifically, it recites the preferred embodiment where "the self-payment app displays on each receipt a QR code, which is a graphical representation of the unique token," and distinguishes another embodiment where "the self-payment application makes available the token or URL for capture by the retailer device via wireless data connection, such as NPC."  Col. 20:10-22.  The discussion reiterates the distinction two sentences later. Col. 20:27-30 ("The capture of the token, such as the scanning of the unique QR code ***or transmission of the token via a wireless link***, is performed by the retailer device…." (emphasis added)).  At the final step of Fig. 3, the specification notes that, although the step is described using the preferred embodiment of a QR code "for capture via scanning, it would be appreciated that this step may take ***other forms where the unique token is presented via wireless transmission***, such as through NPC communications."  Col. 23:4-17 (emphasis added).  While discussing Fig. 4, the specification also distinguishes QR code scanning from "an alternative embodiment, [wherein] the consumer's mobile device is brought into proximity of the retailer's device so that the token associated with a purchase transaction ***can be wirelessly transmitted*** to the retailer's device."  Col. 26:22-30 (emphasis added).  Finally, the specification describes using

an "*alternative…to QR codes*, such as NFC communications or other types of *wireless communications*."  Col. 37:56-59 (emphasis added).

Despite the specification's repeated teaching that "wirelessly transmitting" is a distinct act from scanning a QR code, DRA has pushed for "wireless transmission" to be inclusive, without directing the Court to *any* of these discussions in the specification.  Instead, all DRA has done to advocate for its proposal is to suggest that H-E-B's proposed construction would "exclude the preferred embodiment."  (Dkt. 53 at 11-12.)  But that argument fails because the preferred embodiment DRA is addressing is actually contained in the unasserted '771 patent. The '781 Patent asserted here was prosecuted to claim the embodiments that use "wireless transmission" instead of scanning a QR code.  Indeed, "scanning" and "capturing" are never used in the claims of the '781, and QR codes are not mentioned.  *See* '781 at Claims.  Instead, DRA chose to use the term "wirelessly transmitting" exclusively in these claims to gain patent protection for the alternative embodiments unclaimed by the '771.  *Compare* '781 Cls. 1, 7, 9, 10, 15, 22, *with* '771 Cls. 1, 7, 12, 18, 23, 24, 28.

The claims of the earlier '771 patent exclusively claim the preferred embodiment which only includes scanning a QR code.  *See* '771 at Claims.  The claim limitations of '771 independent claims 1 and 12 both recite "receiving from the retailer electronic device a request to validate the QR code optically captured from the screen" and "determining whether the QR code optically captured from the screen of the mobile device is valid."  '771 Cl. 1; '771 Cl. 12. Dependent claim 7 further claims "scanning via the electronic device said QR code displayed on the mobile device," '771 Cl. 7, and dependent claim 23 includes "scanning via the optical input device said QR code, '771 Cl. 23.  Independent claims 24 and 28 then again claim "scanning a QR code displayed on the mobile device."  '771 Cl. 24; '771 Cl. 28.

-24-

It is telling that DRA used consistent claim language in each patent, and that language reflects the two alternative embodiments repeatedly disclosed by the specification.  If DRA had intended "wireless transmission" to include scanning QR codes, they could have simply looked to the language of the '771 for inspiration to so claim.

In sum, while DRA is now trying to artificially broaden the '781 Patent's clear scope, it is doing so by once again ignoring unambiguous, repetitive statements from the intrinsic record. H-E-B's proposed construction follows the exact scope of the specification and keeps DRA from broadening the '781 claims to include activity they chose to not assert against H-E-B from the '771.  Accordingly, H-E-B respectfully requests the Court adopt its proposal for this term.

### G.      DRA Has No Intelligible Response to the Printed Matter Doctrine.

DRA's claim that the printed matter doctrine does not apply to "list of goods and services," "list of goods and services purchased," "time and place of the purchase," and "identity of the consumer who made the purchase"[10] hinges on the idea that each is *communicated* from one component of the claimed system to another."  (Dkt. 53 at 12 (emphasis added).)  In particular, DRA analogizes itself to *In re Lowry*, 32 F.3d 1579 (Fed. Cir. 1994), where the court found printed matter cases inapplicable to machine-readable data structures that were never printed, displayed, or seen by human eyes.

DRA's "communication" argument is a red herring, as transitory signals are not patentable subject matter under 35 U.S.C. § 101.  MPEP § 2106.03 (9th ed. Jan. 2018).  But the overarching problem for DRA is that its argument requires ignoring the fact that these four categories of data are "displayed," and the claims of the '506 Patent expressly require such

---

[10] DRA alleges that these terms are each "a species of 'purchase information' in Claim[] 1," without acknowledging that "purchase information" is never disclosed in claim 1.  (Dkt. 53 at 12; Dkt. 54 at 27 n.7.)  Thus, "the purchase information" in claims 3-5 lacks an antecedent basis, thereby rendering those claims invalid for that additional reason.

display.  '506 Cl. 2; '506 Cl. 18 ("displaying the purchase information").  Indeed, while DRA

has conspicuously omitted the "displaying" steps from '506 claims 2 and 18 in its opening brief,

(Dkt. 53 at 12), it is the displaying of the information, that brings these terms within the ambit of

the printed matter doctrine in the first place.  *Praxair Distribution, Inc. v. Mallinckrodt Hosp.*

*Prod. IP Ltd.*, 890 F.3d 1024, 1032 (Fed. Cir. 2018) ("[w]here the printed matter is not

functionally related to the substrate, the printed matter will not distinguish the invention from the

prior art in terms of patentability." (citation omitted)).

Ultimately, once the Court considers all of the claim language, DRA has no answer for

the printed matter doctrine.  These three terms cannot be given patentable weight as a matter of

law, and H-E-B therefore requests the Court find claims 2-5 and 19-21 of the '506 Patent

invalid.[11]

### H.   DRA Seeks to Broaden "Currently Unavailable for Purchase" With No Support for Doing So.

The term "currently unavailable for purchase" is clear on its face and, as detailed in

H-E-B's opening brief, the proposed construction of "currently out of stock or at high risk of

running out of stock" is taken directly from the specification.  (Dkt. 54 at 28-29.)  DRA's

proposal, on the other hand, contains new language meant to broaden the term without any

support for such additions.

DRA's construction is overbroad, adding the words "for purchase through the app" while

pointing only to a single citation to support such additional scope.  (Dkt. 53 at 13.)  But even

DRA's cited passage—referencing that the self-payment application "permits a consumer to

select the item from a list of available goods or services," Col. 14:46-49—is clarified two

---

[11] H-E-B also reasserts its reservation of right to seek remedies downstream for DRA's continued pursuit of these improper claims.

sentences later.  There, in language DRA did not provide the Court, "availability" is explained to mean that "the app can provide the consumer with various information about the item, such as product availability either in-store or on-line."  Col. 14:55-61.  Thus, this text—the lone support DRA cites—only contemplates availability in-store or on-line, and DRA's assertion the items must be available "for purchase through the app" is unfounded.

When one reads the specification as a whole, "availability" consistently depends on whether an item is in physical stock, without any reference to in-app availability.  While describing the step of using the self-payment app to make a purchase in Fig. 3, the specification explains that "[a]s items are added into the shopping cart, the secure self-payment application sends out a request to the retailer network *to confirm that the retailer carries the item and that it is stock*."  Col. 22:17-20 (emphasis added).  While explaining Fig. 5 the specification dictates that "[s]tore inventory 504 includes data representing the goods and services *available for sale by a retailer*."  Col. 30:8-9 (emphasis added).  The specification then notes that this data is optionally used "to determine *whether an item is in stock*."  Col. 30:17-18 (emphasis added).

Thus, there is absolutely no support that "unavailable for purchase" is limited to purchases through the app as DRA has suggested.  Rather, the app checks the retailer's stock to determine whether an item is available for purchase.  Accordingly, H-E-B respectfully requests the Court adopt its proposal which is drawn directly from the patent itself.

**I.     DRA Has No Answer for the Proper Construction of the "Transmitting…" and "Displaying…" Terms Other than Rewriting the Claims.**

As H-E-B explained on opening, the Court has a choice regarding these two claim terms.

On one hand, the Court could hold DRA to the literal words present in the claims.  After all, as written, the claims are not facially invalid—certain categories of electronic goods, like software programs, plug-ins, and digital files, could all be "displayed on" and/or "transmitted to"

an electronic device.  Such a construction would thus preserve the claims' validity, which is typically preferable under Federal Circuit practice.  *Ruckus Wireless, Inc. v. Innovative Wireless Sols.*, LLC, 824 F.3d 999, 1004 (Fed. Cir. 2016).

On the other hand, the Court could take DRA's allegations, which are being applied against real-world physical goods, and recognize that the claims cannot possibly be read to accomplish what DRA is suggesting.  Unless your name is Mr. Scott, and this is the Starship Enterprise, an apple cannot be transmitted to an electronic device using today's technology.  Accordingly, the claims would be invalid for lack of enablement, lack of written description, and indefiniteness.

What the Court **cannot** do is what DRA is requesting, *i.e.*, to leave the claims as they are presently worded while implicitly adding additional language that is not present.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014).  When DRA suggests the "natural reading" of claim language suggests "the identity of the goods or services is then transmitted and displayed," (Dkt. 53 at 14), it is implicitly acknowledging those words do not appear in the claim as written.  Moreover, as H-E-B has already explained, other claims demonstrate that DRA knew the difference between claiming "information" about goods and services versus "goods and services" themselves.  *Compare* '506 Claim 3 ("wherein the purchase information includes the list of goods and services purchased."), *with* '781 Claim 8 ("transmitting to the electronic device the goods or services purchased by the consumer").  Such differing word choices are assumed to connote different meanings, and DRA has no explanation

here for why that rule should not be applied.[12]  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

## V.    CONCLUSION

For the reasons stated herein and in its opening papers, H-E-B respectfully requests the Court adopt H-E-B's proposed constructions for the disputed terms and phrases from the '781 and '506 patents.


Dated:  November 22, 2019                    Respectfully submitted,


By:    */s/ Joseph P Reid*
       Thomas N. Millikan, *Pro Hac Vice*
       Texas State Bar No. 24105276
       California State Bar No. 234430
       TMillikan@perkinscoie.com
       Joseph P. Reid, *Pro Hac Vice*
       California State Bar No. 211082
       JReid@perkinscoie.com
       PERKINS COIE LLP
       11452 El Camino Real, Suite 300
       San Diego, CA 92130-2080

       Skyler M. Howton
       Texas State Bar No. 24077907
       SHowton@perkinscoie.com
       PERKINS COIE LLP
       500 N. Akard Street, Suite 3300
       Dallas, TX 75201-3307

       ATTORNEYS FOR DEFENDANT
       H-E-B, LP

---

[12] DRA also has the prerogative to seek a certificate of correction from the U.S.P.T.O. if it believes the claims contain an error that should be corrected, *e.g.*, the addition of inadvertently missing words like "information about."  To date, however, DRA has not sought such a correction to H-E-B's knowledge.

-29-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 22, 2019, a true and correct copy of

the foregoing **DEFENDANT H-E-B, LP'S RESPONSIVE CLAIM CONSTRUCTION**

**BRIEF** has been served via the Court's CM/ECF system per Local Rule CV-5(b) on the

following parties:

Todd P. Blakely
tblakely@sheridanross.com
Robert R. Brunelli
rbrunelli@sheridanross.com
Matthew C. Holohan
mholohan@sheridanross.com
Tara K. Hawkes
thawkes@sheridanross.com
SHERIDAN ROSS P.C.

Jeffrey G. Toler
jtoler@tlgiplaw.com
Benjamin R. Johnson
bjohnson@tlgiplaw.com
TOLER LAW GROUP, PC

By: */s/ Joseph P. Reid*
    Joseph P. Reid