# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| DIGITAL RETAIL APPS, INC., <br><br> Plaintiff, <br><br> v. <br><br> H-E-B, LP, <br><br> Defendant. | Civil Action No. 6:19-cv-00167-ADA <br><br> HON. ALAN D. ALBRIGHT <br><br> **Jury Trial Demanded** |

**DEFENDANT H-E-B, LP'S REPLY CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. DISPUTED TERMS FROM THE ASSERTED PATENTS ............................................... 2

    A. DRA Has No Effective Counter to the Express Disavowal of Returns During Prosecution ................................................................................................ 2

    B. DRA's Proposed Construction of "User of the Retailer Device" Actively Ignores the Claim Language to Reach an Overbroad, Self-Serving Result ........... 5

    C. None of DRA's Various Arguments Overcome the Indefiniteness of "First Communication Module" as a Means-Plus-Function Term ................................. 7

    D. DRA's Potshots Do Not Overcome H-E-B's Systematic Analysis of the Intrinsic Evidence Regarding "Spot-Checking." .................................................. 10

    E. DRA Ignores the Fact that "Verify" Appears in the Limiting Phrases of the Claim and Is Narrowly Defined in the Intrinsic Record ...................................... 11

    F. DRA's Argument on "Wirelessly Transmitting" Incorrectly Assumes Every Claim Must Address the Preferred Embodiment ...................................... 12

    G. DRA's Timing Arguments Ring Hollow and Provide No Defense to the Printed Matter Doctrine ....................................................................................... 13

    H. Contrary to Its Protestations Elsewhere, DRA Is the Party Seeking to Add "Through the App" to the Disputed Term "Currently Unavailable for Purchase." ............................................................................................................. 14

    I. DRA Admits It Wants the Court to Implicitly Rewrite the "Transmitting…" and "Displaying…" Terms ................................................... 15

III. CONCLUSION ................................................................................................................... 15

## TABLE OF CONTENTS

Page

**Cases**

*Aug. Tech. Corp. v. Camtek, Ltd.*
  655 F.3d 1278 (Fed. Cir. 2011) .................................................................................................. 12

*Envirotech Corp. v. Al George, Inc.*
  730 F.2d 753 (Fed. Cir. 1984) ..................................................................................................... 6

*In re Distefano*
  808 F.3d 845 (Fed. Cir. 2015) ................................................................................................... 13

*Laitram Corp. v. Morehouse Indus., Inc.*
  143 F.3d 1456 (Fed. Cir. 1998) ................................................................................................... 5

*Lucent Techs., Inc. v. Gateway, Inc.*
  543 F.3d 710 (Fed. Cir. 2008) ..................................................................................................... 9

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995) ....................................................................................................... 6

*Microunity Systems Engineering, Inc. v. Acer, Inc.*
  No. 2:10-CV-91-LED-RSP, 2013 WL 12134146 (E.D. Tex. Mar. 8, 2013) ............................... 4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
  521 F.3d 1351 (Fed. Cir. 2008) ................................................................................................... 1

*Ormco Corp. v. Align Tech., Inc.*
  498 F.3d 1307 (Fed. Cir. 2007) ................................................................................................... 3

*Pacing Techs., LLC v. Garmin Int'l, Inc.*
  778 F.3d 1021 (Fed. Cir. 2015) ................................................................................................. 12

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................................................... 2

*Reckitt Benckiser Inc. v. Watson Labs., Inc.*
  430 F. App'x 871 (Fed. Cir. 2011) .............................................................................................. 4

*Seachange Int'l, Inc. v. C-COR, Inc.*
  413 F.3d 1361 (Fed. Cir. 2005) ................................................................................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................................... 2

*Williamson v. Citrix Online, LLC*
  792 F.3d 1339 (Fed. Cir. 2015) ................................................................................................... 7

I.      INTRODUCTION

Through two rounds of briefing, the parties' sharply divergent approaches to claim construction have yielded radically different results. Plaintiff Digital Retail Apps, Inc.'s ("DRA") responsive brief crystalizes the problem with its approach when it contends that the asserted claims "employ plain language that would readily be understood by lay jurors without formal construction." (Dkt. 55 at 1.)

As Defendant H-E-B, LP ("H-E-B") has explained in its prior rounds of papers, however, DRA's approach usurps the Court's authority to construe the claims, and is fatally flawed as a matter of law. Where there is an actual dispute regarding the proper scope of claim terms, "the court, **not the jury**, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (emphasis added). Moreover, merely deciding a claim term "needs no construction" or has "plain and ordinary meaning" is "inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* Here, although the disputed terms are used in lay parlance, they are not simple, physical structures that have a singular, universally implicit meaning to everyone—H-E-B is not asking the Court to construe a wheel, or a hammer, or a valve. Rather, many of the terms at issue are forms of activity—*e.g.*, "purchase," "verify," "spot-check," "wirelessly transmitting"—the bounds of which are open to varying interpretations.

The need for express constructions here is compounded by DRA's active avoidance of the intrinsic record and its steadfast refusal to define the level of ordinary skill in the art. DRA cannot say one thing to the USPTO about its purported invention and something else to a lay jury. DRA cannot ask for lay construction when a person of ordinary skill in the art sees the term differently. That is why the Federal Circuit has reiterated time and again that intrinsic

evidence—the claims, specification, and file history—is "the most significant source of the legally operative meaning of disputed claim language," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).  Yet, DRA's responsive brief is replete with criticisms of H-E-B's citations to the intrinsic evidence, and in almost every case DRA actively encourages the Court to reject "disclaimer and specification-based arguments" and provide the jury with no construction whatsoever.  (*Compare* Dkt. 55 *generally*, *with id.* at 4.)  DRA only mentions the level of ordinary skill once across 37 collective pages of briefing.  But that lone invocation of ordinary skill rings hollow given DRA's silence elsewhere regarding what that level of skill is.

Ultimately, DRA cannot run from the language of the patents it is asserting.[1]  Words and phrases from the asserted claims are not entitled to just any meaning, or even to their lay meaning to an average juror.  Rather, these disputed terms are entitled to the specific scope that they receive in the context of the intrinsic evidence as viewed by one of ordinary skill.  Those are the proposals H-E-B has advanced, and those are the constructions the Court should adopt.

## II.  DISPUTED TERMS FROM THE ASSERTED PATENTS

### A.  DRA Has No Effective Counter to the Express Disavowal of Returns During Prosecution.

DRA's effort to keep the Court from considering its express disavowal of return activity has now sunk from the "gotcha" gamesmanship in its opening brief, (Dkt. 56 at 4-5), to accusing

---

[1] United States Patent No. 9,262,781 (the "'781 Patent") was previously attached as Ex. 1 (DRA0002336), and its file history was previously attached as Ex. 2 (DRA0001303).  United States Patent No. 9,934,506 (the "'506 Patent") was previously attached as Ex. 3 (DRA0002389), and its file history was previously attached as Ex. 4 (DRA0001929).  Those patents-in-suit are continuations of United States Patent No. 8,720,771 (the "'771 Patent"), which was previously attached as Ex. 8 to the Decl. of Joseph Reid (Dkt. 56-1).

H-E-B of violating the Court's Scheduling Order, (Dkt. 55 at 9.)  What goes unsaid in DRA's papers is that H-E-B expressly raised the returns issue in its § 285 letter on October 23, 2019, *i.e.*, two days **before** the parties' meet and confer deadline and over a week before opening claim construction briefs were due.  (Letter from Tom Millikan to Robert Brunelli, Dkt. 54-7, Ex. 5 at 2-3 (Oct. 23, 2019) (via e-mail); Dkt. 35 at 6.)  During the parties' telephonic meet and confer two days later, H-E-B raised the issue of DRA improperly attempting to include "returns" in its infringement contentions again.  (Dkt. 54 at 8; Decl. of Joseph Reid, Dkt. 54-1 at 2.)  Thus, DRA had over a week of notice before its opening brief that the disavowal of "returns" was an issue, then 21 more days to address returns in its responsive brief.  It is unclear why 30 days was insufficient for DRA to form a position on the claim construction implications of such a major event in the asserted patents' prosecution history.[2]

Turning to substance, the intrinsic record shows the applicant did make a clear and purposeful disavowal of scope with respect to return activity during the prosecution of both patents-in-suit.  (Dkt. 54 at 9-11.)  As H-E-B detailed in its opening brief, the claims were denied over prior art that taught each limitation with respect to returns.  (Dkt. 54 at 9.)  The applicant distinguished that prior art by indicating the claimed invention addressed verification in connection with an original purchase—not a return.  (Dkt. 54 at 9-11.)

Neither of DRA's counterarguments undo this unambiguous disavowal of scope.  First, although DRA makes much of the fact that the applicant cancelled the claims to which the return-implicating prior art was directed, that cancellation was made as part of the disavowal and

---

[2] As H-E-B explained in its responsive brief, the Federal Circuit has held that a general disclaimer of scope need not be tied to an individual claim term or phrase at all.  (Dkt. 54 at 5-6 (discussing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1312-16 (Fed. Cir. 2007)).)  Consequently, whether the applicant's disavowal of "return" activity is considered tied to "purchase," "in-store purchase," or no term at all, that question of scope must be answered.

therefore limited the ensuing claims.  Specifically, the applicant argued that the broad, cancelled claims regarding the retailer device receiving the unique token and transmitting it to the server "address verification…in connection with an original purchase," distinguishing the prior art's returns.  ('781 File History, Aug. 13, 2015 Amendment and Response to the Non-Final Office Action, Ex. 2 at 1380-81.)  Moreover, the allowed independent claims each include the very same verification steps from cancelled claim 30 that the applicant argued were connected to an original purchase.  *Compare* ('781 File History, Feb. 25, 2014 Transmittal of New Application, Ex. 2 at 1898-99), *with* '781 Cls. 1, 15.  Accordingly, the cancellation of certain claims and substitution of new ones was all part-and-parcel of the same traversal.  In such instances, cancelled claims and arguments made by applicants regarding cancelled claims are entirely relevant to the scope of the issued claims.  *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005).

For example, in *Reckitt Benckiser Inc. v. Watson Labs., Inc.*, 430 F. App'x 871, 876 (Fed. Cir. 2011), "applicants disavowed claim coverage of sustained release tablets by cancelling original claims 1–11 and remarking to the examiner that original claims 1–11 were directed to a sustained release formulation." *Id.* (citations and quotations omitted).  The Federal Circuit held that, "[t]he unmistakable effect of that disavowal, evident from the applicants' remarks distinguishing the prior art, was to limit the remaining claims," and that "[t]he file history thus demonstrates a 'clear and unambiguous' prosecution disclaimer." *Id.*  Accordingly, DRA's corresponding disclaimer of return activity here similarly limits the claims that were ultimately adopted and issued.[3]

---

[3] DRA's citation to *Microunity Systems Engineering, Inc. v. Acer, Inc.*, No. 2:10-CV-91-LED-RSP, 2013 WL 12134146, at *17 (E.D. Tex. Mar. 8, 2013) is a red herring.  There, the court's

DRA's argument concerning the examiner's statement of allowance is equally unavailing. (Dkt. 55 at 10.) "The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction." *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998) (citations and quotations omitted). Rather, applicants are held to their statements limiting claim scope whenever those statements are made. *Seachange*, 413 F.3d at 1372. Here, the applicant expressly and unambiguously told the Patent Office that "scanning a barcode at a POS terminal in connection with a ***return*** and in-store ***adjustment*** to an [sic] ***prior*** purchase is distinguishable from" its invention involving "verification of a unique token in connection with an original purchase for purposes of fraud detection and loss prevention." ('781 File History, Aug. 13, 2015 Amendment and Response to the Non-Final Office Action, Ex. 2 at 1380-81.) Thus, H-E-B is simply asking the Court to hold DRA to the limitations in scope that were made to the Patent Office during prosecution. Such return activity was in the prior art, the applicant disclaimed it, and therefore DRA should not be allowed to recapture it now.

### B. DRA's Proposed Construction of "User of the Retailer Device" Actively Ignores the Claim Language to Reach an Overbroad, Self-Serving Result.

H-E-B's proposed construction of "user of the retailer device" requires that the "user" be "retail personnel" because the intrinsic record ***only*** contemplates retailer personnel using the device. Indeed, H-E-B had meticulously walked the Court through every instance of the specification contemplating the "user of the retailer device," and never once does it imply or disclose that the "user" may be the consumer. (Dkt. 56 at 6-8; *see also* Dkt. 54 at 14.)

---

claim construction holding was not based on the cancelled claims, but on "the context of the specification and the prosecution history as a whole."

Confronted by the unanimity of the intrinsic evidence, DRA's only substantive argument is to claim that, had the applicant intended to limit "user," it would have utilized the term "retailer" instead. (Dkt. 55 at 6-7.) While clever, this argument fails by conflating different concepts. "Retailer," as the patents use that term, connotes the company or corporate entity on whose behalf sales are made, while "user of the retailer device" hones in on the human employees of the retailer who actually perform sales activity. Indeed, the specification makes this same distinction by referring to "retail associates," "sales associates," a "retail sales associate," a "clerk," and a "store associate" as users of the retailer device instead of merely referring to them each as the "retailer." (Dkt. 56 at 6-8.) While "user" is broad enough to mean any or all of these individual retail employees, it does not encompass the "consumer" for all the reasons H-E-B has already articulated. (Dkt. 54 at 12-14; Dkt. 56 at 6-9.)

DRA's only other source of alleged "support" for its proposed construction is its own infringement contentions. (Dkt. 55 at 8.) But relying on the plaintiff's contentions for the meaning of the claims would be the ultimate in self-service: the Federal Circuit has always indicated that infringement is a two-step process where the claims are construed ***first*** and ***then*** the properly-construed claims are applied to the accused activity. *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976-77 (Fed. Cir. 1995); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984). DRA cannot use H-E-B's accused systems as the measuring stick for what its claims should mean.

Ultimately, the choice between the parties' competing proposed constructions of "user of the retailer device" should be an easy one—H-E-B has relied on the intrinsic record and the language of the claims themselves, while DRA has yet to explain how or why a retailer would

allow a consumer to confirm his or her own lack of theft.  (*See* Dkt. 53 at 8-9; Dkt. 55 at 6-8.)  Accordingly, H-E-B requests that the Court adopt its construction of "user of the retailer device."

### C. None of DRA's Various Arguments Overcome the Indefiniteness of "First Communication Module" as a Means-Plus-Function Term.

In its first two briefs, H-E-B has consistently and repeatedly explained why "first communication module" is a means-plus-function term, and why it is indefinite.  (Dkt. 54 at 15-20; Dkt. 56 at 9-12.)  While DRA's responsive brief presents a slew of new arguments, none overcome the clear applicability of *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).  Indeed, DRA's effort to avoid *Williamson* has led to increasingly incoherent and internally inconsistent arguments that expose the fallacy of DRA's position on this term.

DRA begins its response by asserting that, while "module" standing alone may be a nonce term, "communication module" is not because the modifier "communication" confers sufficient structure.  (Dkt. 55 at 11.)  Ironically, DRA cites to *Williamson* for that proposition, when *Williamson* itself found a much more detailed modifier, "distributed learning control," was insufficiently structural to save "module" from means-plus-function treatment.  *Compare* (*id.*), *with Williamson*, 792 F.3d at 1351.  H-E-B maintains that "communication" provides far less insight into the structure of a "module" than "distributed learning control," and as such, "communication module" should be construed in means-plus-function format.

Much of the remainder of DRA's arguments regarding "first communication module" center around the three functions expressly identified in the claim, *i.e.*, (1) "transmitting a request for the server to verify the consumer's in-store purchase of goods and services, said request including the unique token," (2) "receiving a response from the server indicating whether the unique token is valid," and (3) "receiving from the server purchase information associated with the unique token." (Dkt. 54 at 15, 20.)  The problem is, with nothing else to point to, DRA

alternatively and inconsistently tries to use these functional statements to satisfy virtually every role with respect to construing "first communication module." This leads to bizarre, circular results like the following:

- DRA claims "first communication module" is itself structural, composed of API software that performs "communications." (Dkt. 53 at 9.)

- Because software requires an "algorithm" to be sufficiently definite, DRA contends the three functional statements above are the "algorithm" performed by the API software. (Dkt. 55 at 12-13.)

- But, because there is no specification support for how those functions are performed, DRA claims the module itself does not do the communicating, it is merely a "conduit" for such communications. (*Id.* at 14-15.)

- But if the module is not actually doing the communicating, then it is not performing the algorithm. If the algorithm does not specify what the module does, then the module is back to lacking specification support and is indefinite.

As if that were not convoluted enough, DRA's invocation of the three functional statements becomes even more tortured when DRA attempts to address what happens if "first communication module" is treated as a means-plus-function limitation. That logic goes like this:

- The first step in construing a means-plus-function element is to identify the functions performed. Those, according to DRA, are the three functional statements reprinted above. (Dkt. 53 at 10-11.)

- The second step is to identify a structure performing the identified functions. DRA says it is the API software. (*Id.* at 10.)

- But software must have an algorithm. DRA says the three functional statements are the algorithm. (Dkt. 55 at 12-13.)

- Thus, according to DRA, the API software performs three functions by following an algorithm consisting of those very same three functions.

As the Court can see, this kind of circular logic cannot withstand even the slightest scrutiny. The reason for DRA's gyrations, however, is the very reason H-E-B has been contending from the start that this limitation is indefinite: there is simply nothing structural here.

Everything is purely functional, and because of that, the term "first communication module" is simply not construable.

DRA's final attempt to rescue "first communication module" involves arguing that a person of ordinary skill in the art ("POSITA") would understand point-of-sale ("POS") systems and API software well enough to implement the three functions without any further guidance. (Dkt. 55 at 13-14.) As noted at the outset of this brief, DRA has *never* identified what level of ordinary skill here is, making it impossible to assess whether and what a POSITA would understand.

But, even more fundamentally, the Federal Circuit has foreclosed the idea that knowledge of a POSITA can be used to overcome a lack of structural disclosure. This issue was front and center in *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 719 (Fed. Cir. 2008), where the patentee was attempting to claim priority to an earlier application to avoid prior art. When the defendant noted that the earlier application lacked any structural disclosure to support the means-plus-function elements at issue, the plaintiff claimed—exactly as DRA is attempting to do here—that a POSITA would know how to implement such structures without any guidance. *Id.* at 718-19. The court rejected that argument, holding that "[t]he understanding of one of skill in the art does not relieve the patentee of the duty to disclose sufficient structure to support means-plus-function claim terms." *Id.* at 719.

Ultimately, the situation regarding "first communication module" is what H-E-B has maintained from the start: under *Williamson*, "first communication module" must receive means-plus-function treatment, and it is indefinite under that framework due to a lack of structural disclosure. (*See* Dkt. 54 at 15-20; Dkt. 56 at 9-12.) Accordingly, the Court should adopt H-E-B's proposal and find the claims containing "first communication module" indefinite.

### D. DRA's Potshots Do Not Overcome H-E-B's Systematic Analysis of the Intrinsic Evidence Regarding "Spot-Checking."

H-E-B has walked the Court systematically through the intrinsic record to show that "spot-checking" is a limiting preamble term, and that the term is limited to a physical or visual inspection by retailer personnel after a completed purchase due to disavowal during prosecution. (Dkt. 54 at 21-23; Dkt. 56 at 13-18.)  While DRA criticizes certain pieces of this analysis, it does so without addressing the term's meaning as used in the claims and without any comparable intrinsic analysis.  (Dkt. 55 at 2-4.)

DRA attempts to sidestep its disavowal requires bootstrapping its argument for "user of the retailer device," *e.g.*, because DRA claims a "user of the retailer device" can be anyone, DRA similarly reasons that the spot-check can be performed by anyone.  (*Id.* at 2-3.)  H-E-B has already explained why DRA's interpretation of "user" is incorrect.  (*See supra* Section II.B.)  But here, too, even a cursory reading of the intrinsic record confirms that DRA's argument is fatally flawed.  While DRA does not provide the Court with the full language of its disclaimer, here is the operative paragraph from the file history:

> [In Carney,] [n]o interaction by store employees or personnel is required.  In fact, Carney *explicitly disparages the use of personnel for each spot-check*:….  Carney makes clear that *store personnel are only involved if a problem or discrepancy is detected* by the automated reader:….  Carney includes absolutely no disclosure regarding the clearing of flags or clearing of alerts.  Again, *this is consistent with Carney's disparagement of the use of personnel*, and Carney's focus on limiting the use of personnel to the greatest extent possible.

('506 File History, June 2, 2017 Response After Final Office Action, Ex. 4 at 1995-98.)  This disclaimer could not be any more clear or unequivocal: the applicant distinguished the invention from Carney based on the idea that the invention uses retail personnel for each spot-check.

Confronted by the plain disclaimer of scope, DRA's only other tactic is to cite a self-checkout embodiment wholly irrelevant to the "spot-checking" claims. (Dkt. 56 at 15-17.) While the self-payment may be performed by a consumer alone, it is the "spot-checking" limitations of "prompting" and "inspection and approval" of that self-payment which require personnel. (Dkt. 56 at 15-17.)

Given that the intrinsic record, including DRA's express disavowal of scope during prosecution, supports H-E-B's proposal for "spot-checking," the Court should adopt that construction, including limiting the phrase to a physical or visual inspection by retailer personnel after a completed purchase.

### E.  DRA Ignores the Fact that "Verify" Appears in the Limiting Phrases of the Claim and Is Narrowly Defined in the Intrinsic Record.

As with "spot-checking," DRA's approach to the term "verifying" is to attack specific citations to the intrinsic record without providing any comparable evidence supporting its own position. Indeed, DRA has actively avoided briefing the substance of this term by ignoring any claim or limitation that includes "verify" instead of "verifying." (*See* Dkt. 55 at 4-6; Dkt. 55 at 5 n.2.)

DRA's unwillingness to address "verify" stems from the fact that the patents-in-suit only use the term one way, *i.e.*, to confirm that there is a valid purchase transaction. (*See* Dkt. 54 at 23-24.) As H-E-B detailed in its responsive brief, the specification overwhelmingly uses "verify," "verifying," or "verification" exactly as that term is used in the claims. (Dkt. 56 at 20-22.) Given that H-E-B's proposal is based in and supported by the intrinsic record and DRA has no substantive response, the Court should adopt H-E-B's proposal for "verifying."

### F. DRA's Argument on "Wirelessly Transmitting" Incorrectly Assumes Every Claim Must Address the Preferred Embodiment.

In advocating for its proposed construction, H-E-B laid out in detail every instance where the intrinsic record distinguishes "wireless transmission" from "scanning" or "reading" a barcode or QR code. (Dkt. 56 at 23-25.) While DRA suggests this approach "excludes the proposed embodiment," that argument is a red herring.

While it is true that a court should not adopt a construction that *completely* excludes a preferred embodiment, the Federal Circuit has instructed that "where the patent describes multiple embodiments, every claim does *not* need to cover every embodiment." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2015) (emphasis added). "This is especially true where…other unasserted claims in the parent patent cover the excluded embodiments." *Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011).

Here, the preferred embodiment DRA is complaining about being excluded is actually covered by other claims in this very same patent family that do not contain the "wirelessly transmitting" phrase. (Dkt. 56 at 24.) For example, the claims of the unasserted '771 patent are exclusively directed to the preferred embodiment wherein a QR code is "optically captured from the screen of the mobile device." '771 Patent, Ex. 8, Cls. 1, 7, 12, 18, 23, 24, 28. Thus, for the '781 claims at issue here, those that include the phrase "wirelessly transmitting," excluding scanning of a QR and barcode is wholly appropriate if supported by the intrinsic evidence.

In its previous briefs, H-E-B has detailed how the specification expressly distinguishes between "wirelessly transmitting" on one hand and "scanning" on the other. (Dkt. 54 at 25-26; Dkt. 56 at 23-24.) DRA has no response to that evidence, and therefore DRA's attempts to conflate "scanning" and "wireless transmission" to broaden the claims of the '781 patent should be rejected.

### G. DRA's Timing Arguments Ring Hollow and Provide No Defense to the Printed Matter Doctrine.

DRA's only defense to the printed matter doctrine is based on timing, *i.e.*, DRA suggests it was incapable of addressing the doctrine in its responsive brief. (Dkt. 55 at 17.) But again, as with "returns," DRA tacitly admits that H-E-B disclosed this theory in the § 285 letter sent prior to the parties' meet and confer. (*Id.*; *see* Letter from Tom Millikan to Robert Brunelli, Dkt. 54-7, Ex. 5 at 4-5 (Oct. 23, 2019) (via e-mail).) Moreover, that discussion occurred 30 days prior to responsive briefs, so it is wholly unclear why DRA has been incapable of developing a position during that time.

DRA claims not to understand why "communicated information is 'printed matter' under any cognizable legal theory." (Dkt. 55 at 17.) But that question has been squarely addressed in the Federal Circuit's cases addressing the doctrine, which have explained that "[t]he common thread amongst all of these cases is that printed matter must be matter claimed for what it communicates." *In re Distefano*, 808 F.3d 845, 850 (Fed. Cir. 2015). As H-E-B has detailed, the identified printed matter terms are information that is merely displayed on a screen, which is not entitled to patentable weight. (Dkt. 56 at 25-26.) H-E-B has also noted how '506 claims 3-5 are alternatively invalid for lacking antecedent basis, (Dkt. 54 at 27 n.7), a theory DRA has also refused to address and to which it has therefore waived any response. Given the complete lack of any rebuttal, the Court should adopt H-E-B's proposal and find these terms indefinite.[4]

---

[4] H-E-B also reasserts its reservation of right to seek remedies downstream for DRA's continued pursuit of these improper claims.

### H. Contrary to Its Protestations Elsewhere, DRA Is the Party Seeking to Add "Through the App" to the Disputed Term "Currently Unavailable for Purchase."

DRA's proposed construction of "currently unavailable for purchase" seeks to impermissibly broaden the term to expand DRA's infringement contentions. DRA is arguing that the Court should construe "currently unavailable for purchase" as "currently unavailable for purchase *through the app*," without citing any evidence in the intrinsic record that actually supports the addition. (Dkt. 53 at 13 (emphasis added).)

The single specification phrase DRA cites does disclose that an app "permits a consumer to select the item from a list of available goods or services," but DRA omits that "available" is defined as "product availability either in-store or on-line" rather than availability through the app. (Dkt. 56 at 26-27.) In its opening brief, H-E-B detailed how the specification and file history contemplate determining whether an item is in stock. (Dkt. 54 at 28-29.) H-E-B also explained that when items are added to one's shopping cart, the intrinsic record teaches that the app confirms "that the retailer carries the item and that it is [sic] stock." (Dkt. 56 at 27.) Further, H-E-B explained that the app looks up items using store inventory, which represents "the goods and services *available* for sale by a retailer" and is used to "determine whether an item is in stock." (*Id.* (emphasis added).) None of these scenarios concern whether the items are available through the app, but rather whether they are in physical inventory, as H-E-B's proposed construction acknowledges.

The lack of any support for DRA's addition of "through the app" should be fatal. Accordingly, the Court should adopt H-E-B's proposal for this term, as it is the only construction supported by the intrinsic record.

### I.      DRA Admits It Wants the Court to Implicitly Rewrite the "Transmitting…" and "Displaying…" Terms.

When DRA argues that, "[i]t is clear from the plain meaning of the claim language what the terms in question are ***meant to convey***," it is an implicit admission that the "transmitting…" and "displaying…" terms do not explicitly say what DRA wants. (Dkt. 55 at 19 (emphasis added).) While DRA wishes the claims were "displaying" and "transmitting" information rather than goods and services, the claim language says what it says, and the Court is not empowered or obligated to rewrite the language to suit DRA's infringement case.

As H-E-B has explained across its briefs, the "displaying" and "transmitting" terms are not necessarily invalid and can be interpreted to mean exactly what they say, *i.e.*, that the purchased goods and services are "transmitted to" and "displayed on" the electronic device because they are electronic in nature. (Dkt. 54 at 30; Dkt. 56 at 27-28.) Alternatively, the Court can interpret the terms in light of DRA's allegations and find they are invalid with respect to electronically transmitting or displaying physical goods. (Dkt. 54 at 29-30; Dkt. 56 at 28.)

But the Court cannot do what DRA is asking, *i.e.*, construe the claims to mean something other than what they say. (Dkt. 55 at 18-19.) Accordingly, the Court should adopt H-E-B's proposal and either hold DRA to the clear meaning of their claims as drafted or find the claims indefinite.

### III.     CONCLUSION

For the reasons stated herein and in its opening and responsive papers, H-E-B respectfully requests the Court adopt H-E-B's proposed constructions for the disputed terms and phrases from the '781 and '506 patents.

-16-

Dated: December 6, 2019                Respectfully submitted,


                                                By:  */s/ Joseph P. Reid*
                                                       Thomas N. Millikan, *Pro Hac Vice*
                                                        Texas State Bar No. 24105276
                                                       California State Bar No. 234430
                                                       TMillikan@perkinscoie.com
                                                       Joseph P. Reid, *Pro Hac Vice*
                                                       California State Bar No. 211082
                                                       JReid@perkinscoie.com
                                                       PERKINS COIE LLP
                                                       11452 El Camino Real, Suite 300
                                                       San Diego, CA 92130-2080

                                                       Skyler M. Howton
                                                       Texas State Bar No. 24077907
                                                       SHowton@perkinscoie.com
                                                       PERKINS COIE LLP
                                                       500 N. Akard Street, Suite 3300
                                                       Dallas, TX 75201-3347

                                                       Attorneys for Defendant
                                                       H-E-B, LP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 6, 2019, a true and correct copy of the foregoing **DEFENDANT H-E-B, LP'S REPLY CLAIM CONSTRUCTION BRIEF** has been served via the Court's CM/ECF system per Local Rule CV-5(b) upon the following parties:

Todd P. Blakely
tblakely@sheridanross.com
Robert R. Brunelli
rbrunelli@sheridanross.com
Matthew C. Holohan
mholohan@sheridanross.com
Tara K. Hawkes
thawkes@sheridanross.com
SHERIDAN ROSS P.C.

Jeffrey G. Toler
jtoler@tlgiplaw.com
Benjamin R. Johnson
bjohnson@tlgiplaw.com
TOLER LAW GROUP, PC

By: */s/ Joseph P. Reid*
    Joseph P. Reid